UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE PROPERTY & CASUALTY INSURANCE
COMPANY,
ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,
ALLSTATE VEHICLE & PROPERTY INSURANCE COMPANY, AND
NORTHBROOK INDEMNITY COMPANY,

C.A. No.

Plaintiffs,

vs.

ANDREY ANIKEYEV,
ELLINA MATSKINA, L.AC.,
KARINA KOLOMIYTSEVA, L.AC.,
NATALYA KORNILOVA, L.AC.,
OKSANA LENDEL, L.AC.,
YURY TSUKANOV, L.AC.,
ADA KULAGINA, L.AC.
VALENTINA ANIKEYEVA, L.AC.,
ROMAN SHIMUNOV, L.AC.,
ILONA SHOSHANA ABITBOL, L.AC.,
DIMITRY ZAPOLSKY, L.AC.,
IGOR SHKAPENYUK, L.AC.,
NELLYA RAZZAKOVA, L.AC.,
LYUBOV KONDRANINA, L.AC.,
BAY NEEDLE CARE, ACUPUNCTURE P.C.,
KARINA K. ACUPUNCTURE P.C.,
HEALTHY WAY ACUPUNCTURE P.C.,
ALPHA ACUPUNCTURE P.C.,
LOTUS ACUPUNCTURE P.C.,
SUNRISE ACUPUNCTURE P.C.,
EASY CARE ACUPUNCTURE P.C.,

1

SHIROM ACUPUNCTURE P.C.,
URBAN WELL ACUPUNCTURE P.C.,
ACUPUNCTURE APPROACH, P.C.,
SML ACUPUNCTURE P.C.,
BRONX ACUPUNCTURE THERAPY P.C.,
TC ACUPUNCTURE P.C.,
ACUHEALTH ACUPUNCTURE P.C.,
NR ACUPUNCTURE P.C.,
SILVER LOTUS ACUPUNCTURE P.C., AND
NEW CENTURY ACUPUNCTURE P.C.,

Defendants.

-------------------------------------------------------------------------------X

## COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Vehicle & Property Insurance Company, and Northbrook Indemnity Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

## I.   INTRODUCTION

1.    Allstate has been purposely and systematically defrauded by the actions of several acupuncturists, numerous professional acupuncture service corporations, and an individual who does not hold, and has never held, a license to provide professional healthcare services—Andrey Anikeyev ("Anikeyev").

2.    As part of this scheme to defraud, Anikeyev conspired with several licensed acupuncturists to provide Anikeyev with secret—and unlawful—control over a series of professional service entities, each of which had been organized to provide licensed acupuncture services.

2

3.     Anikeyev orchestrated this scheme by recruiting licensed acupuncturists for participation, and by using these acupuncturists' names and professional credentials to organize several professional service corporations.

4.     In exchange for compensation, the acupuncturists agreed to represent in public corporate filings that they were an officer, director, and shareholder of one or more of the professional service entities involved in this scheme.  None of the filings made in connection with these entities disclose Anikeyev's involvement with the companies.

5.     Specifically, Anikeyev purposely and knowingly conspired with licensed acupuncturists, Ellina Matskina, L.Ac. ("Matskina"), Karina Kolomiytseva, L.Ac. ("Kolomiytseva"), Natalya Kornilova, L.Ac. ("Kornilova"), Oksana Lendel, L.Ac. ("Lendel"), Yury Tsukanov, L.Ac. ("Tsukanov"), Ada Kulagina, L.Ac. ("Kulagina"), Valentina Anikeyeva, L.Ac. ("Anikeyeva"), Roman Shimunov, L.Ac. ("Shimunov"), Ilona Shoshana Abitbol, L.Ac. ("Abitbol"), Dimitry Zapolsky, L.Ac. ("Zapolsky"), Igor Shkapenyuk, L.Ac. ("Shkapenyuk"), Nellya Razzakova, L.Ac. ("Razzakova"), and Lyubov Kondranina, L.Ac. ("Kondranina") (collectively, the "Nominal Owner Defendants" and/or "Nominal Owners"), to facilitate the unlawful operation and control of Bay Needle Care, Acupuncture P.C. ("Bay Needle"), Karina K. Acupuncture P.C. ("Karina K."), Healthy Way Acupuncture P.C. ("Healthy Way"), Alpha Acupuncture P.C. ("Alpha"), Lotus Acupuncture P.C. ("Lotus"), Sunrise Acupuncture P.C. ("Sunrise"), Easy Care Acupuncture P.C. ("Easy Care"), Shirom Acupuncture P.C. ("Shirom"), Urban Well Acupuncture P.C. ("Urban Well"), Acupuncture Approach, P.C. ("Approach"), SML Acupuncture P.C. ("SML"), Bronx Acupuncture Therapy P.C. ("Bronx Therapy"), TC Acupuncture P.C. ("TC"), Acuhealth Acupuncture P.C. ("Acuhealth"), NR Acupuncture P.C.

("NR"), Silver Lotus Acupuncture P.C. ("Silver Lotus"), and New Century Acupuncture P.C. ("New Century") (collectively, the "PC Defendants").

6.      Throughout the course of this scheme, Anikeyev and the Nominal Owners purposely and knowingly caused the PC Defendants to be operated and controlled in direct violation of New York law.

7.      In doing so, these defendants repeatedly and intentionally defrauded Allstate by demanding payment from Allstate for acupuncture services that were not lawfully compensable.

8.      Even though the Nominal Owners were held out to the public as the only officers, directors, and shareholders of the respective PC Defendants, Anikeyev always managed and controlled the PC Defendants despite having no lawful authorization to do so.

9.      In reality, the Nominal Owners never exercised any meaningful ownership or control over the PC Defendants.  At most, the nominal owners were Anikeyev's employees.

10.     Anikeyev also caused the PC Defendants to enter into service agreements, such as billing and collection agreements, with one or more company owned by Anikeyev. These agreements were illusory and were designed to (a) give Anikeyev control over the PC Defendants and their finances, and (b) create the outward—but false—appearance that Anikeyev, Anikeyev's company(ies), and the Nominal Owners maintained legitimate, arm's-length business relationships with respect to the PC Defendants.

11.     Anikeyev also caused the PC Defendants to enter into certain kickback/referral arrangements with unlawfully-operated No-Fault medical clinics. These agreements ensured Anikeyev a steady flow of patients to the PCs under his control.

12.     To conceal this scheme and ensure its continued viability, Anikeyev recruited several additional acupuncturists to incorporate new entities—each providing the New York

State Department of Education with a different name, owner, taxpayer identification number ("TIN"), and address. Organizing and operating the PC Defendants in this manner allowed Anikeyev to carry out this scheme without detection.

13.     Anikeyev and his cohorts acted in furtherance of this scheme until Anikeyev was indicted and arrested on federal healthcare fraud charges. *See* Superseding Information, *United States v. Zemlyansky, et al.*, 1:12-cr-00171 (JPO) (S.D.N.Y. 2012), annexed hereto at Exhibit 1. In pleading guilty to these charges, Anikeyev admitted to his unlawful control of several acupuncturists and the entities falsely registered in their names, a group which includes some of the above-captioned defendants. *See* Transcript of Anikeyev's Allocution, *United States v. Zemlyansky, et al.*, 1:12-cr-00171 (JPO) (S.D.N.Y. 2012) annexed hereto at Exhibit 2.

14.     In addition to the unlawful operation and control of the PC Defendants, the defendants also created and mailed to Allstate treatment records and payment demands relative to acupuncture services there were (a) medically unnecessary, (b) fraudulently reported, and/or (c) never actually rendered.

15.     As explained below, the PC Defendants were never eligible to seek or receive payments from Allstate because:

(a) The PC Defendants were unlawfully operated, managed, and controlled by Anikeyev, an individual not lawfully authorized to (i) provide acupuncture services, or own, control, and/or (ii) profit from a professional service corporation organized to provide licensed acupuncture services;

(b) The PC Defendants were purposely caused to split their professional fees and profits with Anikeyev;

(c) The PC Defendants were caused to enter into improper patient referral arrangements with one or more healthcare provider;

(d) One or more of the Nominal Owner Defendants failed to engage in the practice of acupuncture through their respective PC Defendant(s);

(e) The PC Defendants falsely billed—and collected payments from—Allstate for acupuncture services that were falsely represented as having been performed by employees or owners of the PC Defendants when in reality, the services were provided by independent contractors whose true identity and employment status was falsified in, or omitted from, the PC Defendants' treatment records and invoices;

(f) The PC Defendants billed Allstate for acupuncture services that were not medically necessary, but that were nonetheless provided pursuant to a pre-determined protocol, which was purposely designed to financially enrich Anikeyev and his confederates at the expense of patient care;

(g) The PC Defendants intentionally and systematically billed Allstate for acupuncture services that were not rendered as represented—and in certain instances were not rendered at all; and

(h) The PC Defendants failed to appear for Examinations Under Oath ("EUOs") reasonably requested and noticed by Allstate, in violation of the No-Fault Regulations.

16.     The defendants' scheme involved the regular and repeated use of U.S Mails to submit to Allstate treatment records and invoices warranting the PC Defendants' eligibility to collect No-Fault benefits under New York law on their patients' behalf.

6

17.     Over the life of this scheme, Allstate reasonably relied on the defendants'
representations regarding the PC Defendants' compliance with New York No-Fault laws, and
their representations regarding the legitimacy, necessity, and compensability of the billed-for
services in making over $5,669,000.00 in payments to the PC Defendants.

18.     By this Complaint, Allstate brings this action against the defendants for: (a)
violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C.
§ 1962(c)-(d); (b) common-law fraud; and (c) unjust enrichment.

19.     This action seeks actual damages of more than $5,669,000.00, representing
payments Allstate was wrongfully induced to make in connection with No-Fault reimbursement
claims submitted by, or on behalf of, the PC Defendants.  The charts annexed at Exhibits 44-60
contain itemized lists of the payments made to the PC Defendants, with each entry providing the
amount, check number, date, and claim information relating to each payment.

20.     Allstate's claim for compensatory damages includes: (a) payments made by
Allstate to the PC Defendants in reliance upon false representations that the PC Defendants were
eligible to receive reimbursement under the New York No-Fault laws; (b) payments made by
Allstate to the defendants in reliance upon the false health care documentation submitted by, or
on behalf of, the PC Defendants; (c) treble damages; (d) statutory interest; (e) costs, including,
but not limited to, the costs of claims handling and the cost of investigation to uncover the
fraudulent scheme executed by the defendants; and (f) attorneys' fees.

21.     This action also seeks a declaration pursuant to 28 U.S.C. § 2201 that the PC
Defendants have no right to receive payment from Allstate for any pending, previously-denied,
and/or future claims for any services purportedly provided to Allstate claimants because: (a) the
defendants intentionally and knowingly submitted false health care documentation (namely, NF-

3 verification forms) representing to Allstate that the PC Defendants were owned and controlled by the Nominal Owner Defendants in accordance with New York law when, in fact, the PC Defendants were owned and/or controlled by Anikeyev and thus have always been ineligible to receive No-Fault benefits; (b) the PC Defendants to engaged in unlawful fee-splitting with one or more non-licensee; (c) the PC Defendants were caused to maintain unlawful financial and referral relationships with other healthcare providers; (d) one or more of the Nominal Owner Defendants failed to practice acupuncture through their respective professional service corporation; (e) certain services provided to Allstate claimants and billed for by the PC Defendants were rendered by independent contractors rather than employees of the PC Defendants; (f) the PC Defendants were caused to bill Allstate for acupuncture services that were excessive and medically unnecessary, and in some cases, never actually rendered at all; (g) the defendants engaged in a pervasive pattern and practice of mailing false health care documentation to Allstate through the U.S. Mail for the purpose of demanding payment from Allstate on claims that the defendants knew were not compensable; and (h) each of the PC Defendants failed to appear for numerous, duly scheduled EUOs, and thus materially breached a condition precedent to coverage, rendering these entities lawfully ineligible to receive reimbursement of No-Fault benefits in connection with specific claims.

22.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

23.     The defendants' scheme was designed to elicit payment of automobile insurance contract proceeds from Allstate to, or for the benefit of, the defendants.

24.     In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the defendants sought—and in many cases obtained—payment for the acupuncture services that were not compensable under New York's No-Fault laws.

25.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

26.     Allstate estimates that the defendants purposely and knowingly submitted hundreds of bills to Allstate on behalf of the PC Defendants for acupuncture services purportedly rendered to persons eligible for insurance coverage under Allstate insurance policies, knowing that none of the bills were compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement.

## II.    **THE PARTIES**

### A.    **PLAINTIFFS**

27.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Vehicle & Property Insurance Company, and Northbrook Indemnity Company are corporations duly organized and existing under the laws of the State of Illinois, each having their principal place of business in Northbrook, Illinois.

28.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Vehicle & Property Insurance Company, and Northbrook Indemnity Company were authorized to conduct business in New York.

**B.**   **DEFENDANTS**

29.   Andrey Anikeyev resides in and is a citizen of the State of New Jersey.

30.   Anikeyev has never been licensed to practice acupuncture in the State of New York.

31.   Ellina Matskina resides in and is a citizen of the State of New York.

32.   Matskina has been a licensed acupuncturist in the State of New York (License No. 002633) since 2003.

33.   Karina Kolomiytseva resides in and is a citizen of the State of New York.

34.   Kolomiytseva has been a licensed acupuncturist in the State of New York (License No. 002674) since 2004.

35.   Natalya Kornilova resides in and is a citizen of the State of New York.

36.   Kornilova has been a licensed acupuncturist in the State of New York (License No. 002605) since 2003.

37.   Oksana Lendel resides in and is a citizen of the State of New York.

38.   Lendel has been a licensed acupuncturist in the State of New York (License No. 002819) since 2004.

39.   Yury Tsukanov resides in and is a citizen of the State of New York.

40.   Tsukanov has been a licensed acupuncturist in the State of New York (License No. 002818) since 2004.

41.   Ada Kulagina resides in and is a citizen of the State of New York.

42.   Kulagina has been a licensed acupuncturist in the State of New York (License No. 002267) since 2002.

43.   Valentina Anikeyeva resides in and is a citizen of the State of New Jersey.

44.     Anikeyeva has been a licensed acupuncturist in the State of New York (License No. 001097) since 1998.

45.     Roman Shimunov resides in and is a citizen of the State of New York.

46.     Shimunov has been a licensed acupuncturist in the State of New York (License No. 002839) since 2004.

47.     Ilona Shoshana Abitbol resides in and is a citizen of the State of New York.

48.     Abitbol has been a licensed acupuncturist in the State of New York (License No. 002837) since 2004.

49.     Dimitry Zapolsky resides in and is a citizen of the State of New York.

50.     Zapolsky has been a licensed acupuncturist in the State of New York (License No. 003694) since 2007.

51.     Igor Shkapenyuk resides in and is a citizen of the State of New York.

52.     Shkapenyuk has been a licensed acupuncturist in the State of New York (License No. 002675) since 2004.

53.     Nellya Razzakova resides in and is a citizen of the State of New York.

54.     Razzakova has been a licensed acupuncturist in the State of New York (License No. 003366) since 2006.

55.     Lyubov Kondranina resides in and is a citizen of the State of New York.

56.     Kondranina has been a licensed acupuncturist in the State of New York (License No. 003752) since 2008.

57.     During the relevant period, Bay Needle was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

58.     Bay Needle maintains its principal place of business in the State of New York.

11

59.     At all relevant times, Matskina was falsely represented to be the sole officer, director, and shareholder of Bay Needle.

60.     During the relevant period, Karina K. was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

61.     Karina K. maintains its principal place of business in the State of New York.

62.     At all relevant times, Kolomiytseva was falsely represented to be the sole officer, director, and shareholder of Karina K.

63.     During the relevant period, Healthy Way was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

64.     Healthy Way maintains its principal place of business in the State of New York.

65.     At its inception, Matskina was falsely represented to be the sole officer, director, and shareholder of Healthy Way.

66.     Then, on or about October 31, 2013, Lendel purportedly joined Healthy Way as an owner, and thereafter Matskina and Lendel were falsely represented to be the only officers, directors, and shareholders of Healthy Way.

67.     During the relevant period, Alpha was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

68.     Alpha maintains its principal place of business in the State of New York.

69.     At all relevant times, Kolomiytseva was falsely represented to be the sole officer, director, and shareholder of Alpha.

70.     During the relevant period, Lotus was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

71.     Lotus maintains its principal place of business in the State of New York.

12

72.     At its inception, Kornilova was falsely represented to be the sole officer, director, and shareholder of Lotus.

73.     Then, on or about October 31, 2013, Lendel purportedly joined Lotus as an owner, and thereafter Kornilova and Lendel were falsely represented to be the only officers, directors, and shareholders of Lotus.

74.     During the relevant period, Sunrise was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

75.     Sunrise maintains its principal place of business in the State of New York.

76.     At all relevant times, Tsukanov was falsely represented to be the sole officer, director, and shareholder of Sunrise.

77.     During the relevant period, Easy Care was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

78.     Easy Care maintains its principal place of business in the State of New York.

79.     At its inception, Kulagina was falsely represented to be the sole officer, director, and shareholder of Easy Care.

80.     Then, on or about June 1, 2013, Anikeyeva purportedly joined Easy Care as an owner, and thereafter Kulagina and Anikeyeva were falsely represented to be the only officers, directors, and shareholders of Easy Care.

81.     During the relevant period, Shirom was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

82.     Shirom maintains its principal place of business in the State of New York.

83.     At all relevant times, Shimunov was falsely represented to be the sole officer, director, and shareholder of Shirom.

84.     During the relevant period, Urban Well was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

85.     Urban Well maintains its principal place of business in the State of New York.

86.     At all relevant times, Abitbol was falsely represented to be the sole officer, director, and shareholder of Urban Well.

87.     During the relevant period, Approach was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

88.     Approach maintains its principal place of business in the State of New York.

89.     At its inception, Zapolsky was falsely represented to be the sole officer, director, and shareholder of Approach.

90.     Then, on or about May 21, 2013, Anikeyeva purportedly joined Approach as an owner, and thereafter Zapolsky and Anikeyeva were falsely represented to be the only officers, directors, and shareholders of Approach.

91.     During the relevant period, SML was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

92.     SML maintains its principal place of business in the State of New York.

93.     At its inception, Kulagina was falsely represented to be the sole officer, director, and shareholder of SML.

94.     Then, on or about June 1, 2013, Anikeyeva purportedly joined SML as an owner, and thereafter Kulagina and Anikeyeva were falsely represented to be the only officers, directors, and shareholders of SML.

95.     During the relevant period, Bronx Therapy was operated as a professional service corporation organized to provide acupuncture services in the State of New York. Bronx

96.     Bronx Therapy maintains its principal place of business in the State of New York.

97.     At all relevant times, Shimunov was falsely represented to be the sole officer, director, and shareholder of Bronx Therapy.

98.     During the relevant period, TC was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

99.     TC maintains its principal place of business in the State of New York.

100.    At all relevant times, Shkapenyuk was falsely represented to be the sole officer, director, and shareholder of TC.

101.    During the relevant period, Acuhealth was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

102.    Acuhealth maintains its principal place of business in the State of New York.

103.    At all relevant times, Kornilova was falsely represented to be the sole officer, director, and shareholder of Acuhealth.

104.    During the relevant period, NR was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

105.    NR maintains its principal place of business in the State of New York.

106.    At all relevant times, Razzakova was falsely represented to be the sole officer, director, and shareholder of NR.

107.    During the relevant period, Silver Lotus was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

108.    Silver Lotus maintains its principal place of business in the State of New York.

109.    At all relevant times, Tsukanov was falsely represented to be the sole officer, director, and shareholder of Silver Lotus.

15

110.     During the relevant period, New Century was operated as a professional service corporation organized to provide acupuncture services in the State of New York.

111.     New Century maintains its principal place of business in the State of New York.

112.     At all relevant times, Kondranina was falsely represented to be the sole officer, director, and shareholder of New Century.

## III.    JURISDICTION AND VENUE

113.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

114.     Supplemental jurisdiction over Allstate's state law claims is proper pursuant to 28 U.S.C. § 1367.

115.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

116.     At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed *infra*.

117.     The defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

118.     Because the allegations and causes of action in this Complaint arise from the defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

16

IV.     **NO-FAULT LAWS AND RELEVANT LICENSING PROVISIONS**

A.      **GENERAL OVERVIEW OF NEW YORK'S NO-FAULT SYSTEM**

119.    Allstate underwrites automobile insurance in the State of New York.

120.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary health care services.

121.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter "No-Fault Benefits") to Allstate claimants.

122.    No-Fault Benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary health care goods and services.

123.    A patient can assign his/her No-Fault benefits to health care service providers.

124.    Pursuant to an executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

125.    NF-3 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

126.    Indeed, pursuant to N.Y. Ins. Law § 403(d), NF-3 forms must be verified by the health care provider subject to the following warning: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

127.    It is a material representation to submit an NF-3 form for treatment, testing, and other services that are: (a) never provided; (b) billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) billed at a greater monetary charge than is permitted by the applicable fee schedule.

128.    Moreover, in terms of the fees charged by health care providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

129.    The Fee Schedule is used by health care providers and insurers to determine the level of reimbursement paid on legitimate claims.

130.    Under Insurance Law § 5102(a)(1), the term "basic economic loss" covers "all necessary expenses incurred for…medical…surgical…physical therapy…[and] any other professional health services."

131.    In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

132.    Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault laws] and the workers' compensation law with respect to the charges for the professional health

18

services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

133.    Providers are prohibited from seeking reimbursement in excess of the charges authorized by the Fee Schedule.  *In re Med. Soc'y of N.Y. v. Serio*, 100 N.Y.2d 854 (N.Y. 2003).

**B.**    **THE PROHIBITION ON NON-PROFESSIONAL OWNERSHIP/CONTROL OF PROFESSIONAL SERVICE CORPORATIONS AND IMPROPER KICKBACK REFERRAL ARRANGEMENTS**

134.    New York law requires that all professional health care corporations be owned and controlled by appropriately licensed health care professionals. *See* N.Y. Bus. Corp. Law §§ 1503, 1507.

135.    Under New York law, a professional corporation may only be owned by individuals who are: (a) licensed to practice the profession in which the corporation is authorized to practice; and (b) engaged in the practice of that profession through the corporation.  *See id.*

136.    Moreover, for a provider of health care services to be eligible to bill for and collect charges from an insurer for health care services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault laws, a professional service corporation is not eligible to bill or collect for services that were rendered by persons who are not direct employees of the professional service corporation, such as independent contractors.

137.    New York's No-Fault laws provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

138.   New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services as individuals.

139.   New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

140.   Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he or she is authorized by law to practice in this state a profession that such corporation is authorized to practice.

141.   Under New York law, licensed health care professionals, such as acupuncturists, are prohibited from sharing fees with unlicensed persons. *See* N.Y. Educ. Law § 6509(9).

142.   Under 8 N.Y.C.R.R. § 29.1(b)(4), a professional licensed pursuant to Title VIII of the Education Law is prohibited from permitting any person to share in fees for professional services, other than a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice the same profession, or a legally authorized trainee practicing under the supervision of a licensed practitioner.

143.   New York law also prohibits licensed health care professionals from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services." 8 N.Y.C.R.R. 29.1(b)(3).

144.    A health care provider is not eligible to receive No-Fault benefits if it pays or receives kickbacks in exchange for patient referrals.

145.    In New York, insurers are not precluded from seeking affirmative recovery against individuals and entities that have violated the above statutes and regulations.

146.    In *State Farm Mutual Insurance Co. v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) and held that health care corporations that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) are not entitled to No-Fault reimbursement.

147.    In the matter of *Metroscan Imaging, P.C. v. GEICO Insurance Co.*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), the court held that an insurer may maintain a cause of action against a fraudulently incorporated health care provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

### C.    CONDITIONS PRECEDENT TO COVERAGE

148.    New York's No-Fault laws provide certain mechanisms for insurers to investigate the circumstances of an automobile accident and to establish that treatment was rendered as it was represented to the carrier and as a result of the accident. These investigative tools are typically referred to as verification requests.

149.    One such verification request available to insurers is the ability to conduct an Examination Under Oath of a health care service provider that was assigned No-Fault benefits by a patient.

150.    The provider's compliance with the insurer's reasonable request for an EUO is also a condition precedent to coverage.

21

151.    The No-Fault laws state, in relevant part:

**Conditions**

Action Against Company. No action shall lie against the [Insurance] Company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this [no-fault] coverage.

\* \* \*

Upon request by the Company, the eligible injured person or that person's assignee or representative shall:

\* \* \*

(b) as may reasonably be required **submit to examinations under oath by any person named by the Company** and subscribe the same; [and]

\* \* \*

(d) provide any other pertinent information that may assist the Company in determining the amount due and payable.

11 N.Y.C.R.R. § 65-1.1. (emphasis added)

152.    11 N.Y.C.R.R. § 65-2.4(c) specifically directs that, as a condition precedent to coverage, the "eligible injured person or that person's assignee or representative shall . . . as may reasonably be required submit to examinations under oath by any person named by the self-insurer and subscribe the same."  *See* 11 N.Y.C.R.R. § 65-2.4(c)(2).

153.    Pursuant to 11 N.Y.C.R.R. § 65-3.5(c), an insurer is "entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested."

154.    New York courts have held that the appearance of an assignee-health care provider is a condition precedent to the insurer's liability on the policy.  *See Stephen Fogel Psychological, P.C. v. Progressive Cas. Ins. Co.*, 35 A.D.3d 720, 722 (N.Y. App. Div. 2d Dept.

22

2006); *Mega Supplies Billing Inc. v. State Farm Fire & Cas. Co.*, 2012 N.Y. Slip Op. 51014(U), *1-2 (N.Y. App. Term 2d Dept. May 14, 2012); *W & Z Acupuncture, P.C. v. Amex Assurance Co.*, 2009 N.Y. Slip Op. 51732(U), *2 (N.Y. App. Term 2d Dept. July 31, 2009), *overruled on other grounds by Alrof, Inc. v. Safeco Nat'l Ins. Co.*, 2013 N.Y. Slip Op. 50458(U), *1-2 (N.Y. App. Tem 2d Dept. Mar. 21, 2013); *Unitrin Advantage Ins. Co. v. Bayshore Physical Therapy, PLLC*, 82 A.D.3d 559, 560 (N.Y. App. Div. 1st Dept. 2011) ("A denial premised on breach of a condition precedent to coverage voids the policy *ab initio*. . . ."), *leave to appeal denied by* 2011 N.Y. Slip Op. 76777 (N.Y.)

155.    The willful failure of a party to submit to an EUO and to supply all relevant material in compliance with the provisions of an insurance policy has been held to constitute a material breach of contract, and to preclude recovery.  *Levy v. Chubb Ins.*, 240 A.D.2d 336, 337 (N.Y. App. Div. 1st Dept. 1997); *Lentini Bros. Moving & Stor. Co. v. N.Y. Prop. Ins. Underwriting Assn.*, 53 N.Y.2d 835, 836-837 (N.Y. 1981); *Evans v. Int'l Ins. Co.*, 168 A.D.2d 374 (N.Y. App. Div. 1st Dept. 1990); *D&R Plaza Jewelry v. Those Lead Underwriters at Bellmarine, S.A.*, 2008 N.Y. Slip Op. 52060(U), *8 (Sup. Ct. Kings Co. Oct. 16, 2008); *Cabe v. Aetna Cas. & Surety Co.*, 153 A.D.2d 653, 654 (N.Y. App. Div. 2d Dept. 1989); *Pizzirusso v. Allstate Ins. Co.*, 143 A.D.2d 340, 341 (N.Y. App. Div. 2d Dept. 1988); *Bulzomi v. N.Y. Cent. Mut. Fire Ins. Co.*, 92 A.D. 2d 878, 878 (1983); *State Farm Mut. Auto. Ins. Co. v. Santiago*, 2008 N.Y. Slip Op. 30365(U), *4-5 (Sup. Ct. N.Y. Co. Jan. 31, 2008).

156.    Courts require a pattern of, or persistent, willful noncooperation or noncompliance to preclude recovery on an insurance policy.  *LeBaron v. Erie Ins. Co.*, 2007 N.Y. Slip Op. 52588(U), *3 (Sup. Ct. Steuben Co. Dec. 12, 2007), *aff'd by* 59 A.D.3d 939 (N.Y. App. Div. 4th Dept. 2009); *D&R Plaza Jewelry*, 2008 N.Y. Slip Op. 52060(U) at *7-8; *N.Y.*

*Craniofacial Care P.C. v. Lumberman's Mut. Cas. Co.*, 3 Misc. 3d 322, 326-327 (N.Y. Civ. Ct. 2004); *Unitrin Advantage Ins. Co. v. Carothers*, 2007 N.Y. Slip Op. 52100U, *3 (Sup Ct. N.Y. Co. Aug. 20, 2007).

157.   Willful noncooperation has been found to exist where there is a pattern of noncompliance for which no reasonable excuse can be offered (*see Argento v. Aetna Cas. & Sur. Co.*, 184 A.D.2d 487, 488 (N.Y. App. Div. 1992)), or where the failure to cooperate is persistent (*304 Meat Corp. v. New York Prop. Ins. Underwriting Assn.*, 188 A.D.2d 382 (N.Y. App. Div. 1992)).  *See Levy*, 240 A.D.2d at 337; *Pryor v. New York Prop. Ins. Underwriting Assn.*, 18 A.D.3d 361, 362 (N.Y. App. Div. 1st Dept. 2005); *D&R Plaza Jewelry*, 2008 N.Y. Slip Op. 52060(U) at *7-8; *LeBaron*, 2007 N.Y. Slip Op. 52588(U) at *3; *Carothers*, 2007 N.Y. Slip Op. 52100U at *3.

158.   While "in the proper circumstances" a party may be given a second chance, courts will not grant a second chance without a party's reasonable excuse for noncompliance, as "insurance companies are 'entitled to obtain, promptly and while the information is still fresh' … relevant information to enable them to decide upon their obligations and protect against false claims."  *See Levy*, 240 A.D.2d at 338 (*citing Williams v. Am. Home Assur. Co.*, 97 A.D.2d 707, 709, *aff'd* 62 N.Y.2d 953 (N.Y. App. Div. 1st Dept. 1983)); *LeBaron*, 2007 N.Y. Slip Op. 52588(U) at *4-5 ("Long delays occasioned by an insured's refusal to timely provide necessary information often makes it difficult for insurers to fully investigate the claim, defeating the very purpose of the insurance policy's cooperation clause.").

## V.      FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.      ANIKEYEV'S CONFESSED CRIMINAL CONDUCT

159.    On or about February 29, 2012, Anikeyev was indicted on federal charges in connection with an elaborate scheme to defraud the New York automobile insurance industry. *See* Criminal Indictment, *United States v. Zemlyansky*, 1:12-cr-00171 (JPO) (S.D.N.Y. 2012), annexed hereto at Exhibit 3.

160.    Anikeyev was charged with conspiracy to commit health care fraud, conspiracy to commit mail fraud, and conspiracy to commit money laundering.

161.    Anikeyev was alleged to be an integral member of a massive health care fraud conspiracy, which involved, among other things, the unlawful operation and control of various professional healthcare service corporations—including acupuncture entities—for the purpose of defrauding Allstate and other No-Fault insurers.

162.    None of the professional healthcare service corporations involved in the scheme were owned, operated, or controlled by a licensed healthcare professional, and none of these entities' patients received legitimate healthcare treatment.

163.    Rather, these unlawfully controlled entities demanded payment for treatments and services that were (a) not medically necessary, (b) not rendered as represented, and/or (c) not rendered at all.

164.     It was alleged that Anikeyev and the other non-licensees in control of these entities received most, if not all, of the professional fees and proceeds generated through each entity's operation.

165.    It was further alleged that certain defendants caused a series of unlawfully owned acupuncture entities to make kickback payments to other healthcare providers and "runners"

25

(i.e., persons who recruited accident victims for treatment with the involved providers) in exchange for patient referrals.

166. Anikeyev, one of the non-licensee controllers, was alleged to have controlled several of these acupuncture entities. *See* the Government's Opposition to the Defendants' Motion for a Bill of Particulars filed in *United States v. Zemlyansky*, 1:12-cr-00171 (JPO) (S.D.N.Y. 2012), attached hereto at Exhibit 4.

167. Anikeyev eventually pleaded guilty to conspiracy to commit health care fraud and mail fraud in violation of 18 U.S.C. § 371. *See* Superseding Information and Transcript of Anikeyev's Allocution, annexed hereto at Exhibits 1-2.

168. In his allocution, Anikeyev admitted that he:

> [a]greed with others to commit health care fraud and mail fraud . . . by submitting bills through mail to various insurance companies for acupuncture services which [he] knew were false . . . . These bills requested payments for health care services for time periods in excess of the actual time period the patient spent with the acupuncturist . . . with the intent to obtain money from various insurance companies which was not rightfully [his].

> *See id.*

169. As part of his plea agreement and subsequent asset forfeiture, certain bank accounts under Anikeyev's control were forfeited, including the accounts of the following PC Defendants: Bay Needle, TC, Acuhealth, and New Century.[1]  *See* Consent Preliminary Order of Forfeiture, annexed hereto at Exhibit 5.

---

[1] Notably, although 21 U.S.C. § 853(n) permits individuals declaring an interest in funds seized by the federal government to file a petition with the court asserting their claim, none of the record owners of Bay Needle, TC, Acuhealth, or New Century made such a claim. *See* Declaration of Publication of Notice of Criminal Forfeiture as to Andrey Anikeyev annexed hereto at Exhibit 6; Final Order of Forfeiture as to Andrey Anikeyev, pp. 3-4, annexed hereto at Exhibit 7.

170.    Anikeyev also admitted that he owned a medical billing company responsible for submitting bills to insurance companies for acupuncture services, and that the bills submitted through his billing company were fraudulent.[2]  *See* Affidavit of Andrey Anikeyev in Support of Motion to Suppress at ¶¶ 1-2, annexed hereto at Exhibit 8; Anikeyev's Memorandum in Aid of Sentencing, p. 13, annexed hereto at Exhibit 9.

**B.    ANIKEYEV'S HISTORY OF DEFRAUDING THE NEW YORK AUTOMOBILE INSURANCE INDUSTRY**

171.    Anikeyev has orchestrated other No-Fault insurance fraud schemes, and such conduct demonstrates Anikeyev's motive, opportunity, and intent to engage in the conduct alleged herein.

172.    Anikeyev's participation in other similar schemes erases any possibility that the bad acts alleged herein were the product of a mistake or accident on the part of Anikeyev and/or his confederates.

173.    For example, Anikeyev has been sued for his unlawful control of several acupuncture professional corporations registered in his wife's (i.e., Valentina Anikeyeva) name.

174.    Several acupuncturists who worked for these Anikeyev-controlled entities testified that: (a) Anikeyev negotiated their salaries; (b) Anikeyev signed their paychecks; (c) Anikeyev supervised the provision of acupuncture; (d) they did not meet the record owner, Anikeyeva, until several years after becoming employed by her; (e) the record owner, Anikeyeva, did not treat any patients through her entities; and (f) Anikeyev instructed them regarding the number of needles to use per patient.

---

[2] Upon information and belief, the billing company referred to by Anikeyev is Sylvan.

27

175.    Notably, the registered owner of the entities could not identify the location of any of the acupuncture professional corporations (≈50) organized under her name, could not recall the timeframe in which the entities were incorporated, could not identify the landlords or rental amounts for any of "her" entities, and could not identify any of "her" entities' employees (≈100).

176.    Anikeyeva referred all organizational and operational questions to Anikeyev, as he was the person most knowledge on these subjects.

177.    During the course of this other scheme, Anikeyev specifically prohibited all employees from disclosing any information about the operation and management of the involved entities.

178.    Employees were reminded that Anikeyeva was the registered owner of the entities, and that Anikeyev was merely a manager that worked for his wife.

179.    With respect to this other scheme, there was "overwhelming evidence" of Anikeyev unlawful control of the entities, thus rendering each entity awfully ineligible to pursue or collection No-Fault benefit payments.

## VI.    ANIKEYEV'S UNLAWFUL OPERATION AND CONTROL OF THE PC DEFENDANTS

180.    Despite the existence of corporate filings naming the Nominal Owners as the sole officers, directors, and shareholders of the respective PC Defendants, Anikeyev—not the nominal owners—controlled the PC Defendants.

181.    To orchestrate this scheme, Anikeyev recruited several licensed acupuncturists, and induced these professional licensees to become, on paper, the sole officer, director, and shareholder of one or more professional service corporation ("PC").    These arrangements

between Anikeyev and the acupuncturists allowed Anikeyev to create, control, and profit from a network of acupuncture PCs.

182.    Once the acupuncture PCs were incorporated, Anikeyev assumed all control over the operation and management of the companies, including handling the day-to-day operation, hiring the treating acupuncturists, setting the treatment protocol, determining how services were to be billed, and controlling the distribution of professional fees and profits generated by each of the acupuncture PCs.

183.    The Nominal Owners never exercised any degree of management or control over the PC Defendants, and thus never were actually the true or sole officers, directors, and shareholders of the PC Defendants.

184.    In reality, several of the Nominal Owners were simply employees of Anikeyev.

185.    Indeed, two or more of the Nominal Owners—including, but not necessarily limited to, Kolomiytseva and Shkapenyuk—were employed by, or on the payroll of, at least one of the prior Anikeyeva-"owned"/Anikeyev-controlled acupuncture PCs.

186.    Moreover, in addition to having no managerial responsibilities with respect to the operation of the PC Defendants, several of the Nominal Owners never provided any professional services through their respective PC Defendant(s), and also never directly supervised the provision of any professional services to patients of their respective acupuncture PCs.

187.    At most, the Nominal Owners were straw owners of the PC Defendants, each having no meaningful ownership or controlling interest in any of the acupuncture PCs.

188.    Indeed, none of the Nominal Owners made any initial capital investment into the PC Defendants; instead, all start-up funds were provided by Anikeyev.

29

189.    Throughout the course of this scheme, Anikeyev used the façade of the PC Defendants to do indirectly what he is legally prohibited from doing directly, namely: (a) employing acupuncturists, (b) controlling their practices, and (c) deriving economic benefit from their services.

190.    At Anikeyev's direction, the PC Defendants operated not from fixed locations, but through a network of multi-disciplinary medical facilities located throughout the New York metropolitan area ("No-Fault Medical Mills"), each of which were controlled by non-professionals.

191.    While these No-Fault Medical Mills were organized as ostensibly legitimate multi-disciplinary treatment centers, their sole purpose was to bill insurers for as much treatment as possible, which was accomplished through the use of fraudulent, pre-determined treatment protocols specifically designed to financially benefit the non-licensee owners rather than actually treat the patients' conditions.

192.    The PC Defendants gained access to patients of these No-Fault Medical Mills by paying kickbacks and/or referral fees (often disguised as "rent" payments), thereby allowing the PC Defendants to bill for a battery of worthless and virtually identical acupuncture treatment.

193.    Anikeyev also caused the PC Defendants to share professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

194.    The payments to runners were typically disguised as "transportation" fees paid to drivers for transporting patients to the clinics.

195.    In furtherance of the scheme, Anikeyev caused the PC Defendants to enter into certain agreements with a company he owned—i.e., Sylvan—for billing, collection, and other services.

196.    Upon information and belief, these agreements obligated the PC Defendants to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan for these services.

197.    These agreements were purposely structured as a means to channel the PC Defendants' professional fees and proceeds to Anikeyev.

198.    These agreements were also meant to create the illusion that Anikeyev and Sylvan on the one hand, and the Nominal Owners and the PC Defendants on the other, maintained legitimate, arm's-length business relationships, even though they did not.

199.    To further the objectives of this scheme, Anikeyev purposely made it appear that the PC Defendants were separately owned and operated by causing the repeated organization of acupuncture PCs under different names, owners, tax identification numbers, and principal executive office addresses.

200.    Despite these efforts, the PC Defendants were not separate, unrelated entities.

201.    For example, although the PC Defendants have different registered principal executive office addresses located around the New York metropolitan area, the PC Defendants have similar mailing addresses, with several of the entities having post office box numbers in near-sequential order at a location in Brooklyn, NY.

202.    The similarities among the PC Defendants do not end at mailing addresses, primarily because Anikeyev has never treated the PC Defendants as truly distinct from one another.

31

203.    Throughout the course of this scheme, the PC Defendants utilized the same treating acupuncturists—members of a syndicate of health care professionals controlled by Anikeyev.

204.    Consistent with the means and methods of this scheme, the PC Defendants' "treating acupuncturist" (i.e., the practitioner who actually provided the patient service) was not, in virtually every case, the registered owner of the acupuncture PC.

205.    The PC Defendants were also caused to operate from the same series of No-Fault Medical Mills.

206.    A number of the PC Defendants have even submitted bills and treatment records to Allstate that correspond to a different PC Defendant.

207.    In these particular instances, there is no plausible explanation for why (seemingly) unrelated entities had access to each other's treatment records and bills, except that all the PC Defendants were under someone's common control—i.e., Anikeyev.

208.    The PC Defendants have also been caused to submit virtually identical patient examination reports and treatment notes.

209.    According to these records, the PC Defendants' patients have been subjected to a virtually identical protocol of worthless acupuncture treatment.

210.    None of the PC Defendants exhibit any of the typical characteristics of a legitimate, modern practice, such as: (a) maintaining websites or a social media presence; (b) advertising; (c) displaying the owner's name or the entity's contact information (i.e., address, phone number, fax number, or email address) on the PCs' letterheads; or (d) operating from fixed office locations.

211.     Anikeyev also set the treatment and billing protocols as part of his effort to control the PC Defendants.

212.     Each PC Defendant was caused to utilize boilerplate and virtually identical initial examination reports, which never varied based on the patient's symptoms or diagnoses, the PC Defendant that submitted the report, or the treating acupuncturist.

213.     To conceal the identical nature of their reports, the PC Defendants were caused to use different fonts and to reorganize the order of otherwise boilerplate paragraphs to make it appear as if the reports were unique.

214.     These minimal efforts failed, and virtually every initial examination report submitted by the PC Defendants to Allstate contains the exact same language.

215.     For example, virtually every initial examination report submitted by the PC Defendants indicates that their patients suffered the exact same injury: "According to TCM, (Traditional Chinese Medicine), the injury caused by the motor vehicle accident belongs to the pattern of Chi and Blood stagnation.  The obstruction of flow of Chi and blood in certain meridians can cause pain, numbness, heavy sensation and swelling of the injured area."

216.     In fact, the PC Defendants' initial examination reports are so similar that they contain the same typographical errors.

217.     The following examples demonstrate the identical nature of each entity's initial examination reports:

(a) The "Comments" section of the initial examination report utilized by all of the PC Defendants for virtually every patient states: "***I fell [SIC] that there is a direct causal relationship*** between the accident described and current injuries." (emphasis added)

33

(b) The "Prognosis" section of the initial examination report utilized by all of the PC Defendants for virtually every patient states: "***The prognosis of the patient's consultation in regard to a full and complete recovery to state as <u>exited</u> [SIC] to the accident <u>in</u> [SIC] guarded***." (emphasis added)

(c) In the "Treatment and Recommendation" section of the initial examination report utilized by all of the PC Defendants for virtually every patient, "folium artemisiae ***argyii***" is misspelled—"folium artemisiae ***argyi***" is the correct spelling. (emphasis added)

(d) In the "Treatment and Recommendation" section of the initial examination report utilized by all of the PC Defendants for virtually every patient, the word "***conjunction***" is spelled as "***con-junction***." (emphasis added)

A sample of virtually identical initial examination reports submitted by the PC Defendants is annexed hereto at Exhibit 10.

218.    Further, many of the initial examination reports erroneously indicate that "[t]he patient has been persistent with acupuncture treatments and showed moderate improvement" despite the fact that, at the time that these reports were drafted, the patients had not yet received a single acupuncture treatment.

219.    As a further part of this scheme, the PC Defendants were caused to bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though patients never received treatment for such duration of time.

220.    Anikeyev has already confessed to engaging in such false billing practices in connection with several of the PC Defendants named in this lawsuit.

34

221.    The PC Defendants were also caused to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

222.    Overall, Anikeyev purposely caused the PC Defendants to engage in this unlawful conduct for his own financial enrichment, without regard to the actual needs of the patients.

A.    UNLAWFUL OPERATION AND CONTROL OF BAY NEEDLE

223.    Anikeyev recruited Matskina to fraudulently incorporate Bay Needle.

224.    Matskina agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of Bay Needle in the entity's articles of incorporation.

225.    Once Bay Needle was organized, Matskina ceded actual control of the company to Anikeyev.

226.    Throughout the course of this scheme, Anikeyev held all decision-making authority regarding the management and operation of Bay Needle.

227.    First, Anikeyev set up kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Bay Needle to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

228.    These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

35

229.     Anikeyev also arranged to share Bay Needle's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

230.     Similarly, these illicit payments were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

231.     In addition to securing Bay Needle's clinic location(s) and referral relationships/source of patients, Anikeyev hired the treating acupuncturists and administrative staff, determined how services were to be billed, and assumed control over Bay Needle's profits.

232.     In furtherance of his scheme to secretly control Bay Needle, Anikeyev caused Bay Needle to enter into one or more agreement with Sylvan, which required Bay Needle to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

233.     These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Matskina and Bay Needle on the other, maintained legitimate, arm's-length business relationships, even though they did not.

234.     Indeed, the agreements were meant to give Anikeyev control over Bay Needle.

235.     These agreements were purposely structured as a means to channel Bay Needle's professional fees and proceeds to Anikeyev.

236.     Overall, Anikeyev had substantial control over Bay Needle.

237.     For example, all questions posed to Bay Needle about the company's operation were directed to Sylvan—a company owned by Anikeyev.

238.     In addition to handling Bay Needle's billing through Sylvan, Anikeyev also dictated Bay Needle's billing and treatment protocols.

36

239.    For example, Anikeyev caused Bay Needle to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Bay Needle patients never received treatment for such duration of time.

240.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several of the PC Defendants named in this lawsuit.

241.    Anikeyev also caused Bay Needle to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other PC Defendants.  *See* Exhibits 10-11

242.    Anikeyev further caused Bay Needle to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

243.    Matskina never had any meaningful control over Bay Needle.

244.    Similarly, Matskina never played a role in developing or implementing Bay Needle's treatment or billing protocols.

245.    Matskina also never made any initial capital investment into Bay Needle—Anikeyev provided the necessary start-up funds.

246.    Matskina never even practiced acupuncture through Bay Needle.

247.    Further, Matskina did not hire, train, or supervise any acupuncturist employed by Bay Needle, nor did she supervise any of the services provided by these acupuncturists.

248.    While her role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Matskina did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Bay Needle.

249.    As part of his plea agreement entered in the *Zemlyansky* criminal matter (described above), Anikeyev consented to the forfeiture of all funds contained in two bank accounts registered to Bay Needle, as those funds constituted the proceeds of Anikeyev's and his confederates' criminal activity.

250.    Despite having an opportunity to claim ownership over the funds in these Bay Needle accounts, Matskina never made any attempt to do so.

251.    Indeed, in several arbitrations related to Bay Needle's attempt to obtain No-Fault benefit payments, several arbitrators have concluded that Bay Needle was not lawfully controlled, and is not entitled to No-Fault reimbursement.

252.    Several such decisions rely on the premise that if Matskina was the actual owner of Bay Needle (as is represented in Bay Needle's public record filings), Matskina would have claimed (or at least made *some* attempt to claim) ownership of the funds contained in the Bay Needle bank accounts that had been seized as part of Anikeyev's criminal sentence.[3] *See* Exhibit 12.

253.    Matskina's inability to explain credibly why Anikeyev had access to the seized Bay Needle bank accounts permits the conclusion that Anikeyev—not Matskina—owned and controlled Bay Needle.

254.    Accordingly, because Bay Needle was unlawfully controlled by a non-licensed acupuncturist, Bay Needle is not lawfully eligible to seek or receive No-Fault benefit payments.

255.    To the extent that Allstate was caused to make payments to Bay Needle, Allstate is entitled to recover all such payments made to, or for the benefit of, Bay Needle, including, but not necessarily limited to, those payments listed in Exhibit 44.

---

[3] According to the relevant AAA awards, there was approximately $42,000.00 in the Bay Needle accounts that were seized.

256.    Moreover, to the extent any charges submitted to Allstate by Bay Needle in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Bay Needle is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

**B.    UNLAWFUL OPERATION AND CONTROL OF KARINA K.**

257.    Anikeyev recruited Kolomiytseva to fraudulently incorporate Karina K.

258.    Kolomiytseva was a suitable candidate for participation in this scheme since she was already acquainted with Anikeyeva as an employee of one of the earlier Anikeyeva-"owned"/Anikeyev-controlled acupuncture PCs.

259.    Kolomiytseva agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of Karina K. in the entity's articles of incorporation.

260.    Once Karina K. was organized, Kolomiytseva ceded actual control of the company to Anikeyev.

261.    Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Karina K.

262.    First, Anikeyev set up kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Karina K. to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

263.    These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

264.     Anikeyev also arranged to share Karina K.'s professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

265.     Similarly, these illicit payments were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

266.     In addition to securing Karina K.'s clinic location(s) and referral relationships, Anikeyev hired the treating acupuncturists and administrative staff, determined how services were to be billed, and assumed control over Karina K.'s profits.

267.     In furtherance of his scheme to secretly control Karina K., Anikeyev caused Karina K. to enter into one or more agreement with Sylvan, which required Karina K. to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

268.     These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Kolomiytseva and Karina K. on the other, maintained legitimate, arm's-length business relationships, even though they did not.

269.     Indeed, the agreements were meant to give Anikeyev control over Karina K.

270.     These agreements were purposely structured as a means to channel Karina K.'s professional fees and proceeds to Anikeyev.

271.     Overall, Anikeyev had substantial control over Karina K.

272.     For example, persons inquiring about Karina K.'s operation were directed to Sylvan—a company owned by Anikeyev

273.     Anikeyev also dictated Karina K.'s billing and treatment protocols.

274.    For example, Anikeyev caused Karina K. to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Karina K. patients never received treatment for such duration of time.

275.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several of the PC Defendants named in this lawsuit.

276.    Anikeyev also caused Karina K. to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other PC Defendants.  *See* Exhibits 10-11

277.    Anikeyev further caused Karina K. to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

278.    Kolomiytseva never had any meaningful control over Karina K.

279.    Similarly, Kolomiytseva never played a role in developing or implementing Karina K.'s treatment or billing protocols.

280.    Kolomiytseva also never made any initial capital investment into Karina K.—Anikeyev provided the necessary start-up funds.

281.    Kolomiytseva practiced acupuncture through Karina K. only on certain occasions, if at all.

282.    Further, Kolomiytseva did not hire, train, or supervise any acupuncturist employed or contracted by Karina K., nor did she supervise any of the serves purportedly provided by these acupuncturists.

283.    While her role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Kolomiytseva did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Karina K.

284.    Notably, in the *Zemlyansky* criminal matter (described above), Karina K. was identified as an entity unlawfully controlled by Anikeyev.

285.    For all the reasons described above, Karina K. was unlawfully controlled by a non-licensed acupuncturist, and thus Karina K. is not lawfully eligible to seek or receive No-Fault benefit payments.

286.    To the extent that Allstate was caused to make payments to Karina K., Allstate is entitled to recover all such payments made to, or for the benefit of, Karina K., including, but not necessarily limited to, those payments listed in Exhibit 45.

287.    Moreover, to the extent any charges submitted to Allstate by Karina K. in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Karina K. is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

C.    UNLAWFUL OPERATION AND CONTROL OF HEALTHY WAY

288.    Anikeyev recruited Matskina to fraudulently incorporate Healthy Way.

289.    Matskina agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of Healthy Way in the entity's articles of incorporation.

290.    Consistent with the manner and means of this scheme to defraud, Healthy Way was operated in violation of New York law.

42

291.    Once Healthy Way was organized, Matskina ceded actual control of the company to Anikeyev.

292.    Throughout the course of this scheme, Anikeyev held all decision-making authority regarding the management and operation of Healthy Way.

293.    In or about October 2013, Anikeyev induced Lendel to join Matskina as a professional licensee officer, director, and shareholder of Healthy Way.

294.    Despite purporting to be the only owners of Healthy Way, both Matskina and Lendel ceded actual control of the company to Anikeyev.

295.    Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Healthy Way.

296.    First, Anikeyev set up kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Healthy Way to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

297.    These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

298.    Anikeyev also arranged to share Healthy Way's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

299.    Similarly, these illicit payments were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

300.     In addition to securing Healthy Way's clinic location(s) and referral relationships, Anikeyev hired the treating acupuncturists and administrative staff, determined how services were to be billed, and assumed control over Health Way's profits.

301.     Anikeyev also accomplished his secret control of Healthy Way by causing the PC to enter into one or more agreement with Sylvan, which required Health Way to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

302.     These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Matskina, Lendel, and Healthy Way on the other, maintained legitimate, arm's-length business relationships, even though they did not.

303.     Indeed, the agreements were meant to give Anikeyev control over Healthy Way.

304.     These agreements were purposely structured as a means to channel Healthy Way's professional fees and proceeds to Anikeyev.

305.     Overall, Anikeyev had substantial control over Healthy Way.

306.     For example, persons contacting Health Way about the company's operation were directed to Sylvan—a company owned by Anikeyev

307.     Anikeyev also dictated Healthy Way's billing and treatment protocols.

308.     For example, Anikeyev caused Healthy Way to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Healthy Way patients never received treatment for such duration of time.

309.     Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several of the PC Defendants named in this lawsuit.

310.     Anikeyev also caused Healthy Way to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other PC Defendants. *See* Exhibits 10-11.

311.     Anikeyev further caused Healthy Way to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

312.     Both Matskina and Lendel never had any meaningful control over Healthy Way.

313.     Similarly, Matskina and Lendel never played a role in developing or implementing Healthy Way's billing and treatment protocols.

314.     Matskina and Lendel also never made any initial capital investment into Healthy Way—Anikeyev provided the necessary start-up funds.

315.     Matskina and Lendel never even practiced acupuncture through Healthy Way.

316.     Further, Matskina and Lendel did not hire, train, or supervise any acupuncturist, nor did they supervise any of the services provided by these acupuncturists.

317.     While their roles were limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Matskina and Lendel did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Healthy Way.

318.     Notably, in the *Zemlyansky* criminal matter (described above), Healthy Way was identified as an entity unlawfully controlled by Anikeyev.

319.    For all the reasons described above, Healthy Way was unlawfully controlled by a non-licensed acupuncturist, and thus Healthy Way is not lawfully eligible to seek or receive No-Fault benefit payments.

320.    To the extent that Allstate was caused to make payments to Healthy Way, Allstate is entitled to recover all such payments made to, or for the benefit of, Healthy Way, including, but not necessarily limited to, those payments listed in Exhibit 46.

321.    Moreover, to the extent any charges submitted to Allstate by Healthy Way in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Healthy Way is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

D.    UNLAWFUL OPERATION AND CONTROL OF ALPHA

322.    Anikeyev recruited Kolomiytseva to fraudulently incorporate Alpha.

323.    As with Karina K., Kolomiytseva was a suitable candidate for participation in this scheme since she was already acquainted with Anikeyeva as an employee of one of the earlier Anikeyeva-"owned"/Anikeyev-controlled acupuncture PCs

324.    Kolomiytseva agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of Alpha in entity's articles of incorporation.

325.    Once Alpha was organized, Kolomiytseva ceded actual control of the company to Anikeyev.

326.    Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Alpha.

46

327.     Anikeyev organized kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Alpha to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

328.     These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

329.     Anikeyev also arranged to share Alpha's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

330.     These payments to the "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

331.     Anikeyev was also solely responsible for securing Alpha's clinic location(s) and referral relationships, hiring the treating acupuncturists and administrative staff, determining how services were to be billed, and controlling Alpha's profits.

332.     In furtherance of his scheme to secretly control Alpha, Anikeyev caused Alpha to enter into one or more agreement with Sylvan, which required Alpha to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

333.     These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Kolomiytseva and Alpha on the other, maintained legitimate, arm's-length business relationships, even though they did not.

334.     In reality, the agreements were actually intended to give Anikeyev control over Alpha.

335.     Overall, Anikeyev had substantial control over Alpha.

47

336.    Indeed, persons inquiring about Alpha's operation were directed to Sylvan—a company owned by Anikeyev.

337.    Anikeyev also dictated Alpha's billing and treatment protocols.

338.    For example, Anikeyev caused Alpha to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Alpha patients never received treatment for such duration of time.

339.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several of the PC Defendants named in this lawsuit.

340.    Anikeyev also caused Alpha to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other PC Defendants. *See* Exhibits 10-11.

341.    Anikeyev further caused Alpha to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

342.    Kolomiytseva never had any meaningful control over Alpha.

343.    Similarly, Kolomiytseva never played a role in developing or implementing Alpha's treatment or billing protocols.

344.    Kolomiytseva also never made any initial capital investment into Alpha—Anikeyev provided the necessary start-up funds.

345.    Kolomiytseva practiced acupuncture through Alpha only on certain occasions, if at all.

48

346.    Further, Kolomiytseva did not hire, train, or supervise any acupuncturist employed or contracted by Alpha, nor did she supervise any of the serves purportedly provided by these acupuncturists.

347.    While her role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Kolomiytseva did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Alpha.

348.    Notably, in the *Zemlyansky* criminal matter (described above), Alpha was identified as an entity unlawfully controlled by Anikeyev.

349.    For all the reasons described above, Alpha was unlawfully controlled by a non-licensed acupuncturist, and thus Alpha is not lawfully eligible to seek or receive No-Fault benefit payments.

350.    To the extent that Allstate was caused to make payments to Alpha, Allstate is entitled to recover all such payments made to, or for the benefit of, Alpha, including, but not necessarily limited to, those payments listed in Exhibit 47.

351.    Moreover, to the extent any charges submitted to Allstate by Alpha in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Alpha is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

E.    UNLAWFUL OPERATION AND CONTROL OF LOTUS

352.    Anikeyev recruited Kornilova to fraudulently incorporate Lotus.

353.     Kornilova agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of Lotus in the entity's articles of incorporation.

354.     Consistent with the manner and means of this scheme to defraud, Lotus was caused to be operated in violation of New York law.

355.     Once Lotus was organized, Kornilova ceded actual control of the company to Anikeyev.

356.     Throughout the course of this scheme, Anikeyev held all decision-making authority regarding the management and operation of Lotus.

357.     Similar to Anikeyev's mode of operation with respect to Healthy Way, in or about October 2013, Anikeyev induced Lendel to join Kornilova as a professional licensee officer, director, and shareholder of Lotus.

358.     Despite purporting to be the only owners of Lotus, both Kornilova and Lendel ceded actual control of the company to Anikeyev.

359.     Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Lotus.

360.     Similar to the other acupuncture PCs under his control, Anikeyev set up kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Lotus to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

361.     These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

50

362.    Anikeyev also arranged to share Lotus's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

363.    Payments to the "runners" working with Lotus were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

364.    Anikeyev further exerted his control over Lotus by securing the company's clinic location(s) and referral relationships, hiring Lotus' treating acupuncturists and administrative staff, determining how services were to be billed, and controlling Lotus' corporate finances and profits.

365.    Anikeyev disguised his control of Lotus by causing the company to enter into one or more agreement with Sylvan, which required Lotus to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

366.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Kornilova, Lendel and Lotus on the other, maintained legitimate, arm's-length business relationships, even though they did not.

367.    Indeed, the agreements were meant to give Anikeyev control over Lotus.

368.    These agreements were purposely structured as a means to channel Lotus' professional fees and proceeds to Anikeyev.

369.    Overall, Anikeyev had substantial control over Lotus.

370.    For example, persons contacting Lotus about the company's operation were directed to Sylvan—a company owned by Anikeyev

371.    Anikeyev also dictated Lotus' billing and treatment protocols.

372. Anikeyev caused Lotus to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Lotus patients never received acupuncture treatment for that amount of time.

373. Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several of the PC Defendants named in this lawsuit.

374. During the course of this scheme, Anikeyev caused Lotus to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other PC Defendants. *See* Exhibits 10-11.

375. Anikeyev further caused Lotus to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

376. Kornilova and Lendel never had any meaningful control over the management or operation of Lotus.

377. Similarly, Kornilova and Lendel never played a role in developing or implementing Lotus' billing and treatment protocols.

378. Kornilova and Lendel also never made any initial capital investment into Lotus— Anikeyev provided the necessary start-up funds.

379. Kornilova and Lendel never even practiced acupuncture through Lotus.

380. Further, Kornilova and Lendel did not hire, train, or supervise any acupuncturists, nor did they supervise any of the services provided by these acupuncturists.

381. While their roles were limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Kornilova and Lendel did, in fact, participate in this

scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Lotus.

382.    Notably, in the *Zemlyansky* criminal matter (described above), Lotus was identified as an entity unlawfully controlled by Anikeyev.

383.    For all the reasons described above, Lotus was unlawfully controlled by a non-licensed acupuncturist, and thus Lotus is not lawfully eligible to seek or receive No-Fault benefit payments.

384.    To the extent that Allstate was caused to make payments to Lotus, Allstate is entitled to recover all such payments made to, or for the benefit of, Lotus, including, but not necessarily limited to, those payments listed in Exhibit 48.

385.    Moreover, to the extent any charges submitted to Allstate by Lotus in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Lotus is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above

386.    Accordingly, Lotus was never lawfully eligible for No-Fault reimbursement and Allstate is entitled to recover all payments made to Lotus, and Allstate is also entitled to a declaration disclaiming any legal obligation to make any further payments on all presently outstanding reimbursement claims submitted by (or on behalf of) Lotus.

F.    UNLAWFUL OPERATION AND CONTROL OF SUNRISE

387.    Anikeyev recruited Tsukanov to fraudulently incorporate Sunrise.

388.    Tsukanov agreed to falsely represent to the State of New York—and to the public—that he was the sole officer, director, and shareholder of Sunrise in the entity's articles of incorporation.

389.    Once Sunrise was organized, Tsukanov ceded actual control of the company to Anikeyev.

390.    Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Sunrise.

391.    Similar to the other acupuncture PCs under his control, Anikeyev organized kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Sunrise to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

392.    These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

393.    Anikeyev also arranged to share Sunrise's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

394.    Payments to the "runners" affiliated with Sunrise were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

395.    Anikeyev controlled Sunrise in other ways, such as by securing the company's clinic location(s) and referral relationships, hiring Sunrise's treating acupuncturists and administrative staff, determining how patient services were to be billed, and controlling Sunrise's corporate finances and profits.

54

396.    Anikeyev was able to disguise his unlawful control of Sunrise by causing the company to enter into one or more agreement with Sylvan, which required Sunrise to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

397.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Tsukanov and Sunrise on the other, maintained legitimate, arm's-length business relationships, even though they did not.

398.    In reality, the agreements were actually intended to give Anikeyev control over Sunrise.

399.    Overall, Anikeyev had substantial control over Sunrise's corporate affairs.

400.    Anikeyev also dictated Sunrise's billing and treatment protocols.

401.    For example, Anikeyev caused Sunrise to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Sunrise patients never received treatment for such duration of time.

402.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

403.    Anikeyev also caused Sunrise to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme. *See* Exhibits 10-11.

404.    Anikeyev further caused Sunrise to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

405.    Tsukanov never had any meaningful control over Sunrise.

55

406.    Tsukanov never had role in developing or implementing Sunrise's billing and treatment protocols.

407.    Tsukanov also never made any initial capital investment into Sunrise—Anikeyev provided the necessary start-up funds.

408.    Tsukanov never even practiced acupuncture through Sunrise.

409.    Further, Tsukanov did not hire, train, or supervise any acupuncturists employed or contracted by Sunrise, nor did he supervise any of the serves purportedly provided by these acupuncturists.

410.    While his role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Tsukanov did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Sunrise.

411.    Notably, in the *Zemlyansky* criminal matter (described above), Sunrise was identified as an entity unlawfully controlled by Anikeyev.

412.    For all the reasons described above, Sunrise was unlawfully controlled by a non-licensed acupuncturist, and thus Sunrise is not lawfully eligible to seek or receive No-Fault benefit payments.

413.    To the extent that Allstate was caused to make payments to Sunrise, Allstate is entitled to recover all such payments made to, or for the benefit of, Sunrise, including, but not necessarily limited to, those payments listed in Exhibit 49.

414.    Moreover, to the extent any charges submitted to Allstate by Sunrise in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in

connection with those charges because Sunrise is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

### G. UNLAWFUL OPERATION AND CONTROL OF EASY CARE

415. Anikeyev recruited Kulagina to fraudulently incorporate Easy Care as a professional service corporation authorized to provide and bill for licensed acupuncture services.

416. Kulagina agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of Easy Care in the entity's articles of incorporation.

417. Consistent with the manner and means of this scheme to defraud, Easy Care was operated in violation of Law York law.

418. Once Easy Care was organized, Kulagina ceded actual control of the company to Anikeyev.

419. Throughout the course of this scheme, Anikeyev held all decision-making authority regarding the management and operation of Easy Care.

420. In or around June 2013, Anikeyev induced his wife, Anikeyeva, to join Kulagina as a professional licensee officer, director, and shareholder of Easy Care.

421. Despite purporting to be the only owners of Easy Care, both Kulagina and Anikeyeva ceded actual control of the company to Anikeyev.

422. Throughout this scheme, Anikeyev held all decision-making authority regarding the operation and management of Easy Care.

423. Anikeyev helped control Easy Care by organizing kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Easy Care to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and

57

(b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

424. These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

425. Anikeyev also arranged to share Easy Care's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

426. Payments to Easy Care's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

427. Anikeyev also controlled many other business functions by securing Easy Care's clinic location(s) and referral relationships, hiring Easy Care's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling Easy Care's corporate finances and professional fees/profits.

428. Anikeyev also accomplished his secret control of Easy Care by causing the company to enter into one or more agreement with Sylvan, which obligated Easy Care to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

429. These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Kulagina, Anikeyeva, and Easy Care on the other, maintained legitimate, arm's-length business relationships, even though they did not.

430. Indeed, the agreements were meant to give Anikeyev control over Easy Way by, among other things, serving as a means to channel Easy Care's professional fees and profits to Anikeyev.

431. Overall, Anikeyev had substantial control over Easy Care.

58

432.     In fact, when asked to discuss the operation of Easy Care, Kulagina directed all such questions to Sylvan—a company owned by Anikeyev.

433.     Anikeyev also dictated Easy Care's billing and treatment protocols.

434.     For example, Anikeyev caused Easy Care to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Easy Care patients never received treatment for such duration of time.

435.     Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several of the PC Defendants named in this lawsuit.

436.     Anikeyev also caused Easy Care to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme.  *See* Exhibits 10-11.

437.     Anikeyev further caused Easy Care to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared

438.     Kulagina and Anikeyeva never had meaningful control over the operation and management of Easy Care.

439.     Kulagina and Anikeyeva had no role in developing or implementing Easy Care's billing and treatment protocols.

440.     Kulagina and Anikeyeva did not hire, train, or supervise any acupuncturists employed or contracted by Easy Care, nor did they supervise any of the services provided by these acupuncturists.

441.    Kulagina and Anikeyeva also never made any initial capital investment into Easy Care—Anikeyev provided the necessary start-up funds.

442.    While their roles were limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Kulagina and Anikeyeva did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Easy Care.

443.    Notably, in the *Zemlyansky* criminal matter (described above), Easy Care was identified as an entity unlawfully controlled by Anikeyev.

444.    For all the reasons described above, Easy Care was unlawfully controlled by a non-licensed acupuncturist, and thus Easy Care is not lawfully eligible to seek or receive No-Fault benefit payments.

445.    To the extent that Allstate was caused to make payments to Easy Care, Allstate is entitled to recover all such payments made to, or for the benefit of, Easy Care, including, but not necessarily limited to, those payments listed in Exhibit 50.

446.    Moreover, to the extent any charges submitted to Allstate by Easy Care in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Easy Care is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

**H.    UNLAWFUL OPERATION AND CONTROL OF SHIROM**

447.    Anikeyev recruited Shimunov to fraudulently incorporate Shirom.

448.     Shimunov agreed to falsely represent to the State of New York—and to the public—that he was the sole officer, director, and shareholder of Shirom in the entity's articles of incorporation.

449.     Once Shirom was organized, Shimunov ceded actual control of the company to Anikeyev.

450.     Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Shirom.

451.     Anikeyev did many things to control the company, such as making kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Shirom to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

452.     These kickback payments were often disguised as rental fees paid to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

453.     Anikeyev also arranged to share Shirom's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

454.     Payments to Shirom's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

455.     Anikeyev also controlled Shirom by securing the company's clinic location(s) and referral relationships, hiring Shirom's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling Shirom's corporate finances and professional fees/profits.

456.     Anikeyev's control of Shirom was accomplished, in part, by his structuring of one or more agreement between Shirom and Sylvan, which required Shirom to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

457.     These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and **Shimunov** and **Shirom** on the other, maintained legitimate, arm's-length business relationships, even though they did not.

458.     Indeed, the agreements were meant to give Anikeyev control over **Shirom** by, among other things, serving as a means to channel Shirom's professional fees and profits to Anikeyev.

459.     Anikeyev also dictated Shirom's billing and treatment protocols.

460.     For example, Anikeyev caused Shirom to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Shirom patients never received treatment for such duration of time.

461.     Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several of the PC Defendants named in this lawsuit.

462.     Anikeyev also caused Shirom to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme.  *See* Exhibits 10-11.

463.     Anikeyev further caused Shirom to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

464.    Shimunov never had meaningful control over the operation and management of Shirom.

465.    Shimunov had no role in developing or implementing Shirom's billing and treatment protocols.

466.    Shimunov also never made any initial capital investment into Shirom—Anikeyev provided the necessary start-up funds.

467.    Shimunov did not hire, train, or supervise any acupuncturists employed or contracted by Shirom, nor did he supervise any of the services provided by these acupuncturists.

468.    While his role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Shimunov did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Shirom.

469.    Notably, in the *Zemlyansky* criminal matter (described above), Shirom was identified as an entity unlawfully controlled by Anikeyev.

470.    For all the reasons described above, Shirom was unlawfully controlled by a non-licensed acupuncturist, and thus Shirom is not lawfully eligible to seek or receive No-Fault benefit payments.

471.    To the extent that Allstate was caused to make payments to Shirom, Allstate is entitled to recover all such payments made to, or for the benefit of, Shirom, including, but not necessarily limited to, those payments listed in Exhibit 51.

472.    Moreover, to the extent any charges submitted to Allstate by Shirom in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in

connection with those charges because Shirom is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

## I.    UNLAWFUL OPERATION AND CONTROL OF URBAN WELL

473.    Anikeyev recruited Abitbol to fraudulently incorporate Urban Well.

474.    Abitbol agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of Urban Well in the entity's articles of incorporation.

475.    Once Urban Well was organized, Abitbol ceded actual control of entity to Anikeyev.

476.    Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Urban Well.

477.    Anikeyev did many things to control the company, such as making kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Urban Well to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

478.    These kickback payments were often disguised as rental fees paid to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

479.    Anikeyev also arranged to share Urban Well's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

480.    Payments to Urban Well's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

481.    Anikeyev also controlled Urban Well by securing the company's clinic location(s) and referral relationships, hiring Urban Well's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling Urban Well's corporate finances and professional fees/profits.

482.    Anikeyev's control of Urban Well was accomplished, in part, by his structuring of one or more agreement between Urban Well and Sylvan, which required Urban Well to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

483.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Abitbol and Urban Well on the other, maintained legitimate, arm's-length business relationships, even though they did not.

484.    Indeed, the agreements were meant to give Anikeyev control over Urban Well by, among other things, serving as a means to channel Urban Well's professional fees and profits to Anikeyev.

485.    Anikeyev also dictated Urban Well's billing and treatment protocols.

486.    For example, Anikeyev caused Urban Well to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Urban Well patients never received treatment for such duration of time.

487.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

488.    Anikeyev also caused Urban Well to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme. *See* Exhibits 10-11.

489.    Anikeyev further caused Urban Well to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

490.    Abitbol never had meaningful control over the operation and management of Urban Well.

491.    Abitbol had no role in developing or implementing Urban Well's billing and treatment protocols.

492.    Abitbol also never made any initial capital investment into Urban Well — Anikeyev provided the necessary start-up funds.

493.    Abitbol did not hire, train, or supervise any acupuncturists employed or contracted by Urban Well, nor did he supervise any of the services provided by these acupuncturists.

494.    While his role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Abitbol did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Urban Well.

495.    Notably, in the *Zemlyansky* criminal matter (described above), Urban Well was identified as an entity unlawfully controlled by Anikeyev.

496.    For all the reasons described above, Urban Well was unlawfully controlled by a non-licensed acupuncturist, and thus Urban Well is not lawfully eligible to seek or receive No-Fault benefit payments.

497.    To the extent that Allstate was caused to make payments to Urban Well, Allstate is entitled to recover all such payments made to, or for the benefit of, Urban Well, including, but not necessarily limited to, those payments listed in Exhibit 52.

498.    Moreover, to the extent any charges submitted to Allstate by Urban Well in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Urban Well is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

### J.    UNLAWFUL OPERATION AND CONTROL OF APPROACH

499.    Anikeyev recruited Zapolsky to fraudulently incorporate Approach.

500.    Zapolsky agreed to falsely represent to the State of New York—and to the public—that he was the sole officer, director, and shareholder of Approach in the entity's articles of incorporation.

501.    Consistent with the manner and means of this scheme to defraud, Approach was operated in violation of New York law.

502.    Once Approach was organized, Zapolsky ceded actual control of the company to Anikeyev.

503.    Throughout the course of this scheme, Anikeyev held all decision-making authority regarding the management and operation of Approach.

504.    In or around May 2013, Anikeyev induced his wife, Anikeyeva, to join Zapolsky as a professional licensee officer, director, and shareholder of Approach.

505.    Despite purporting to be the only owners of Approach, both Zapolsky and Anikeyeva ceded actual control of the company to Anikeyev.

506. Throughout this scheme, Anikeyev held all decision-making authority regarding the operation and management of Approach.

507. Anikeyev helped control Approach by organizing kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Approach to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

508. These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

509. Anikeyev also arranged to share Approach's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

510. Payments to Approach's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

511. Anikeyev also controlled many other business functions by securing Approach's clinic location(s) and referral relationships, hiring Approach's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling Approach's corporate finances and professional fees/profits.

512. Anikeyev also accomplished his secret control of Approach by causing the company to enter into one or more agreement with Sylvan, which obligated Easy Care to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

513.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Zapolsky, Anikeyeva, and Approach on the other, maintained legitimate, arm's-length business relationships, even though they did not.

514.    Indeed, the agreements were meant to give Anikeyev control over Approach by, among other things, serving as a means to channel Approach's professional fees and profits to Anikeyev.

515.    Overall, Anikeyev had substantial control over Approach.

516.    In fact, when asked to discuss the operation of Approach, Kulagina directed all such questions to Sylvan—a company owned by Anikeyev.

517.    Anikeyev also dictated Approach's billing and treatment protocols.

518.    For example, Anikeyev caused Approach to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Approach patients never received treatment for such duration of time.

519.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

520.    Anikeyev also caused Approach to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme.  *See* Exhibits 10-11.

521.    Anikeyev further caused Approach to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared

522.    Zapolsky and Anikeyeva never had meaningful control over the operation and management of Approach.

523.    Zapolsky and Anikeyeva had no role in developing or implementing Approach's billing and treatment protocols.

524.    Zapolsky and Anikeyeva did not hire, train, or supervise any acupuncturists employed or contracted by Approach, nor did they supervise any of the services provided by these acupuncturists.

525.    Zapolsky and Anikeyeva also never made any initial capital investment into Approach—Anikeyev provided the necessary start-up funds.

526.    While their roles were limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Zapolsky and Anikeyeva did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Approach.

527.    Notably, in the *Zemlyansky* criminal matter (described above), Approach was identified as an entity unlawfully controlled by Anikeyev.

528.    For all the reasons described above, Approach was unlawfully controlled by a non-licensed acupuncturist, and thus Approach is not lawfully eligible to seek or receive No-Fault benefit payments.

529.    To the extent that Allstate was caused to make payments to Approach, Allstate is entitled to recover all such payments made to, or for the benefit of, Approach, including, but not necessarily limited to, those payments listed in Exhibit 53.

530.    Moreover, to the extent any charges submitted to Allstate by Approach in connection with patients eligible for No-Fault coverage under an automobile insurance policy

issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Approach is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above

### K.   UNLAWFUL OPERATION AND CONTROL OF SML

531.   Anikeyev induced Kulagina to fraudulently incorporate SML.

532.   As with Easy Care, Kulagina agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of SML in the entity's articles of incorporation.

533.   Consistent with the manner and means of this scheme to defraud, SML was operated in violation of New York law.

534.   Once SML was organized, Kulagina ceded actual control of the company to Anikeyev.

535.   Throughout the course of this scheme, Anikeyev held all decision-making authority regarding the management and operation of SML.

536.   In or around June 2013, Anikeyev induced his wife, Anikeyeva, to join Kulagina as a professional licensee officer, director, and shareholder of SML.

537.   Despite purporting to be the only owners of SML, both Kulagina and Anikeyeva ceded actual control of the company to Anikeyev.

538.   Throughout this scheme, Anikeyev held all decision-making authority regarding the operation and management of SML.

539.   Anikeyev helped control SML by organizing kickback/referral arrangements with No-Fault Medical Mills, whereby he caused SML to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b)

access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

540.    These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

541.    Anikeyev also arranged to share SML's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

542.    Payments to SML's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

543.    Anikeyev also controlled many other business functions by securing SML's clinic location(s) and referral relationships, hiring SML's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling SML's corporate finances and professional fees/profits.

544.    Anikeyev also accomplished his secret control of SML by causing the company to enter into one or more agreement with Sylvan, which obligated SML to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

545.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Kulagina, Anikeyeva, and SML on the other, maintained legitimate, arm's-length business relationships, even though they did not.

546.    Indeed, the agreements were meant to give Anikeyev control over SML by, among other things, serving as a means to channel SML's professional fees and profits to Anikeyev.

547.    Overall, Anikeyev had substantial control over SML.

548.    In fact, when asked to discuss the operation of SML, Kulagina directed all such questions to Sylvan—a company owned by Anikeyev.

549.    Anikeyev also dictated SML's billing and treatment protocols.

550.    For example, Anikeyev caused SML to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though SML patients never received treatment for such duration of time.

551.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with other acupuncture PCs named in this lawsuit.

552.    Anikeyev also caused SML to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme. *See* Exhibits 10-11.

553.    Anikeyev further caused SML to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared

554.    Kulagina and Anikeyeva never had meaningful control over the operation and management of SML.

555.    Kulagina and Anikeyeva had no role in developing or implementing SML's billing and treatment protocols.

556.    Kulagina and Anikeyeva did not hire, train, or supervise any acupuncturists employed or contracted by SML, nor did they supervise any of the services provided by these acupuncturists.

557.    Kulagina and Anikeyeva also never made any initial capital investment into SML—Anikeyev provided the necessary start-up funds.

558.    While their roles were limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Kulagina and Anikeyeva did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of SML.

559.    For all the reasons described above, SML was unlawfully controlled by a non-licensed acupuncturist, and thus SML is not lawfully eligible to seek or receive No-Fault benefit payments.

560.    Moreover, upon information and belief, several licensed acupuncturists whose names appear on SML's invoices (i.e., NF-3 forms) as the "treating provider" were not actually employed by SML, but were, instead, working as independent contractors.

561.    By billing for services provided by an independent contractor rather than an employee or owner of SML, and then by purposely misrepresenting the person's employment status on NF-3 forms submitted to Allstate, all such claims are not compensable under the No-Fault laws.

562.    In light of SML's unlawful control and impermissible independent contractor usage, to the extent that Allstate was caused to make payments to SML, Allstate is entitled to recover all such payments made to, or for the benefit of, SML, including, but not necessarily limited to, those payments listed in Exhibit 54.

563.    Moreover, to the extent any charges submitted to Allstate by SML in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in

connection with those charges because SML is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above

## L.   UNLAWFUL OPERATION AND CONTROL OF BRONX THERAPY

564.   Anikeyev induced Shimunov to fraudulently incorporate Bronx Therapy.

565.   As with Shirom, Shimunov agreed to falsely represent to the State of New York— and to the public—that he was the sole officer, director, and shareholder of Bronx Therapy in the entity's articles of incorporation.

566.   Once Bronx Therapy was organized, Shimunov ceded actual control of the company to Anikeyev.

567.   Throughout this scheme, Anikeyev held all decision-making authority regarding the operation and management of Bronx Therapy.

568.   Anikeyev did many things to control the company, such as making kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Bronx Therapy to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

569.   These kickback payments were often disguised as rental fees paid to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

570.   Anikeyev also arranged to share Bronx Therapy's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

571.   Payments to Bronx Therapy's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

75

572.    Anikeyev also controlled Bronx Therapy by securing the company's clinic location(s) and referral relationships, hiring Bronx Therapy's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling Bronx Therapy's corporate finances and professional fees/profits.

573.    Anikeyev's control of Bronx Therapy was accomplished, in part, by his structuring of one or more agreement between Bronx Therapy and Sylvan, which required Bronx Therapy to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

574.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Shimunov and Bronx Therapy on the other, maintained legitimate, arm's-length business relationships, even though they did not.

575.    Indeed, the agreements were meant to give Anikeyev control over Bronx Therapy by, among other things, serving as a means to channel Bronx Therapy's professional fees and profits to Anikeyev.

576.    Anikeyev also dictated Bronx Therapy's billing and treatment protocols.

577.    For example, Anikeyev caused Bronx Therapy to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Bronx Therapy patients never received treatment for such duration of time.

578.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

579.    Anikeyev also caused Bronx Therapy to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme. *See* Exhibits 10-11.

76

580.    Anikeyev further caused Bronx Therapy to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

581.    Shimunov never had meaningful control over the operation and management of Bronx Therapy.

582.    Shimunov had no role in developing or implementing Bronx Therapy's billing and treatment protocols.

583.    Shimunov also never made any initial capital investment into Bronx Therapy—Anikeyev provided the necessary start-up funds.

584.    Shimunov did not hire, train, or supervise any acupuncturists employed or contracted by Bronx Therapy, nor did he supervise any of the services provided by these acupuncturists.

585.    While his role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Shimunov did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Bronx Therapy.

586.    Notably, in the *Zemlyansky* criminal matter (described above), Bronx Therapy was identified as an entity unlawfully controlled by Anikeyev.

587.    For all the reasons described above, Bronx Therapy was unlawfully controlled by a non-licensed acupuncturist, and thus Bronx Therapy is not lawfully eligible to seek or receive No-Fault benefit payments.

588.    To the extent that Allstate was caused to make payments to Bronx Therapy, Allstate is entitled to recover all such payments made to, or for the benefit of, Bronx Therapy, including, but not necessarily limited to, those payments listed in Exhibit 55.

589.    Moreover, to the extent any charges submitted to Allstate by Bronx Therapy in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Bronx Therapy is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

### M.    UNLAWFUL OPERATION AND CONTROL OF TC

590.    Anikeyev recruited Shkapenyuk to fraudulently incorporate TC.

591.    Shkapenyuk was a suitable candidate for participation in this scheme since he was already acquainted with Anikeyeva as an employee of one of the earlier Anikeyeva-"owned"/Anikeyev-controlled acupuncture PCs

592.    Shkapenyuk agreed to falsely represent to the State of New York—and to the public—that he was the sole officer, director, and shareholder of TC in the entity's articles of incorporation.

593.    Once TC was organized, Shkapenyuk ceded actual control of the company to Anikeyev.

594.    Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of TC.

595.    Anikeyev did many things to control the company, such as making kickback/referral arrangements with No-Fault Medical Mills, whereby he caused TC to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the

use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

596.     These kickback payments were often disguised as rental fees paid to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

597.     Anikeyev also arranged to share TC's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

598.     Payments to TC's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

599.     Anikeyev also controlled TC by securing the company's clinic location(s) and referral relationships, hiring TC's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling TC's corporate finances and professional fees/profits.

600.     Anikeyev's control of TC was accomplished, in part, by his structuring of one or more agreement between TC and Sylvan, which required TC to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

601.     These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Shkapenyuk and TC on the other, maintained legitimate, arm's-length business relationships, even though they did not.

602.     Indeed, the agreements were meant to give Anikeyev control over TC by, among other things, serving as a means to channel TC's professional fees and profits to Anikeyev.

603.     Anikeyev also dictated TC's billing and treatment protocols.

604.    For example, Anikeyev caused TC to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though TC patients never received treatment for such duration of time.

605.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

606.    Anikeyev also caused TC to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme.  *See* Exhibits 10-11.

607.    Anikeyev further caused TC to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

608.    Shkapenyuk never had meaningful control over the operation and management of TC.

609.    Shkapenyuk had no role in developing or implementing TC's billing and treatment protocols.

610.    Shkapenyuk also never made any initial capital investment into TC—Anikeyev provided the necessary start-up funds.

611.    Shkapenyuk did not hire, train, or supervise any acupuncturists employed or contracted by TC, nor did he supervise any of the services provided by these acupuncturists.

612.    While his role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Shkapenyuk did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of TC.

80

613.    Notably, in the *Zemlyansky* criminal matter (described above), TC was identified as an entity unlawfully controlled by Anikeyev.

614.    As part of his plea agreement entered in the *Zemlyansky* criminal matter (described above), Anikeyev consented to the forfeiture of all funds contained in one or more bank account registered to TC, as those funds constituted the proceeds of Anikeyev's and his confederates' criminal activity.

615.    Despite having an opportunity to claim ownership over the funds in a TC account, Shkapenyuk never made any attempt to do so.

616.    Indeed, several arbitrations related to TC's attempt to obtain No-Fault benefit payments have been resolved on the idea that TC was not lawfully controlled, and is not entitled to No-Fault reimbursement.

617.    Several such decisions rely on the premise that if Shkapenyuk was the actual owner of TC (as is represented in TC's public record filings), then Shkapenyuk would have claimed (or at least made *some* attempt to claim) ownership of the funds contained in any TC bank account that had been seized as part of Anikeyev's criminal sentence. *See* Exhibit 13.

618.    Shkapenyuk's inability to explain credibly why Anikeyev had access to bank accounts registered to TC permits the conclusion that Anikeyev—not Shkapenyuk —owned and controlled TC.

619.    For all the reasons described above, TC was unlawfully controlled by a non-licensed acupuncturist, and thus TC is not lawfully eligible to seek or receive No-Fault benefit payments.

620.    Moreover, upon information and belief, several licensed acupuncturists whose names appear on TC's invoices (i.e., NF-3 forms) as the "treating provider" were not actually employed by TC, but were, instead, working as independent contractors.

621.    By billing for services provided by an independent contractor rather than an employee or owner of TC, and then by purposely misrepresenting the person's employment status on NF-3 forms submitted to Allstate, all such claims are not compensable under the No-Fault laws.

622.    In light of TC's unlawful control and impermissible independent contractor usage, to the extent that Allstate was caused to make payments to TC, Allstate is entitled to recover all such payments made to, or for the benefit of, TC, including, but not necessarily limited to, those payments listed in Exhibit 56.

623.    Moreover, to the extent any charges submitted to Allstate by TC in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because TC is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

### N.    UNLAWFUL OPERATION AND CONTROL OF ACUHEALTH

624.    Anikeyev induced Kornilova to fraudulently incorporate Acuhealth.

625.    As she did with Lotus, Kornilova agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of Acuhealth in the entity's articles of incorporation.

626.    Once Acuhealth was organized, Kornilova ceded actual control of the company to Anikeyev.

627.    Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Acuhealth.

628.    Anikeyev did many things to control the company, such as making kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Acuhealth to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

629.    These kickback payments were often disguised as rental fees paid to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

630.    Anikeyev also arranged to share Acuhealth's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

631.    Payments to Acuhealth's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

632.    Anikeyev also controlled Acuhealth by securing the company's clinic location(s) and referral relationships, hiring Acuhealth's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling Acuhealth's corporate finances and professional fees/profits.

633.    Anikeyev's control of Acuhealth was accomplished, in part, by his structuring of one or more agreement between Acuhealth and Sylvan, which required Acuhealth to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

634.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Kornilova and Acuhealth on the other, maintained legitimate, arm's-length business relationships, even though they did not.

635.    Indeed, the agreements were meant to give Anikeyev control over Acuhealth by, among other things, serving as a means to channel Acuhealth's professional fees and profits to Anikeyev.

636.    Anikeyev also dictated Acuhealth's billing and treatment protocols.

637.    For example, Anikeyev caused Acuhealth to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Acuhealth patients never received treatment for such duration of time.

638.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

639.    Anikeyev also caused Acuhealth to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme.  *See* Exhibits 10-11.

640.    Anikeyev further caused Acuhealth to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

641.    Kornilova never had meaningful control over the operation and management of Acuhealth.

642.    Kornilova had no role in developing or implementing Acuhealth's billing and treatment protocols.

643.    Kornilova also never made any initial capital investment into Acuhealth—Anikeyev provided the necessary start-up funds.

644.    Kornilova did not hire, train, or supervise any acupuncturists employed or contracted by Acuhealth, nor did she supervise any of the services provided by these acupuncturists.

645.    While her role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Kornilova did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Acuhealth.

646.    Notably, in the *Zemlyansky* criminal matter (described above), Acuhealth was identified as an entity unlawfully controlled by Anikeyev.

647.    As part of his plea agreement entered in the *Zemlyansky* criminal matter (described above), Anikeyev consented to the forfeiture of all funds contained in one or more bank account registered to Acuhealth, as those funds constituted the proceeds of Anikeyev's and his confederates' criminal activity.

648.    Despite having an opportunity to claim ownership over the funds in an Acuhealth account, Kornilova never made any attempt to do so.

649.    Indeed, several arbitrations related to Acuhealth's attempt to obtain No-Fault benefit payments have been resolved on the idea that Acuhealth was not lawfully controlled, and is not entitled to No-Fault reimbursement.

650.    Several such decisions rely on the premise that if Kornilova was the actual owner of Acuhealth (as is represented in Acuhealth's public record filings), then Kornilova would have claimed (or at least made *some* attempt to claim) ownership of the funds contained in any

Acuhealth bank account that had been seized as part of Anikeyev's criminal sentence. *See* Exhibit 14.

651. Kornilova's inability to explain credibly why Anikeyev had access to bank accounts registered to Acuhealth permits the conclusion that Anikeyev—not Kornilova—owned and controlled Acuhealth.

652. For all the reasons described above, Acuhealth was unlawfully controlled by a non-licensed acupuncturist, and thus Acuhealth is not lawfully eligible to seek or receive No-Fault benefit payments

653. To the extent that Allstate was caused to make payments to Acuhealth, Allstate is entitled to recover all such payments made to, or for the benefit of, Acuhealth, including, but not necessarily limited to, those payments listed in Exhibit 57.

654. Moreover, to the extent any charges submitted to Allstate by Acuhealth in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Acuhealth is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

O.   UNLAWFUL OPERATION AND CONTROL OF NR

655. Anikeyev recruited Razzakova to fraudulently incorporate NR.

656. Razzakova agreed to falsely represent to the State of New York—and to the public—that she was the sole officer, director, and shareholder of NR in the entity's articles of incorporation.

657. Once NR was organized, Razzakova ceded actual control of the company to Anikeyev.

86

658.    Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of NR.

659.    Anikeyev did many things to control the company, such as making kickback/referral arrangements with No-Fault Medical Mills, whereby he caused NR to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

660.    These kickback payments were often disguised as rental fees paid to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

661.    Anikeyev also arranged to share NR's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

662.    Payments to NR's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

663.    Anikeyev also controlled NR by securing the company's clinic location(s) and referral relationships, hiring NR's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling NR's corporate finances and professional fees/profits.

664.    Anikeyev's control of NR was accomplished, in part, by his structuring of one or more agreement between NR and Sylvan, which required NR to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

665.     These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Razzakova and NR on the other, maintained legitimate, arm's-length business relationships, even though they did not.

666.     Indeed, the agreements were meant to give Anikeyev control over NR by, among other things, serving as a means to channel NR's professional fees and profits to Anikeyev.

667.     Anikeyev also dictated NR's billing and treatment protocols.

668.     For example, Anikeyev caused NR to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though NR patients never received treatment for such duration of time.

669.     Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

670.     Anikeyev also caused NR to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme.  *See* Exhibits 10-11.

671.     Anikeyev further caused NR to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

672.     Razzakova never had meaningful control over the operation and management of NR.

673.     Razzakova had no role in developing or implementing NR's billing and treatment protocols.

88

674.    Razzakova also never made any initial capital investment into NR—Anikeyev provided the necessary start-up funds.

675.    Razzakova did not hire, train, or supervise any acupuncturists employed or contracted by NR, nor did she supervise any of the services provided by these acupuncturists.

676.    While her role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Razzakova did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of NR.

677.    Notably, in the *Zemlyansky* criminal matter (described above), NR was identified as an entity unlawfully controlled by Anikeyev.

678.    For all the reasons described above, NR was unlawfully controlled by a non-licensed acupuncturist, and thus NR is not lawfully eligible to seek or receive No-Fault benefit payments

679.    To the extent that Allstate was caused to make payments to NR, Allstate is entitled to recover all such payments made to, or for the benefit of, NR, including, but not necessarily limited to, those payments listed in Exhibit 58.

680.    Moreover, to the extent any charges submitted to Allstate by NR in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because NR is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

## P.   UNLAWFUL OPERATION AND CONTROL OF SILVER LOTUS

681.   As a further part of this scheme, Anikeyev induced Tsukanov to fraudulently incorporate Silver Lotus as a professional service corporation authorized to provide and bill for licensed acupuncture services.

682.   In exchange for compensation, Tsukanov agreed to falsely represent to the State of New York—and to the public—that he was the sole officer, director, and shareholder of Silver Lotus in the entity's articles of incorporation.

683.   Once Silver Lotus was organized, Tsukanov ceded actual control of the company to Anikeyev.

684.   Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of Silver Lotus.

685.   Similar to the other acupuncture PCs under his control, Anikeyev organized kickback/referral arrangements with No-Fault Medical Mills, whereby he caused Silver Lotus to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

686.   These kickback payments were often disguised as rental fees owed to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

687.   Anikeyev also arranged to share Silver Lotus' professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

688.   Payments to the "runners" affiliated with Silver Lotus were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

689.    Anikeyev controlled Silver Lotus in other ways, such as by securing the company's clinic location(s) and referral relationships, hiring Silver Lotus' treating acupuncturists and administrative staff, determining how patient services were to be billed, and controlling Silver Lotus' corporate finances and profits.

690.    Anikeyev was able to disguise his unlawful control of Silver Lotus by causing the company to enter into one or more agreement with Sylvan, which required Silver Lotus to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

691.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Tsukanov and Silver Lotus on the other, maintained legitimate, arm's-length business relationships, even though they did not.

692.    In reality, the agreements were actually intended to give Anikeyev control over Silver Lotus.

693.    Overall, Anikeyev had substantial control over Silver Lotus' corporate affairs.

694.    Anikeyev also dictated Silver Lotus' billing and treatment protocols.

695.    For example, Anikeyev caused Silver Lotus to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though Silver Lotus patients never received treatment for such duration of time.

696.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

697.    Anikeyev also caused Silver Lotus to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme. *See* Exhibits 10-11.

698.    Anikeyev further caused Silver Lotus to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

699.    Tsukanov never had any meaningful control over Silver Lotus.

700.    Tsukanov never had role in developing or implementing Silver Lotus' billing and treatment protocols.

701.    Tsukanov also never made any initial capital investment into Silver Lotus— Anikeyev provided the necessary start-up funds.

702.    Tsukanov never even practiced acupuncture through Silver Lotus.

703.    Further, Tsukanov did not hire, train, or supervise any acupuncturists employed or contracted by Silver Lotus, nor did he supervise any of the serves purportedly provided by these acupuncturists.

704.    While his role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Tsukanov did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of Silver Lotus.

705.    Notably, in the *Zemlyansky* criminal matter (described above), Silver Lotus was identified as an entity unlawfully controlled by Anikeyev.

706.    For all the reasons described above, Silver Lotus was unlawfully controlled by a non-licensed acupuncturist, and thus Silver Lotus is not lawfully eligible to seek or receive No-Fault benefit payments.

707.     To the extent that Allstate was caused to make payments to Silver Lotus, Allstate is entitled to recover all such payments made to, or for the benefit of, Silver Lotus, including, but not necessarily limited to, those payments listed in Exhibit 59.

708.     Moreover, to the extent any charges submitted to Allstate by Silver Lotus in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because Silver Lotus is not lawfully eligible for compensation under New York's No-Fault laws for each of the reasons detailed above.

### Q.     UNLAWFUL OPERATION AND CONTROL OF NEW CENTURY

709.     Anikeyev recruited Kondranina to fraudulently incorporate New Century.

710.     Kondranina falsely represented to the State of New York—and to the public—that she was the sole officer, director, and shareholder of New Century in the entity's articles of incorporation.

711.     Once New Century was organized, Kondranina ceded actual control of the company to Anikeyev.

712.     Throughout this scheme, Anikeyev held all decision-making authority regarding the management and operation of New Century.

713.     Anikeyev did many things to control the company, such as making kickback/referral arrangements with No-Fault Medical Mills, whereby he caused New Century to share its professional fees with the lay owners of the fraudulent medical clinics in exchange for: (a) the use of facility space, and (b) access to the clinics' patients in order to subject them to worthless and virtually identical treatment.

93

714.    These kickback payments were often disguised as rental fees paid to the No-Fault Medical Mills for the use of facility space, equipment, and personnel.

715.    Anikeyev also arranged to share New Century's professional fees with "runners," who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics.

716.    Payments to New Century's "runners" were typically labeled as "transportation" fees paid to drivers for transporting patients to the clinics.

717.    Anikeyev also controlled New Century by securing the company's clinic location(s) and referral relationships, hiring New Century's treating acupuncturists and administrative staff, determining how services were to be billed, and controlling New Century's corporate finances and professional fees/profits.

718.    Anikeyev's control of New Century was accomplished, in part, by his structuring of one or more agreement between New Century and Sylvan, which required New Century to make substantial and commercially unreasonable monthly payments to Anikeyev and/or Sylvan.

719.    These agreements were meant to create the illusion that Anikeyev and Sylvan on the one hand, and Kondranina and New Century on the other, maintained legitimate, arm's-length business relationships, even though they did not.

720.    Indeed, the agreements were meant to give Anikeyev control over New Century by, among other things, serving as a means to channel New Century's professional fees and profits to Anikeyev.

721.    Anikeyev also dictated New Century's billing and treatment protocols.

94

722.    For example, Anikeyev caused New Century to consistently bill Allstate for acupuncture treatment sessions lasting between 45-60 minutes, even though New Century patients never received treatment for such duration of time.

723.    Notably, Anikeyev has already confessed to engaging in such false billing practices in connection with several other acupuncture PCs named in this lawsuit.

724.    Anikeyev also caused New Century to submit fraudulent, boilerplate initial examination reports and treatment progress notes that were virtually identical to the reports and notes submitted by the other acupuncture PCs involved in this scheme.  *See* Exhibits 10-11.

725.    Anikeyev further caused New Century to engage in other false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

726.    Kondranina never had meaningful control over the operation and management of New Century.

727.    Kondranina had no role in developing or implementing New Century's billing and treatment protocols.

728.    Kondranina also never made any initial capital investment into New Century—Anikeyev provided the necessary start-up funds.

729.    Kondranina did not hire, train, or supervise any acupuncturists employed or contracted by New Century, nor did he supervise any of the services provided by these acupuncturists.

730.     While his role was limited to opening, and maintaining the facial validity of, the company for Anikeyev to control, Kondranina did, in fact, participate in this scheme to defraud Allstate by facilitating and furthering the unlawful operation and control of New Century.

731.     Notably, in the *Zemlyansky* criminal matter (described above), New Century was identified as an entity unlawfully controlled by Anikeyev.

732.     As part of his plea agreement entered in the *Zemlyansky* criminal matter (described above), Anikeyev consented to the forfeiture of all funds contained in one or more bank account registered to New Century, as those funds constituted the proceeds of Anikeyev's and his confederates' criminal activity.

733.     Despite having an opportunity to claim ownership over the funds in a New Century account, Kondranina never made any attempt to do so.

734.     Indeed, several arbitrations related to New Century's attempt to obtain No-Fault benefit payments have been resolved on the idea that New Century was not lawfully controlled, and is not entitled to No-Fault reimbursement.

735.     Several such decisions rely on the premise that if Kondranina was the actual owner of New Century (as is represented in New Century's public record filings), then Kondranina would have claimed (or at least made *some* attempt to claim) ownership of the funds contained in any New Century bank account that had been seized as part of Anikeyev's criminal sentence.  *See* Exhibit 15.

736.     Kondranina's inability to explain credibly why Anikeyev had access to bank accounts registered to New Century permits the conclusion that Anikeyev—not Kondranina—owned and controlled New Century.

737.    For all the reasons described above, New Century was unlawfully controlled by a non-licensed acupuncturist, and thus New Century is not lawfully eligible to seek or receive No-Fault benefit payments.

738.    Moreover, upon information and belief, several licensed acupuncturists whose names appear on New Century's invoices (i.e., NF-3 forms) as the "treating provider" were not actually employed by New Century, but were, instead, working as independent contractors.

739.    By billing for services provided by an independent contractor rather than an employee or owner of New Century, and then by purposely misrepresenting the person's employment status on NF-3 forms submitted to Allstate, all such claims are not compensable under the No-Fault laws.

740.    In light of New Century's unlawful control and impermissible independent contractor usage, to the extent that Allstate was caused to make payments to New Century, Allstate is entitled to recover all such payments made to, or for the benefit of, New Century, including, but not necessarily limited to, those payments listed in Exhibit 60.

741.    Moreover, to the extent any charges submitted to Allstate by New Century in connection with patients eligible for No-Fault coverage under an automobile insurance policy issued by Allstate remain unpaid, Allstate is under no obligation to make any future payments in connection with those charges because New Century is not lawfully eligible for compensation under New York's No-Fault laws.

## VII.   CERTAIN NOMINAL OWNER DEFENDANTS FAILED TO ENGAGE IN THE PRACTICE OF ACUPUNCTURE THROUGH THE PC DEFENDANTS

742.    Business Corporation Law § 1507 requires a shareholder of an acupuncture professional corporation to actually be engaged in the practice of acupuncture through the professional corporation.

743.    Several of the Nominal Owner Defendants have never engaged in the practice of acupuncture through their respective PC Defendants.

744.    Prevailing New York law is clear that:

A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued…. All shares issued, agreements made, or proxies granted in violation of this section shall be void.

N.Y. Bus. Corp. Law § 1507(a).

745.    The statute's legislative history confirms that an acupuncturist must not only be licensed to practice, but must also be engaged in the practice of acupuncture through the acupuncture professional corporation.

746.    For example, the New York State Education Department stated on June 15, 1971 in its recommendation regarding the amendment to the Business Corporation Law (S 5399-C):

This bill amends the Business Corporation Law in relation to the operation of professional service corporations. While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

98

747.    Similarly, the New York Department of State commented in a letter dated June 24, 1971 to Counsel to the Governor regarding the bill amending the Business Corporation Law (S 5399-C) that:

> Section 1507 currently limits issuance of shares in such a corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity. The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

748.    New York's Department of Health was of the same opinion in a letter dated June 24, 1971 to Counsel to the Governor regarding S 5399-C, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged.

### A.    MATSKINA AND BAY NEEDLE

749.    Matskina has never actually engaged in the practice of acupuncture through Bay Needle.

750.    Matskina's participation in the defendants' scheme involved providing her name and professional credentials for the purpose of organizing Bay Needle, helping maintain the facial validity of the professional service entity through the use of her name and professional credentials, and lending her name and professional credentials for use on patient treatment records and/or invoices.

751.    Throughout the relevant period, Matskina was rarely, if ever, physically present at any of the No-Fault Medical Mills from which Bay Needle operated, making it impossible for

Matskina to supervise the provision of acupuncture services purportedly provided to Bay Needle patients.

752.    None of the treatment records or bills submitted to Allstate by Bay Needle indicates that Matskina actually provided any acupuncture services to any Allstate claimants.

753.    The majority of Bay Needle bills submitted to Allstate do not contain any signature at all—never mind Matskina's signature.

754.    Rather, Bay Needle's bills simply bear the typed name(s) of the acupuncturist(s) who purportedly provided the treatment.

755.    The few bills that were "signed" by Matskina bear only an electronic, not actual, signature, which, upon information and belief, was likely placed on the forms by Anikeyev and those persons and entities working under his direction and control, including Sylvan.

756.    Likewise, virtually all of the assignment of benefit forms submitted to Allstate in connection with patients of Bay Needle do not bear Matskina's actual signature.

757.    Matskina's lack of involvement in the day-to-day operations of Bay Needle was by design—Anikeyev purposely caused the organization and subsequent operation of Bay Needle such that he—and not Matskina—would actually control Bay Needle.

758.    Matskina's failure to engage in the practice of acupuncture through Bay Needle— as well as her failure to supervise any acupuncturists who performed services on behalf of Bay Needle—compromised patient care and resulted in the provision of unnecessary and/or worthless acupuncture treatment.

759.    As a result of the conduct described herein, Bay Needle has always lacked reimbursement eligibility under New York's No-Fault laws.

### B.   MATSKINA, LENDEL, AND HEALTHY WAY

760.   Neither Matskina nor Lendel has ever actually engaged in the practice of acupuncture through Healthy Way.

761.   Matskina's and Lendel's participation in the defendants' scheme involved providing their names and professional credentials for the purpose of organizing or amending Health Way's corporate filings, helping maintain the facial validity of the professional service entity through the use of their names and professional credentials, and lending their names and professional credentials for use on patient treatment records and/or invoices.

762.   Throughout the relevant period, Matskina and Lendel were rarely, if ever, physically present at any of the No-Fault Medical Mills from which Healthy Way operated, making it impossible for either of them to supervise the provision of acupuncture services purportedly provided to Healthy Way patients.

763.   None of the treatment records or bills submitted to Allstate by Healthy Way indicates that either Matskina or Lendel actually provided any acupuncture services to any Allstate claimants.

764.   The majority of Healthy Way bills submitted to Allstate do not contain any signature at all—and thus clearly do not contain Matskina's or Lendel's signatures.

765.   Rather, Healthy Way's bills simply bear the typed name(s) of the acupuncturist(s) who purportedly provided the treatment.

766.   The few bills that were "signed" by Matskina and/or Lendel bear only an electronic, not actual, signature, which, upon information and belief, was likely placed on the forms by Anikeyev and those persons and entities working under his direction and control, including Sylvan.

767.     Likewise, virtually all of the assignment of benefit forms submitted to Allstate in connection with patients of Healthy Way bear neither Matskina's nor Lendel's actual signatures.

768.     Matskina's and Lendel's lack of involvement in the day-to-day operations of Healthy Way was by design—Anikeyev purposely caused the organization and subsequent operation of Healthy Way such that he—and not Matskina and/or Lendel—would actually control Healthy Way.

769.     Matskina and Lendel's failures to engage in the practice of acupuncture through Healthy Way—as well as their failures to supervise any acupuncturists who performed services on behalf of Healthy Way—compromised patient care and resulted in the provision of unnecessary and/or worthless acupuncture treatment.

770.     As a result of the conduct described herein, Healthy Way has always lacked reimbursement eligibility under New York's No-Fault laws.

### C.     KORNILOVA, LENDEL, AND LOTUS

771.     Neither Kornilova nor Lendel ever actually engaged in the practice of acupuncture through Lotus.

772.     Kornilova's and Lendel's participation in the defendants' scheme involved providing their names and professional credentials for the purpose of organizing or amending Lotus' corporate filings, helping maintain the facial validity of the professional service entity through the use of their names and professional credentials, and lending their names and professional credentials for use on patient treatment records and/or invoices.

773.     Throughout the relevant period, Kornilova and Lendel were rarely, if ever, physically present at any of the No-Fault Medical Mills from which Lotus operated, making it

impossible for either of them to supervise the provision of acupuncture services purportedly provided to Lotus patients.

774.   None of the treatment records or bills submitted to Allstate by Lotus indicates that either Kornilova or Lendel actually provided any acupuncture services to any Allstate claimants.

775.   The majority of Lotus bills submitted to Allstate do not contain any signature at all—and thus clearly do not contain Kornilova's or Lendel's signatures.

776.   Rather, Lotus' bills simply bear the typed name(s) of the acupuncturist(s) who purportedly provided the treatment.

777.   The few bills that were "signed" by Kornilova and/or Lendel bear only an electronic, not actual, signature, which, upon information and belief, was likely placed on the forms by Anikeyev and those persons and entities working under his direction and control, including Sylvan.

778.   Likewise, virtually every assignment of benefit form submitted to Allstate in connection with patients of Lotus bears neither Kornilova's nor Lendel's actual signatures.

779.   Kornilova's and Lendel's lack of involvement in the day-to-day operations of Lotus was by design—Anikeyev purposely caused the organization and subsequent operation of Lotus such that he—and not Kornilova and/or Lendel—would actually control Lotus.

780.   Kornilova and Lendel's failures to engage in the practice of acupuncture through Lotus—as well as their failures to supervise any acupuncturists who performed services on behalf of Lotus—compromised patient care and resulted in the provision of unnecessary and/or worthless acupuncture treatment.

781.   As a result of the conduct described herein, Lotus has always lacked reimbursement eligibility under New York's No-Fault laws.

103

### D. TSUKANOV, SUNRISE, AND SILVER LOTUS

782.   Tsukanov never actually engaged in the practice of acupuncture through either Sunrise or Silver Lotus.

783.   Tsukanov's participation in the defendants' scheme involved providing her name and professional credentials for the purpose of organizing Sunrise or Silver Lotus, helping maintain the facial validity of these professional service entities through the use of his name and professional credentials, and lending his name and professional credentials for use on patient treatment records and/or invoices.

784.   Throughout the relevant period, Tsukanov was rarely, if ever, physically present at any of the No-Fault Medical Mills from which Sunrise and Silver Lotus operated, making it impossible for Tsukanov to supervise the provision of acupuncture services purportedly provided to Sunrise and/or Silver Lotus patients.

785.   None of the treatment records or bills submitted to Allstate by either Sunrise or Silver Lotus indicate that Tsukanov actually provided any acupuncture services to any Allstate claimants.

786.   The majority of Sunrise and Silver Lotus bills submitted to Allstate do not contain any signature at all—never mind Tsukanov's signature.

787.   Rather, Sunrise's and Silver Lotus's bills simply bear the typed name(s) of the acupuncturist(s) who purportedly provided the treatment.

788.   The few bills that were "signed" by Tsukanov bear only an electronic, not actual, signature, which, upon information and belief, was likely placed on the forms by Anikeyev and those persons and entities working under his direction and control, including Sylvan.

104

789.     Likewise, virtually every assignment of benefit form submitted to Allstate in connection with patients of Sunrise and Silver Lotus does not bear Tsukanov's actual signature.

790.     Tsukanov's failure to engage in the practice of acupuncture through either Sunrise or Silver Lotus—as well as his failure to supervise any acupuncturists who performed services on behalf of either Sunrise or Silver Lotus—compromised patient care and resulted in the provision of unnecessary and/or worthless acupuncture treatment.

791.     Tsukanov's failure to engage in the practice of acupuncture through either Sunrise or Silver Lotus—as well as his failure to supervise any acupuncturists who performed services on behalf of Sunrise or Silver Lotus—compromised patient care and resulted in the provision of unnecessary and/or worthless acupuncture treatment.

792.     As a result of the conduct described herein, both Sunrise and Silver Lotus have always lacked reimbursement eligibility under New York's No-Fault laws.

## VIII.    UNLAWFUL BILLING FOR SERVICES RENDERED BY INDEPENDENT CONTRACTORS

793.     To be eligible for reimbursement under the No-Fault laws, a professional corporation is entitled to payment from an insurer only if, *inter alia*, the professional corporation—through an owner or employee thereof—is the actual provider of the billed-for services.

794.     A health care provider's use of independent contractors, rather than employees, to provide health care services renders the provider ineligible to receive reimbursement under the No-Fault laws.  *See* DOI Opinion Letters, attached hereto as Exhibit 16.

795.     Throughout the scheme, the bills submitted by the PC Defendants include charges for services provided by independent contractors.

796.     As detailed above, at least one Nominal Owner Defendant, Kondranina, as well as numerous treating acupuncturists who rendered services through several of the PC Defendants, previously disclosed to another insurer that they were paid by Anikeyev (and/or those persons and entities working under his direction and control, including Sylvan) as independent contractors on a 1099 basis.

797.     Specifically, these treating acupuncturists revealed that they were always paid by Sylvan on a 1099 basis regardless of which entity Anikeyev directed them to render treatment under.

798.     Nevertheless, the defendants billed Allstate for acupuncture services as if they were provided by direct employees of the PC Defendants.

799.     To conceal the PC Defendants' practice of billing for services performed by independent contractors, the defendants falsely listed the treating acupuncturists as employees on the bills submitted to Allstate.

800.     Because the acupuncture services were rendered by independent contractors, none of the PC Defendants were ever the direct provider of the health care services that were billed to Allstate.

801.     Accordingly, in all such instances, the PC Defendants were completely ineligible to receive reimbursement for those billed-for services under New York's No-Fault laws.

## IX.     THE PC DEFENDANTS' FAILURE TO APPEAR FOR DULY SCHEDULED EUOS

802.     As part of the investigation into this matter, Allstate duly and properly requested, on several occasions, that PC Defendants Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K.

Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C. appear for and provide testimony at EUOs for the purpose of verifying the compensability of the claims submitted to Allstate by these providers.  *See* Exhibit 17 for a representative example of the EUO scheduling letters where PC Defendants Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C. failed to appear for duly and properly requested EUOs.

803.   Despite proper notice by Allstate, PC Defendants Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C. each failed to appear, on several occasions, for their duly requested EUOs, thereby depriving Allstate of its ability to verify the legitimacy and compensability of the claims submitted to Allstate on behalf of these entities.  *See* Exhibit 18 for a representative example of non-appearance transcripts where PC Defendants Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C. failed to appear for duly and properly requested EUOs.

804.   By failing, on several occasions, to appear for duly scheduled EUOs, PC Defendants Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C. each failed to satisfy a condition precedent to coverage, thus rendering each entity ineligible to receive

reimbursement of No-Fault benefits with respect to several claims submitted to Allstate on behalf of these PCs' patients.

805.    The repeated failures of PC Defendants Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C. to appear for numerous duly noticed EUOs—without offering any excuse, reasonable or otherwise—constitutes a pattern of willful noncooperation.

806.    Based on PC Defendants Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C. respective failures to satisfy a condition precedent to coverage, these PC Defendants have lost their lawful entitlement to No-Fault reimbursement on the specific claims listed in Exhibit 19.

## X.    THE DEFENDANTS' FRAUDULENT TREATMENT PROTOCOL AND BILLING PRACTICES

807.    The defendants' scheme also involved the provision of virtually identical treatment to every patient, regardless of which PC Defendant provided and billed for the services.

808.    The services purportedly provided to Allstate claimants were never based upon any patient's unique characteristics, subjective complaints, or the nature and extent of his or her purported injuries; rather, such services were administered pursuant to a fraudulent, predetermined protocol designed to financially enrich Anikeyev rather than benefit patients of the PC Defendants.

108

809.    The defendants also routinely engaged in false billing practices, such as inflating charges for patient examinations, manipulating charges for acupuncture treatment, and billing for unsupported "adjunct services" during the majority of patient visits, such as moxibustion, acupressure, cupping, and TDP lamp/infrared.

A.   <span style="font-variant:small-caps">**Treatment Rendered Pursuant to a Pre-Determined Protocol**</span>

810.   Acupuncture is a form of Traditional Chinese Medicine ("TCM") that is based upon the concept that the body's vital energy (called "qi")[4] flows through channels within the human body (called "meridians").

811.   There are twelve main meridians. Each meridian is believed to be connected to specific organs, limbs, joints, bones, tendons, tissues, and skin.

812.   Meridians are natural pathways for the flow of qi and supply a constant source of energy to different body parts. Meridians have been described as "energy highways," "rivers" through which the life energy flows, and "the body's healing energy pathways."

813.   In a healthy meridian system, qi successfully nourishes and energizes different organs and tissue, and works to maintain normal metabolic activities.

814.   However the smooth and balanced flow of qi through the meridians can be affected by numerous external and internal factors, including physical injury from trauma.[5]

815.   When a meridian is blocked, the supply of qi to different body parts is disturbed, leading to disharmony and corresponding pain or illness.

816.   This is true even when the affected area is far away from the site of the original blockage because each meridian is connected to multiple parts of the body, and certain meridians are considered to "communicate" with one another—meaning that a problem in one meridian can lead to problems in another meridian.

---

[4] The words "qi" and "chi" are used interchangeably in the English language to refer to TCM's concept of vital energy or life energy. References herein to qi and chi should be construed as references to the same concept.

[5] Other factors that can impact the flow of qi include improper diet, pollution, germs, congenital disorders, internal weakness, emotional distress, and climatic influences. *See* http://www.shen-nong.com/eng/treatment/acupuncture_strategy.html; http://www.healthynewage.com/essences/.

817.   In the practice of acupuncture, the acupuncturist works to remove the disturbances, obstructions, and imbalances of qi by inserting hair-thin needles into specific points (called "acupuncture points") on the superficial structures of the human body (i.e., skin, subcutaneous tissue, or muscles) located along the meridians.[6]

818.   The inserted needles unblock obstructions in the meridians and re-establish regular flow of qi.

819.   Thus, acupuncture helps the body to self-heal through its ability to restore the balance and movement of qi throughout the body so that proper organ function and harmony may resume. Ultimately, the goal is to return the patient to a state of health and balance.

820.   Legitimate acupuncture treatment should vary from patient to patient.

821.   Every person's qi, and flow of qi, is unique.

822.   Thus, restoring balance to a patient's flow of qi requires an individualized treatment strategy.

823.   Moreover, legitimate treatment requires continuous assessment of the patient's condition and energy flow, and of the therapeutic effect of previous treatments.

824.   The acupuncturist should make adjustments as the patient progresses to improve the effectiveness of each treatment session and eventually return the patient to maximum health.

825.   Legitimate acupuncture also requires meaningful documentation of: (a) the patient's complaints and injuries, described in their unique nature; (b) the physical examination performed, including the results of any orthopedic or neurological testing; (c) the patient's

---

[6] While the vast majority of acupuncture points are located along meridians, a small percentage of acupuncture points are not located along meridians (called "extraordinary points"). Acupuncturists may also utilize Ashi points, which are acupuncture points without specific names or definite locations that are selected to treat a particular area of tenderness unique to a specific patient. However, as the defendants utilized neither extraordinary points nor Ashi points, they are not discussed herein any further.

diagnosis, including severity of the diagnosis; (d) a brief prognosis; (e) details on what specifically is better or worse from the previous treatment; and (f) the patient's overall progress.

826.    As detailed below, the acupuncture treatment purportedly provided to patients of the PC Defendants does not bear any of the characteristics of the legitimate practice of acupuncture.

827.    Rather, such treatment was provided in a rote and formulaic manner that is not patient-centered, but represents needle insertion for the sole purpose of billing.

828.    Patients were treated using the same limited selection of repetitive acupuncture points which practically never varied based upon the number or severity of the patient's complaints, or any other factor.

829.    Moreover, while the treatment notes submitted by the PC Defendants consistently reflected that their patients experienced little-to-no progress, the purported "treatment" continued to be administered for many months to the same few points over and over again.

830.    This is because the purported "treatment" provided by the PC Defendants does not reflect the independent professional judgment of any licensed acupuncturist, but rather was the product of a preordained recipe of treatment designed by Anikeyev to maximize the bills submitted to insurers, including Allstate.

831.    This protocol includes, but is not necessarily limited to: (a) deficient initial examinations; (b) virtually identical acupuncture treatment; and (c) several unnecessary and/or unwarranted adjunct services, including moxibustion, acupressure, cupping, and TDP lamp/infrared therapy.

### 1.     Initial Examinations

832.    The initial examinations purportedly provided to patients of the PC Defendants were not individualized exams; instead, the examinations—if even provided—were cursory in nature, and were simply a component of the defendants' uniform treatment protocol.

833.    The documentation created by the PC Defendants in connection with these examinations does not reflect the performance of individualized examinations.

834.    For example, despite their varying complaints and underlying conditions, the examination reports for every patient of the PC Defendants contain the same exact care recommendations.

835.    Indeed, most of the essential elements of a legitimate initial acupuncture exam were either not performed or were wholly deficient.

836.    First, the initial exam reports contained no relevant patient history, such as past medical history, information about personal habits (i.e., smoking, drinking, and/or drug use), family history, or current medications.

837.    In many instances, the PC Defendants' initial exam reports indicated no relevant patient history even though other providers who treated the same patient noted significant past medical history.

838.    For example, Silver Lotus patient N.M. is listed as having no past medical history in her acupuncture initial examination report.  However, a chiropractor who examined her on the same date noted an open worker's compensation case for a pre-existing torn rotator cuff.

839.    Moreover, it is suspect that none of the PC Defendants' patients are documented as taking analgesics, particularly in light of their high pain scale ratings.

840. Second, the tongue and pulse exams documented by the PC Defendants are deficient and of little-to-no value.

841. A legitimate tongue and pulse exam is useful in developing a more comprehensive diagnostic pattern that guides the practitioner to a more effective treatment strategy.

842. The overwhelming majority of the PC Defendants' initial exam reports do not even identify the patient's pulse rate.

843. Tongue evaluations lack any description of the veins under the tongue. Also, an abnormally high percentage of reports indicate that the patient's tongue was purple—which is extremely rare.

844. Additionally, based upon the fact that neither the degree of motion impairment nor the plane of motion affected (i.e., flexion, extension, rotation, abduction, adduction, etc.) were ever noted, the PC Defendants did not have actually perform the range of motion testing purportedly provided as part of their initial exams.

845. The PC Defendants also failed to actually perform palpitation on their patients during their initial exams. The reports contain no information regarding the level, type, and location of the patients' pain. The documented findings from palpitation of the PC Defendants' patients are generalized (i.e., whole regions of the neck and spine) without delineation of what levels or sides were involved.

846. The initial exam reports also failed to indicate that any orthopedic exams were performed.

114

847.    Additionally, all of the PC Defendants' initial examination reports contain several boilerplate phrases/sections that are present across all of the PC Defendants' initial examination reports.

848.    Notably, these phrases appear in different sections of the PC Defendants' initial examination reports—likely to create the appearance that the reports are not substantively identical, which they are.

849.    First, all of the pre-printed initial exam reports state that auricular points will be utilized throughout the treatment, although auricular points were never indicated on any treatment notes.

850.    Pre-printed initial exam reports also conclude that "[i]t was determined that the patient needs hot packs prior to treatment." However heat is not required for every single acupuncture patient.

851.    The size, type, and quantity of needles to be used is also pre-determined and described in pre-printed template language.

852.    It is simply not credible that every patient would need the same size and type of needles on every insertion point at almost every acupuncture session regardless of their individual conditions; indeed, different body types and conditions require the use of different sizes and types of needles.

853.    Moreover, the type of needles selected for all patients—38 gauge hyper-thin needles—are not suitable for the type of deeper muscle penetration needed to treat trauma patients.

854.    All initial exam reports invariably conclude that the patient will receive liquid moxa treatment.

115

855. Finally, all of the reports erroneously indicate that "[t]he patient has been persistent with acupuncture treatments and showed moderate improvement" despite the fact that, at the time that these reports were drafted, the patients had not yet received their first session of acupuncture treatment.

856. Additionally, all patients were diagnosed with the same injury, namely "Chi and Blood stagnation," and given a prognosis of "guarded."

857. It is highly unlikely that every single patient suffered from the same condition.

858. The defendants likely listed all prognoses as guarded (meaning the outcomes of the patients' illnesses were in doubt and could worsen) to justify excessive and medically unnecessary treatment.

859. It also strains credulity that every single patient was diagnosed as having sustained neck and mid/low back injuries, and that a substantial majority of these patients were also diagnosed with an extremity injury (typically to the shoulder).

860. The initial exam reports submitted to Allstate by the PC Defendants—which consist almost entirely of subjective complaints, boilerplate language, and conclusory diagnoses without any indication of any physical examinations or tests (i.e., tongue/pulse exam, palpitation, range of motion testing, orthopedic exams) performed to substantiate these findings—do not reflect legitimate, compensable initial examinations.

861. Rather, the defendants conducted these "exams" as part of their treatment protocol and as a basis to justify excessive and medically unnecessary treatment. Due to the inadequate nature of these exams and corresponding reports, it would be impossible for a practitioner to create a viable treatment plan or evaluate patient progress relying on these reports.

862. It appears that the defendants intentionally created vague, generic, and nondescript initial examination reports to ensure that there was no objective way to track patient progress.

**2.      Acupuncture Treatment**

863. As a further part of their fraudulent treatment protocol, the defendants rendered worthless and virtually identical acupuncture treatment to every patient.

864. The various problems with the PC Defendants' provision of care demonstrate that the goal of the treatment was to financially enrich the defendants, and not to genuinely treat any patient.

**a.      *Lack of Interval Assessment***

865. None of the PC Defendants provided a meaningful interval assessment to any patient during any acupuncture treatment session.

866.  Each acupuncture treatment session should begin with an assessment of the patient's progress from prior treatments, called an interval assessment.

867. A legitimate interval assessment should include obtaining a brief report of the results of the previous treatment and any significant changes that have occurred since the last visit.

868. The PC Defendants' treatment notes list only the date of service, region of complaint, and points needled.

869. There is no other treatment information apart from checkmarks for moxibustion, acupressure, cupping, and TDP lamp/infrared therapy—the results and location of which are never indicated.

117

870.     While some records do indicate a tongue and pulse exam, these exams are essentially of no value since the results never have any impact on treatment.

871.     Some treatment notes permit the practitioner to circle whether the patient's pain is less, worse, or the same, but the patient's pain is never quantified on a numerical scale (nor does it ever impact treatment).

872.     There are no details regarding the type of pain (i.e., burning, numbness, sore, aching, etc.) or what exacerbates or relieves it.

873.     Without knowing which complaints are resolving, staying the same, or getting worse, it would have been impossible for any of the PC Defendants' employees to evaluate the effectiveness of prior treatments and to correspondingly adjust the course of treatment.

**b.     *Excessive Treatment Frequency and Duration***

874.     The PC Defendants rendered treatment at an excessively high frequency for an excessive duration without any valid clinical justification.

875.     It can take up to two to three days for the therapeutic effect of properly performed acupuncture to manifest.

876.     Thus, it is typically not advisable to access the same acupuncture points during that time so the efficacy of the previous treatment can be assessed.

877.     Additionally, while high frequency treatment (2-5 times per week) is common for new patients experiencing severe pain, the frequency of care should be reduced as the patient progresses.

878.     Patients of the PC Defendants received treatment at an excessively high frequency throughout the duration of their treatment without showing any progress.

879.    This is likely because the PC Defendants did not track the progress, or lack thereof, of their patients.

880.    In fact, many patients who received treatment four (4) times per week were never given a re-examination at any point.

881.    In other instances, patients increased frequency without any explanation.

882.    For example, Silver Lotus patient E.R. received treatment three (3) times per week for two months until he suddenly treated four (4) consecutive days (5/2/2011-5/5/2011), without any justification identified in his treatment notes.

883.    Providing treatment this frequently prevents the practitioner from evaluating the efficacy of each individual treatment session.

884.    Moreover, the PC Defendants continued to treat patients long past the time during which it was medically necessary.

885.    The defendants' provision of excessive treatment without any valid justification was done for their financial benefit and had no correlation to the medical needs of their patients.

c.    ***Untreated Complaints***

886.    In almost every case, the PC Defendants failed to treat all of the patient's complaints.

887.    Non-spinal injuries were rarely treated.

888.    For example, although TC patient C.H. complained of head, neck, chest, mid-back, and groin pain, only her back, neck, and shoulder were treated—her head, chest, and groin injuries were ignored.

889.    TC patient B.S.'s headache complaints also went ignored.

119

890.    The PC Defendants only treated a maximum of two complaints at a time, even when many other complaints could have easily been treated simultaneously.

891.    For example, although the most common acupuncture point for treating headaches (GB 20) is only three (3) inches above the point used to treat TC patient B.S.'s shoulder, his headache went untreated.

892.    The reason that the defendants ignored so many injuries was because they endeavored to deliver the least amount of care possible. There is no other plausible explanation for delivering such ineffective care to so many patients over and over again.

### d.    *Inadequate Point Selection*

893.    The PC Defendants failed to select acupuncture points to properly treat their patients' conditions. Acupuncture is effective in treating pain throughout the entire body, and is not restricted to treating back and neck injuries.

894.    Although the precise acupuncture points that should be selected depends on each patient's specific injuries and underlying conditions, general guidelines should be observed in point selection and usage.

895.    First, mild injuries should be treated using a small number of points, while severe injuries should be treated by selecting many points.

896.    Second, practitioners should utilize both local and distal points. Local points are those in close proximity to the location of the pain. Injuries to the limbs and superficial diseases are often treated using local points.

897.    Local points are also used to treat chronic pain.

898.    Distal points are those far away from the site of pain.

899. These points play an important role in clearing channels from obstructions, and thus are widely recognized for their ability to reduce pain from Qi and Blood stagnation.

900. Therefore distal points located on the limbs are often used to treat injuries to the head, chest, abdomen, and back.

901. The use of distal points is especially important in treating cases of acute pain, such as from traumatic injury.

902. Finally, it is common practice to alternate between points or point prescriptions to avoid over-stimulation of or damage to points.

903. The points selected by the PC Defendants are inadequate for a number of reasons.

904. First, the defendants failed to utilize important clinically effective points that should have been used routinely.

905. For instance, the PC Defendants never utilized local Hua Tuo Jia Ji points along the spine, which are useful in reaching deeply into the back muscles.

906. Similarly, the combination of distal points LI-4 (located on the hand) and LV-3 (located on the foot) is widely recognized for its ability to reduce pain from Qi and Blood stagnation—the condition from which all of the PC Defendants' patients purportedly suffer—yet it is never used.

907. The most influential and essential distal point for treating low back pain, point UB 40, located at the back of the knees, is also never used.

908. Likewise, the following organ support points useful in treating back injuries are never used: UB-62, SI-3, and K-13.

909. The defendants also failed to utilize distal points. Instead, the PC Defendants used local points on the posterior back during the overwhelming majority of patient visits.

121

910.     This finding is particularly troublesome given the known usefulness of distal points in alleviating obstructions caused by Qi and Blood stagnation.

911.     The defendants' use of predominantly local points was purely out of convenience for the practitioner and designed to enable the defendants to quickly treat a large number of patients within a given day.

912.     It was not done in the interest of providing patients with comprehensive treatment for the conditions presented.

913.     The patients of the PC Defendants received no discernable benefit from receiving repetitious treatment to the back only.

e.      *__Use of an Insufficient Number of Needles__*

914.     The defendants did not utilize a sufficient number of needles to effectively treat their patients.

915.     As stated above, patients complaining of severe pain should be treated with many acupuncture points.

916.     All of the PC Defendants' patients complained of severe pain in many areas—all pain scale ratings taken at initial exams were within the "excruciatingly" high 7-10 range.

917.     In light of the severity of these complaints, the PC Defendants used too few needles per session for the treatment to be considered therapeutically effective.

918.     The PC Defendants appear to have adhered to an informal yet pre-determined maximum of ten (10) needles per session, typically using four to six (4-6). This informal policy was designed to facilitate the PC Defendants' delivery of high frequency treatment without regard for their patients' needs.

**f.**   ***Lack of Coordination of Care and Patient Progress***

919.   In a legitimate multi-disciplinary clinic setting, providers rendering treatment to the same insured communicate with one another to coordinate the care rendered.

920.   Although all of the PC Defendants' patients were concurrently receiving physical therapy and chiropractic care from providers located within the same multi-disciplinary clinics as the PC Defendants, there is no indication of any communications among the professionals or any attempt to coordinate their treatment. Rather, the patients simply served as a means by which the providers billed insurers.

921.   Additionally, in a legitimate rehabilitative acupuncture practice, the acupuncturist would document the patient's progress by monitoring functional changes, activities of daily living (ADL) improvements, and/or changes in ranges of motion.

922.   Treatments that yield little diminution of pain or little-to-no increase in functionality are deemed medically unnecessary and discontinued.

923.   The treatment notes provided by the PC Defendants contain no evidence of any improvement, suggesting that the defendants were providing maintenance care rather than therapeutic rehabilitative care.

924.   The overall pattern of identical treatments being repeated over and over again strongly suggests that the defendants rendered treatment for the purpose of financially enriching themselves rather than for the purpose of patient care.

**3.**   **Adjunct Services**

925.   As part of their fraudulent treatment protocol, the PC Defendants billed Allstate for certain "adjunct" services, including moxibustion, acupressure, cupping, and TDP

lamp/infrared therapy, to pad their bills with unnecessary charges (on top of the charges for their bogus acupuncture treatments).

926.    The charges for these services were not medically necessary and the services may never have actually been performed.

**B.    FRAUDULENT BILLING PRACTICES**

927.    All of the bills and invoices created and submitted to Allstate by defendants contain Current Procedural Terminology ("CPT") Codes.

928.    CPT Codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental health care payors.

929.    By including CPT Codes on their bills, defendants represented to Allstate that the services listed on their bills were performed in a manner required by the AMA's guidelines.

930.    By creating treatment bills that include CPT Codes, then causing such invoices to be submitted to Allstate through the U.S. Mail, the defendants represented that the invoiced services were performed in conformity with the AMA's CPT Code guidelines.

931.    However, many of the bills prepared and submitted by defendants, under the defendants' supervision and control, were submitted under improper and/or deceptive CPT Codes.

932.    Moreover, in certain instances, the documentation submitted to Allstate fails to support that the billed-for services were even rendered at all.

933.    In fact, Anikeyev admitted in his allocution that he billed insurers for acupuncture treatment using misleading and/or incorrect billing codes, including for services not rendered. *See* Exhibit 2.

1. **False Billing of Patient Initial Examinations**

934. The defendants billed Allstate for patient initial examinations under CPT Codes 99203 and 99202.

935. The criteria developed by the AMA to properly assign a CPT code to a service rendered under CPT Code 99203 include a number of components and factors, with history, examination, and medical decision-making being the three key components.

936. To warrant a medical bill demanding payment for CPT Code 99203, the CPT codebook requires all of the following: (a) a detailed history; (b) a detailed examination; and (c) medical decision-making of low complexity.

937. If any of the three key components are not met, CPT Code 99203 is not supported.

938. Typically, for an initial examination to be billed under CPT Code 99203, the patient must present with a problem of moderate severity.

939. Initial examinations billed under CPT Code 99203 also typically require the treating acupuncturist to spend thirty (30) minutes face-to-face with the patient and/or family.

940. The factors considered to determine the "complexity of medical decision-making" in arriving at a proper CPT Code assignment include:

| | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **CPT Code 99203** | Limited | Limited | Low |

941.    The chart annexed at Exhibit 20 identifies fraudulent, non-compensable charges submitted by defendants to Allstate for reimbursement for initial examinations under CPT Code 99203.

942.    Despite the relatively low requirements needed to sustain a charge under CPT Code 99203, none of the charges submitted by the PC Defendants under that code meet the requirements because all of their initial examinations reports were boilerplate and virtually identical.

943.    In every case, the defendants failed to document the necessary history, physical examination, and medical decision-making to bill under CPT Code 99203.

944.    In fact, based upon the virtually identical nature of the initial examination reports submitted by the PC Defendants, it does not appear that any licensed acupuncturist exhibited any level of medical decision-making in the course of these exams.

945.    The reports consist entirely of unsupported complaints/diagnoses without any indication that objective tests (i.e. tongue and pulse exams, palpitation, range of motion testing, and/or orthopedic exams) were performed to substantiate these findings.

946.    Virtually every report submitted to Allstate by the PC Defendants contained the exact same language in the "Treatments and Recommendations" section, "Comments" section, and "Prognosis" section.

947.    As stated above, the initial examination reports submitted by the PC Defendants were so similar that they even contained the same typographical errors.

948.    Further, many of the initial examination reports erroneously indicate that "[t]he patient has been persistent with acupuncture treatments and showed moderate improvement"

126

despite the fact that, at the time that these reports were drafted, the patients had not yet received their first session of acupuncture treatment.

949. It is unclear how all of these reports contain the same egregious errors if they were the product of legitimate, individualized patient examinations.

950. The initial examination reports submitted to Allstate by the PC Defendants under CPT Code 99203 are so devoid of any patient-specific information that it is unclear whether these examinations were ever actually performed.

951. Based upon the health care documentation submitted by the defendants for each of the patients identified in Exhibit 20, none of the billing containing charges for CPT Code 99203 was warranted because the health care documentation submitted to Allstate by the defendants for each of the patients fails to meet the minimum threshold necessary to bill CPT Code 99203.

952. Specifically, the defendants failed to document the necessary patient history, physical examination, and medical decision-making required by CPT Code 99203.

953. Accordingly, for these reasons, all of the defendants' charges for such services are not compensable.

954. Because the nature and extent of the initial examinations purportedly provided to the patients identified in the chart annexed at Exhibit 20 were misrepresented, the defendants are not entitled to collect payment for such services.

955. To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these initial examinations, Allstate is entitled to recover payments made to the defendants in connection with these services.

956.     Moreover, to the extent any of the charges itemized in Exhibit 20 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable.

### 2.     <u>False Billing for Acupuncture Services</u>

957.     As part of this scheme, the PC Defendants were caused to falsely bill Allstate for three to four (3-4) units of acupuncture treatment, purportedly consisting of 45-60 minutes of personal one-on-one contact, per patient per date of service (in addition to fraudulent charges for bogus "adjunct" treatments—discussed below).

958.     Although none of the patients treated through the PC Defendants ever received acupuncture treatment for that amount of time, the defendants intentionally exaggerated the nature and extent of the services provided as a means to inflate the charges submitted to Allstate.

959.     As indicated above, Anikeyev admitted in his allocution that he billed insurers for acupuncture treatment in excess of the actual time spent treating patients.

960.     For virtually every patient on virtually every date of service, the PC Defendants billed Allstate for one (1) unit of initial fifteen (15) minutes of personal one-on-one contact under CPT Code 97810, as well as two to three units of additional fifteen (15) minute increments of one-on-one contact under CPT Code 97811.

961.     In addition to the actual needling of points, a provider must perform the following tasks to bill an initial acupuncture treatment under CPT Code 97810: (a) chart review; (b) greeting the patient; (c) obtaining an interval assessment (described above); (d) point selection; (e) post-service charting; and (f) providing exit instructions to the patient.

962.    The estimated time for completing these tasks is six (6) minutes, leaving nine (9) minutes for point location, point cleaning, actual needling, and needle removal.

963.    Only one unit of CPT Code 97810 may be billed per patient per date of service. *See CPT Assistant Newsletter*, June 2006, p. 20, attached hereto at Exhibit 21.

964.    None of the charges submitted under CPT Code 97810 are compensable because, in every case, the defendants failed to provide the following necessary components: (a) chart review; (b) interval assessment; (c) post-service charting; and/or (d) exit instructions on self-care.

965.    In fact, it appears that no acupuncturist spent more than ten (10) minutes of one-on-one contact with any patient based upon: (a) the sparse nature of the treatment notes submitted, (b) the small number of points used, and (c) the lack of evidence of the basic elements of CPT Code 97810.

966.    Moreover, at least some of the PC Defendants billed Allstate for multiple units of CPT Code 97810 per patient per date of service, despite the AMA's prohibition against doing so.

967.    Thus, none of the charges submitted to Allstate by the defendants under CPT Code 97810 meet the standard necessary to sustain such a charge.

968.    According to the Fee Schedule, a provider billing CPT Code 97811 must meet the following requirements: (a) the patient received an initial fifteen minutes of personal one-on-one contact with the acupuncturist billed under CPT Code 97810;[7] (b) the acupuncturist removes the needles from the patient's body; (c) the acupuncturist spends an additional fifteen minutes of personal one-on-one contact treating the patient; and (d) the acupuncturist inserts new needles into the patient's body.

---

[7] The fifteen minutes of initial acupuncture treatment may alternatively be billed under CPT Code 98713 if the acupuncture is administered with electric stimulation.

969.    Treating the patient for an additional fifteen minutes, without more, does not entitle a provider to bill under CPT Code 97811; the acupuncturist must also either insert new needles into the body, or re-insert existing needles into different muscle fibers.

970.    The chart annexed at Exhibit 22 identifies fraudulent, non-compensable charges submitted by defendants to Allstate for reimbursement for additional units of acupuncture treatment under CPT Code 97811.

971.    These charges are fraudulent and non-compensable because, in every case, the treating acupuncturist failed to: (a) spend an initial fifteen minutes of personal one-on-one contact with the patient; (b) spend an additional fifteen minutes of personal one-on-one contact treating the patient; and/or (c) insert new needles into the patient's body.

972.    Moreover, although CPT Code 97811 is time-based, the PC Defendants billed a unit of CPT Code 97811 for each body part treated.

973.    Thus, if only one area was treated (i.e., neck), one unit of CPT Code 97811 was billed; if two areas were treated (i.e., neck and back), two units were billed; if three areas were treated (i.e., neck, back, and shoulder), three units were billed.

974.    However, as stated above, the PC Defendants used local points on the posterior back during the overwhelming majority of treatment sessions.

975.    Thus, virtually all points needled by the defendants were adjacent to the primary points and reachable at the same time that the first points were inserted, without the need for patient repositioning.

976.    In fact, the extremely limited set of acupuncture points used by the defendants can be reached within a matter of minutes and could not possibly take more than fifteen minutes to treat.

977.    Accordingly, none of the charges submitted to Allstate by the PC Defendants under CPT Code 98711 were warranted.

978.    Further, none of the treatment progress notes submitted by the PC Defendants indicate more than one set of reinsertion points or additional face time falling outside of the primary CPT Code 97810.

979.    Because the nature and extent of the additional segments of acupuncture treatment purportedly provided to the patients identified in the chart annexed at Exhibit 22 were misrepresented, the defendants are not entitled to collect payment for such services.

980.    To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these acupuncture treatments Allstate is entitled to recover payments made to the defendants in connection with these services.

981.    Moreover, to the extent any of the charges itemized in Exhibit 22 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable.

### 3.    Improper Billing for Unsupported "Adjunct" Services

#### a.    *Moxibustion*

982.    The PC Defendants purportedly provided moxibustion therapy to patients.

983.    Moxibustion, like acupuncture, is a TCM treatment used to simulate the flow of qi and blood.

984.    Moxibustion is used to treat many conditions, including pain from traumatic injury.

985.    Billing for moxibustion requires documentation of the areas treated.

986.    Traditional moxibustion therapy is provided either "directly" or "indirectly."

987.    During direct moxibustion therapy, an herb called mugwort is ground up, shaped into a cone or cigar-shaped stick, placed directly onto an acupuncture point or meridian, and burnt until the patient's surrounding skin becomes red. The ground up mugwort substance is referred to as "moxa."

988.    Indirect moxibustion therapy can be performed in one of several ways.

989.    In the first variation, the acupuncturist holds a burning moxa cigar near an acupuncture point or meridian to heat the skin, until the skin becomes slightly red.  This process typically takes approximately fifteen (15) minutes.

990.    Indirect moxibustion can also be performed by placing a clump of moxa onto an inserted acupuncture needle and igniting the tip to heat the surrounding area.

991.    Alternatively, the acupuncturist may cover an acupuncture point or meridian with a layer of ginseng, salt, garlic, or aconite cake, and place an ignited moxa cone onto the covered point or meridian.

992.    In both direct and indirect moxibustion therapy, the burning mugwort warms the surrounding area, which stimulates circulation and induces a smoother flow of blood and qi.

993.    Thus, traditional moxibustion therapy is often used to alleviate pain caused by Qi and Blood stagnation.

994.    The therapeutic effect of traditional burning moxa has been well known for centuries.  In ancient China, acupuncture and moxibustion were traditionally used together to free blockages and clear excesses in the meridians. In fact, the original Chinese term for acupuncture, "Zhen Jiu," refers to both needling (zhen) and moxibustion (jiu), two techniques

understood to be essential parts of one fundamental approach to treating disease and maintaining health.

995.    It takes time to administer traditional burning moxa, whether applied directly or indirectly.

996.    In contrast to traditional burning moxa, "liquid moxa" is a topical agent applied to the skin instantaneously using a spray bottle.

997.    The therapeutic value of liquid moxa is undocumented. Thus, many TCM practitioners do not perform smokeless versions of moxa therapy.

998.    Because the procedure and therapeutic value of liquid moxa are materially different from the procedure and therapeutic value of traditional burning moxa, it is fraudulent to bill liquid moxa treatment as the traditional burning moxibustion.

999.    In order to inflate the charges submitted to Allstate, the defendants improperly billed Allstate for liquid moxa treatments while falsely representing that the billed-for services were traditional moxibustion treatments.

1000.    Further, the documentation submitted to Allstate by the PC Defendants fails to include any information about the areas treated.

1001.    The chart annexed at Exhibit 23 identifies fraudulent, non-compensable charges submitted by defendants to Allstate for reimbursement for liquid moxa treatments.

1002.    Because the nature and extent of the moxibustion therapy treatments purportedly provided to the patients identified in the chart annexed at Exhibit 23 were misrepresented, the defendants are not entitled to collect payment for such services.

1003.  To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these moxibustion treatments, Allstate is entitled to recover payments made to the defendants in connection with these services.

1004.  Moreover, to the extent any of the charges itemized in Exhibit 23 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable.

### b.  *Acupressure*

1005.  Acupressure is a form of massage that applies the same principles as acupuncture.

1006.  Accordingly, the goal of acupressure is to restore the balanced flow of qi through the meridians by removing obstructions.

1007.  Acupressure is useful in treating various conditions, and is known for its ability to reduce or alleviate pain from physical injury.

1008.  In treatment, the practitioner accesses the same points and meridians as in acupuncture, but using physical pressure rather than needles.

1009.  Pressure is applied with the fingers, thumbs, knuckles, hands, palms, arms, legs, feet, and/or various instruments. Instruments include acuballs, energy rollers, foot rollers, power/pyramid mats, spine rollers, and Teishins.

1010.  Much like in acupuncture, when the points are stimulated, the meridians, or energy channels, are cleared, increasing circulation of qi throughout the body, which, in turn, promotes the body's self-healing power.

1011.  The points stimulated in acupressure are generally those that pass close to the skin because they are the easiest to manipulate with finger pressure.

134

1012.   As in acupuncture treatment, the practitioner must identify the areas being treated.

1013.   There are several styles of acupressure. While each style uses the same acupressure points, they vary in the different rhythms, pressures, and tools used to stimulate the acupressure points.

1014.   For example, in Shiatsu therapy, points are deeply massaged for three to five seconds, where as in Jin Shin acupressure, points are gently held for a minute or more. The Tui Na technique utilizes body stretches in addition to massage.

1015.   Thus, practitioners performing acupressure should document the style used.

1016.   Acupressure sessions typically last anywhere from 45 minutes to 90 minutes.

1017.   Acupressure is not indicated for everyone, and should not be performed on pregnant women or patients with rheumatoid arthritis, spinal injuries, or varicose veins.

1018.   The acupressure treatment billed by the PC Defendants is fraudulent and non-compensable because the documentation submitted to Allstate fails to indicate the areas, meridians, or points being massaged, as well as the style of acupressure used.

1019.   On the dates of service for which the PC Defendants billed Allstate for acupressure, the only indication that the service was actually performed is a checkmark next to a box labeled "acupressure" on the treatment notes.

1020.   Further, delivering effective acupressure takes time, which does not comport with the other rapid-fire, ineffective care provided by the defendants.

1021.   Thus, it is very likely that the billed-for acupressure services were not actually provided.

1022.   The chart annexed at Exhibit 24 identifies fraudulent, non-compensable charges submitted by defendants to Allstate for reimbursement for acupressure treatments.

135

1023.   Because the nature and extent of the acupressure therapy treatments purportedly provided to the patients identified in the chart annexed at Exhibit 24 were misrepresented, the defendants are not entitled to collect payment for such services.

1024.   To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these acupressure treatments, Allstate is entitled to recover payments made to the defendants in connection with these services.

1025.   Moreover, to the extent any of the charges itemized in Exhibit 24 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable.

### c. *Cupping*

1026.   Cupping is a less invasive TCM treatment than acupuncture that provides similar benefits by enhancing blood flow and dispelling stagnation.

1027.   Cupping is a style of acupressure.

1028.   Like acupuncture and acupressure, cupping follows the lines of the meridians, and creates the same beneficial effect as needles.

1029.   Cupping is effective in treating respiratory issues such as bronchitis, asthma, allergy congestion, and pneumonia, and may also be used to treat musculoskeletal conditions including back, neck, and shoulder pain.

1030.   Cupping is performed by placing a round glass cup on the body and sucking the air out with a small hand pump. The skin underneath the cup is gently pulled up by the suction, opening the pores, breaking up blockages, and drawing blood to the area.

1031.   This improves blood flow and draws stagnant fluids into circulation.

136

1032.   While cupping is recognized as an effective treatment, it should only be used on an intermittent basis because it dredges up stagnant blood and leaves bruises in the area applied.

1033.   Once stagnant blood has been moved, additional cupping over the bruised area should never be done. It takes seven to ten days for the bruising to disappear.

1034.   Cupping should not be used on patients who bruise easily.

1035.   Billing for cupping requires documentation of the area treated and should include information regarding the patient's response.

1036.   There are several issues with the charges submitted to Allstate by the PC Defendants for cupping services which render all such charges non-compensable.

1037.   First, the defendants failed to document the area being cupped and patient response.

1038.   Additionally, the PC Defendants that billed for cupping did not use the treatment intermittently but billed for the service at every single session, which is contraindicated due the bruising concern.

1039.   Further, although cupping is contraindicated for patients who bruise easily, the PC Defendants that billed for cupping did so for every patient.

1040.   Because it is virtually impossible that every patient received cupping at every session, which is what is represented by some of the PC Defendants' bills, it is very likely that the billed-for cupping services were not actually provided.

1041.   Moreover, cupping is a form of acupressure, and therefore billing for both services at every session, as at least some of the PC Defendants have done, is double billing for the same procedure.

137

1042.   The chart annexed at Exhibit 25 identifies fraudulent, non-compensable charges submitted by defendants to Allstate for reimbursement for cupping treatments.

1043.   Because the nature and extent of the cupping therapy treatments purportedly provided to the patients identified in the chart annexed at Exhibit 25 were misrepresented, the defendants are not entitled to collect payment for such services.

1044.   To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these cupping treatments, Allstate is entitled to recover payments made to the defendants in connection with these services.

1045.   Moreover, to the extent any of the charges itemized in Exhibit 25 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable.

### d.      *TDP Lamp/Infrared Therapy*

1046.   The term TDP lamp is derived from the Chinese phrase "Teding Diancibo Pu," which roughly translates to "special electromagnetic spectrum."

1047.   TDP lamps are similar to infrared lamps but use a unique mineral plate composed of thirty-three trace elements which, when heated to a specific temperature (approximately 870 °F), emits a band of electromagnetic far-infrared waves that are absorbed by the body.

1048.   The energy emitted by the TDP lamp stimulates micro-circulation, which aids in relief of muscle pain, arthritis, bursitis, joint pain, and several other conditions.

1049.   Micro-circulation refers to circulation in the smallest blood vessels in the body: the metarterioles, precapillary sphincters, capillaries, and the venules that drain capillaries.

138

1050.   Improved micro-circulation delivers increased oxygen and nutrients to cells in the affected areas, flushing out toxins and waste, and relieving muscle pain.

1051.   Thus, the TDP lamp promotes the body's self-healing abilities and helps to restore the uninterrupted flow of qi and blood throughout the body.

1052.   The relaxing effect of the TDP lamp also improves range of motion.

1053.   TDP lamp therapy is performed by exposing bare skin near the affected region to the lamp, which is positioned approximately 12-18 inches from the body, for approximately 5-40 minutes/15-30 minutes.

1054.   Because both moxibustion and TDP lamp therapy help to restore the balanced flow of qi and blood by generating heat, TDP lamp therapy is considered a substitute for, or alternative to, moxibustion.

1055.   TDP lamp therapy is not indicated for pregnant women or patients with ophthalmic conditions, varicose veins, cardiovascular disease, hypertension, or bleeding tendencies.

1056.   A provider billing for TDP lamp therapy should include information about the area being treated.

1057.   There are several issues with the charges submitted to Allstate by the PC Defendants for TDP lamp services which render all such charges non-compensable.

1058.   First, none of the PC Defendants ever indicated the areas being treated with the TDP lamp in the treatment notes submitted to Allstate.

1059.   Thus, it is unclear whether the billed-for TDP lamp therapy services were even provided.

1060.   Moreover, those PC Defendants that billed Allstate for moxibustion and TDP lamp therapy purportedly rendered in the same treatment session effectively double-billed Allstate for the same procedure—particularly where the patients were simultaneously being treated with heat packs in physical therapy.

1061.   The chart annexed at Exhibit 26 identifies fraudulent, non-compensable charges submitted by defendants to Allstate for reimbursement for TDP lamp therapy treatments.

1062.   Because the nature and extent of the TDP lamp therapy treatments purportedly provided to the patients identified in the chart annexed at Exhibit 26 were misrepresented, the defendants are not entitled to collect payment for such services.

1063.   To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these TDP lamp treatments, Allstate is entitled to recover payments made to the defendants in connection with these services.

1064.   Moreover, to the extent any of the charges itemized in Exhibit 26 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable.

## XI.   SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

1065.   As described above, Matskina, Kolomiytseva, Kornilova, Lendel, Tsukanov, Kulagina, Anikeyeva, Shimunov, Abitbol, Zapolsky, Shkapenyuk, Razzakova, Kondranina, and Anikeyev devised and agreed to execute a scheme to defraud by wrongfully obtaining, on behalf of the PC Defendants, No-Fault benefit payments from Allstate.

1066.   At all relevant times, the PC Defendants were not lawfully eligible to seek or receive No-Fault benefit payments based on the unlawful operation and control of the PC

Defendants, and based on the fraudulent treatment and billing practices engaged in by the PC Defendants.

1067.   Despite knowing that the PC Defendants were not lawfully eligible to seek or receive No-Fault benefit payments because they were, among other things, operating in an unlawful manner and engaged in false treatment and billing practices, the defendants nonetheless submitted (or caused to be submitted) reimbursement claims to Allstate seeking No-Fault benefit payments.

1068.   The objective of this scheme to defraud Allstate was to collect No-Fault benefits to which the PC Defendants.

1069.   This objective necessarily required the submission of claims to Allstate.

1070.   The defendants created, prepared, and submitted false medical documentation and placed the same in a post office and/or authorized depository for mail to be sent and delivered by the United States Postal Service.

1071.   All invoices, statutory NF-3 reimbursement forms, patient treatment records, notes, reports, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

1072.   Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, medical records, bills, claims settlement checks, and return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier for filing.

1073.   The scheme detailed herein generated hundreds of mailings.

1074.   The defendants knew, and it was reasonably foreseeable, that the PC Defendants would submit false health care documentation, including the representative mailings detailed in Exhibits 27-43 annexed hereto, for No-Fault benefits reimbursement through the U.S. Mail related to services purportedly provided to patients of the PC Defendants.

1075.   Indeed, it was within the ordinary course of business for each PC Defendant to submit claims for No-Fault benefits reimbursement to insurance carriers like Allstate through the U.S. Mail.

1076.   In the context of each PC Defendant involved in this scheme, as those respective defendants agreed that the PC Defendant entity would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for drug testing that was not compensable under New York's No-Fault laws, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

1077.   Charts detailing representative examples of the mail fraud agreed to and perpetrated by the defendants are attached hereto at Exhibits 37-43, and each chart includes specific information regarding the date, the sender, the recipient, and the content of such mailings.

1078.   As discussed above, certain of the representative mailings identified in Exhibits 37-43 contained misrepresentations regarding the fact, lawfulness, and compensability of the services for which Allstate was billed.

1079.   Allstate reasonably relied on the submissions it received from the defendants through the U.S. Mail when adjusting the claims and tendering payment, including those representative submissions set out in Exhibits 37-43.

1080.  As the defendants agreed to pursue the same criminal objectives (namely, mail fraud) in the course of conducting the affairs of the PC Defendant enterprises, the defendants engaged in conspiratorial conduct within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages caused by the defendants through their operation of the respective PC Defendants.

### A.    Bay Needle Enterprise

1081.  Matskina and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Bay Needle to be mailed to Allstate (and/or counsel for Bay Needle's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1082.  Matskina and Anikeyev caused Bay Needle to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Bay Needle was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1083.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Bay Needle, combined with Anikeyev's unlawful receipt of Bay Needle's professional acupuncture fees and profits, rendered Bay Needle completely ineligible for No-Fault reimbursement under New York law.

1084.  Because Bay Needle was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Bay Needle was not lawfully eligible for No-Fault reimbursement, and Matskina and Anikeyev purposely caused Bay Needle to make a misrepresentation each and every time that

Bay Needle mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1085.  Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Bay Needle, (b) Matskina and Anikeyev caused Bay Needle to seek No-Fault reimbursement from Allstate (even though Bay Needle was not lawfully entitled to such reimbursement), and (c) Bay Needle used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Matskina and Anikeyev committed mail fraud.

1086.  At all relevant times, Matskina and Anikeyev knew that Bay Needle (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Bay Needle.

1087.  Allstate estimates that the unlawful operation of the Bay Needle enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 27 and incorporated herein by reference as if set forth in its entirety.

**B.**      **Karina K. Enterprise**

1088.  Kolomiytseva and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Karina K. to be mailed to Allstate (and/or counsel for Karina K.'s patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

144

1089.   Kolomiytseva and Anikeyev caused Karina K. to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Karina K. was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1090.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Karina K., combined with Anikeyev's unlawful receipt of Karina K.'s professional acupuncture fees and profits, rendered Karina K. completely ineligible for No-Fault reimbursement under New York law.

1091.   Because Karina K. was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Karina K. was not lawfully eligible for No-Fault reimbursement, and Kolomiytseva and Anikeyev purposely caused Karina K. to make a misrepresentation each and every time that Karina K. mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1092.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Karina K., (b) Kolomiytseva and Anikeyev caused Karina K. to seek No-Fault reimbursement from Allstate (even though Karina K. was not lawfully entitled to such reimbursement), and (c) Karina K. used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Kolomiytseva and Anikeyev committed mail fraud.

1093.   At all relevant times, Kolomiytseva and Anikeyev knew that Karina K. (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection

with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Karina K.

1094.   Allstate estimates that the unlawful operation of the Karina K. enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 28 and incorporated herein by reference as if set forth in its entirety.

   C.   **Healthy Way Enterprise**

1095.   Matskina, Lendel, and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Healthy Way to be mailed to Allstate (and/or counsel for Healthy Way's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1096.   Matskina, Lendel, and Anikeyev caused Healthy Way to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Healthy Way was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1097.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Healthy Way, combined with Anikeyev's unlawful receipt of Healthy Way's professional acupuncture fees and profits, rendered Healthy Way completely ineligible for No-Fault reimbursement under New York law.

1098.  Because Healthy Way was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Healthy Way was not lawfully eligible for No-Fault reimbursement, and Matskina, Lendel, and Anikeyev purposely caused Healthy Way to make a misrepresentation each and

every time that Healthy Way mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1099.  Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Healthy Way, (b) Matskina, Lendel, and Anikeyev caused Healthy Way to seek No-Fault reimbursement from Allstate (even though Healthy Way was not lawfully entitled to such reimbursement), and (c) Healthy Way used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Matskina, Lendel, and Anikeyev committed mail fraud.

1100.  At all relevant times, Matskina, Lendel, and Anikeyev knew that Healthy Way (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Healthy Way.

1101.  Allstate estimates that the unlawful operation of the Healthy Way enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 29 and incorporated herein by reference as if set forth in its entirety.

### D.  Alpha Enterprise

1102.  Kolomiytseva and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Alpha to be mailed to Allstate (and/or counsel for Alpha's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

147

1103.   Kolomiytseva and Anikeyev caused Alpha to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Alpha was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1104.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Alpha, combined with Anikeyev's unlawful receipt of Alpha's professional acupuncture fees and profits, rendered Alpha completely ineligible for No-Fault reimbursement under New York law.

1105.   Because Alpha was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Alpha was not lawfully eligible for No-Fault reimbursement, and Kolomiytseva and Anikeyev purposely caused Alpha to make a misrepresentation each and every time that Alpha mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1106.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Alpha, (b) Kolomiytseva and Anikeyev caused Alpha to seek No-Fault reimbursement from Allstate (even though Alpha was not lawfully entitled to such reimbursement), and (c) Alpha used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Kolomiytseva and Anikeyev committed mail fraud.

1107.   At all relevant times, Kolomiytseva and Anikeyev knew that Alpha (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Alpha.

148

1108.   Allstate estimates that the unlawful operation of the Alpha enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 30 and incorporated herein by reference as if set forth in its entirety.

E.      **Lotus Enterprise**

1109.   Kornilova, Lendel, and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Lotus to be mailed to Allstate (and/or counsel for Lotus's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1110.   Kornilova, Lendel, and Anikeyev caused Lotus to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Lotus was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1111.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Lotus, combined with Anikeyev's unlawful receipt of Lotus's professional acupuncture fees and profits, rendered Lotus completely ineligible for No-Fault reimbursement under New York law.

1112.   Because Lotus was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Lotus was not lawfully eligible for No-Fault reimbursement, and Kornilova, Lendel, and Anikeyev purposely caused Lotus to make a misrepresentation each and every time that Lotus mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

149

1113.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Lotus, (b) Kornilova, Lendel, and Anikeyev caused Lotus to seek No-Fault reimbursement from Allstate (even though Lotus was not lawfully entitled to such reimbursement), and (c) Lotus used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Kornilova, Lendel, and Anikeyev committed mail fraud.

1114.   At all relevant times, Kornilova, Lendel, and Anikeyev knew that Lotus (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Lotus.

1115.   Allstate estimates that the unlawful operation of the Lotus enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 31 and incorporated herein by reference as if set forth in its entirety.

### F.    **Sunrise Enterprise**

1116.   Tsukanov and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Sunrise to be mailed to Allstate (and/or counsel for Sunrise's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1117.   Tsukanov and Anikeyev caused Sunrise to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Sunrise was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1118.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Sunrise, combined with Anikeyev's unlawful receipt of Sunrise's professional acupuncture fees and profits, rendered Sunrise completely ineligible for No-Fault reimbursement under New York law.

1119.   Because Sunrise was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Sunrise was not lawfully eligible for No-Fault reimbursement, and Tsukanov and Anikeyev purposely caused Sunrise to make a misrepresentation each and every time that Sunrise mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1120.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Sunrise, (b) Tsukanov and Anikeyev caused Sunrise to seek No-Fault reimbursement from Allstate (even though Sunrise was not lawfully entitled to such reimbursement), and (c) Sunrise used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Tsukanov and Anikeyev committed mail fraud.

1121.   At all relevant times, Tsukanov and Anikeyev knew that Sunrise (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Sunrise.

1122.   Allstate estimates that the unlawful operation of the Sunrise enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of

this scheme is annexed at Exhibit 32 and incorporated herein by reference as if set forth in its entirety.

**G.**     **Easy Care Enterprise**

1123.   Kulagina, Anikeyeva, and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Easy Care to be mailed to Allstate (and/or counsel for Easy Care's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1124.   Kulagina, Anikeyeva, and Anikeyev caused Easy Care to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Easy Care was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1125.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Easy Care, combined with Anikeyev's unlawful receipt of Easy Care's professional acupuncture fees and profits, rendered Easy Care completely ineligible for No-Fault reimbursement under New York law.

1126.   Because Easy Care was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Easy Care was not lawfully eligible for No-Fault reimbursement, and Kulagina, Anikeyeva, and Anikeyev purposely caused Easy Care to make a misrepresentation each and every time that Easy Care mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1127.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Easy Care, (b) Kulagina, Anikeyeva, and

Anikeyev caused Easy Care to seek No-Fault reimbursement from Allstate (even though Easy Care was not lawfully entitled to such reimbursement), and (c) Easy Care used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Kulagina, Anikeyeva, and Anikeyev committed mail fraud.

1128.  At all relevant times, Kulagina, Anikeyeva, and Anikeyev knew that Easy Care (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Easy Care.

1129.  Allstate estimates that the unlawful operation of the Easy Care enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 33 and incorporated herein by reference as if set forth in its entirety.

**H.    Shirom Enterprise**

1130.  Shimunov and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Shirom to be mailed to Allstate (and/or counsel for Shirom's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1131.  Shimunov and Anikeyev caused Shirom to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Shirom was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1132.  Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Shirom, combined with Anikeyev's unlawful

153

receipt of Shirom's professional acupuncture fees and profits, rendered Shirom completely ineligible for No-Fault reimbursement under New York law.

1133.   Because Shirom was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Shirom was not lawfully eligible for No-Fault reimbursement, and Shimunov and Anikeyev purposely caused Shirom to make a misrepresentation each and every time that Shirom mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1134.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Shirom, (b) Shimunov and Anikeyev caused Shirom to seek No-Fault reimbursement from Allstate (even though Shirom was not lawfully entitled to such reimbursement), and (c) Shirom used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Shimunov and Anikeyev committed mail fraud.

1135.   At all relevant times Shimunov and Anikeyev knew that Shirom (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Shirom.

1136.   Allstate estimates that the unlawful operation of the Shirom enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 34 and incorporated herein by reference as if set forth in its entirety.

**I.      Urban Well Enterprise**

1137.   Abitbol and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Urban Well to be mailed to Allstate (and/or counsel for Urban Well's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1138.   Abitbol and Anikeyev caused Urban Well to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Urban Well was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1139.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Urban Well, combined with Anikeyev's unlawful receipt of Urban Well's professional acupuncture fees and profits, rendered Urban Well completely ineligible for No-Fault reimbursement under New York law.

1140.   Because Urban Well was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Urban Well was not lawfully eligible for No-Fault reimbursement, and Abitbol and Anikeyev purposely caused Urban Well to make a misrepresentation each and every time that Urban Well mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1141.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Urban Well, (b) Abitbol and Anikeyev caused Urban Well to seek No-Fault reimbursement from Allstate (even though Urban Well was not lawfully entitled to such reimbursement), and (c) Urban Well used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Abitbol and Anikeyev committed mail fraud.

155

1142.   At all relevant times Abitbol and Anikeyev knew that Urban Well (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Urban Well.

1143.   Allstate estimates that the unlawful operation of the Urban Well enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 35 and incorporated herein by reference as if set forth in its entirety.

**J.      Approach Enterprise**

1144.   Zapolsky, Anikeyeva, and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Approach to be mailed to Allstate (and/or counsel for Approach's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1145.   Zapolsky, Anikeyeva, and Anikeyev caused Approach to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Approach was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1146.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Approach, combined with Anikeyev's unlawful receipt of Approach's professional acupuncture fees and profits, rendered Approach completely ineligible for No-Fault reimbursement under New York law.

1147.   Because Approach was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a

professional service corporation organized to provide professional acupuncture services), Approach was not lawfully eligible for No-Fault reimbursement, and Zapolsky, Anikeyeva, and Anikeyev purposely caused Approach to make a misrepresentation each and every time that Approach mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1148.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Approach, (b) Zapolsky, Anikeyeva, and Anikeyev caused Approach to seek No-Fault reimbursement from Allstate (even though Approach was not lawfully entitled to such reimbursement), and (c) Approach used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Zapolsky, Anikeyeva, and Anikeyev committed mail fraud.

1149.   At all relevant times Zapolsky, Anikeyeva, and Anikeyev knew that Approach (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Approach.

1150.   Allstate estimates that the unlawful operation of the Approach enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 36 and incorporated herein by reference as if set forth in its entirety.

### K.     SML Enterprise

1151.   Kulagina, Anikeyeva, and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from SML to be mailed to

Allstate (and/or counsel for SML's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1152.  Kulagina, Anikeyeva, and Anikeyev caused SML to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that SML was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1153.  Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of SML, combined with Anikeyev's unlawful receipt of SML's professional acupuncture fees and profits, rendered SML completely ineligible for No-Fault reimbursement under New York law.

1154.  Because SML was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), SML was not lawfully eligible for  No-Fault reimbursement, and Kulagina, Anikeyeva, and Anikeyev purposely caused SML to make a misrepresentation each and every time that SML mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1155.  Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of SML, (b) Kulagina, Anikeyeva, and Anikeyev caused SML to seek No-Fault reimbursement from Allstate (even though SML was not lawfully entitled to such reimbursement), and (c) SML used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Kulagina, Anikeyeva, and Anikeyev committed mail fraud.

1156.  At all relevant times, Kulagina, Anikeyeva, and Anikeyev knew that SML (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in

connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) SML.

1157.  Allstate estimates that the unlawful operation of the SML enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 37 and incorporated herein by reference as if set forth in its entirety.

### L.      Bronx Therapy Enterprise

1158.  Shimunov and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Bronx Therapy to be mailed to Allstate (and/or counsel for Bronx Therapy's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1159.  Shimunov and Anikeyev caused Bronx Therapy to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Bronx Therapy was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1160.  Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Bronx Therapy, combined with Anikeyev's unlawful receipt of Bronx Therapy's professional acupuncture fees and profits, rendered Bronx Therapy completely ineligible for No-Fault reimbursement under New York law.

1161.  Because Bronx Therapy was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Bronx Therapy was not lawfully eligible for No-Fault reimbursement, and Shimunov and Anikeyev purposely caused Bronx Therapy to make a misrepresentation each and every time

159

that Bronx Therapy mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1162.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Bronx Therapy, (b) Shimunov and Anikeyev caused Bronx Therapy to seek No-Fault reimbursement from Allstate (even though Bronx Therapy was not lawfully entitled to such reimbursement), and (c) Bronx Therapy used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Shimunov and Anikeyev committed mail fraud.

1163.   At all relevant times Shimunov and Anikeyev knew that Bronx Therapy (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Bronx Therapy.

1164.   Allstate estimates that the unlawful operation of the Bronx Therapy enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 38 and incorporated herein by reference as if set forth in its entirety.

**M.**   **TC Enterprise**

1165.   Shkapenyuk and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from TC to be mailed to Allstate (and/or counsel for TC's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1166.   Shkapenyuk and Anikeyev caused TC to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that TC was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1167.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of TC, combined with Anikeyev's unlawful receipt of TC's professional acupuncture fees and profits, rendered TC completely ineligible for No-Fault reimbursement under New York law.

1168.   Because TC was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), TC was not lawfully eligible for No-Fault reimbursement, and Shkapenyuk and Anikeyev purposely caused TC to make a misrepresentation each and every time that TC mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1169.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of TC, (b) Shkapenyuk and Anikeyev caused TC to seek No-Fault reimbursement from Allstate (even though TC was not lawfully entitled to such reimbursement), and (c) TC used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Shkapenyuk and Anikeyev committed mail fraud.

1170.   At all relevant times Shkapenyuk and Anikeyev knew that TC (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) TC.

161

1171.   Allstate estimates that the unlawful operation of the TC enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 39 and incorporated herein by reference as if set forth in its entirety.

N.      **Acuhealth Enterprise**

1172.   Kornilova and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Acuhealth to be mailed to Allstate (and/or counsel for Acuhealth's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1173.   Kornilova and Anikeyev caused Acuhealth to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Acuhealth was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1174.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Acuhealth, combined with Anikeyev's unlawful receipt of Acuhealth's professional acupuncture fees and profits, rendered Acuhealth completely ineligible for No-Fault reimbursement under New York law.

1175.   Because Acuhealth was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Acuhealth was not lawfully eligible for No-Fault reimbursement, and Kornilova and Anikeyev purposely caused Acuhealth to make a misrepresentation each and every time that Acuhealth mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

162

1176.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Acuhealth, (b) Kornilova and Anikeyev caused Acuhealth to seek No-Fault reimbursement from Allstate (even though Acuhealth was not lawfully entitled to such reimbursement), and (c) Acuhealth used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Kornilova and Anikeyev committed mail fraud.

1177.   At all relevant times Kornilova and Anikeyev knew that Acuhealth (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Acuhealth.

1178.   Allstate estimates that the unlawful operation of the Acuhealth enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 40 and incorporated herein by reference as if set forth in its entirety.

### O.   NR Enterprise

1179.   Razzakova and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from NR to be mailed to Allstate (and/or counsel for NR's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1180.   Razzakova and Anikeyev caused NR to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that NR was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1181.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of NR, combined with Anikeyev's unlawful receipt of NR's professional acupuncture fees and profits, rendered NR completely ineligible for No-Fault reimbursement under New York law.

1182.   Because NR was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), NR was not lawfully eligible for No-Fault reimbursement, and Razzakova and Anikeyev purposely caused NR to make a misrepresentation each and every time that NR mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1183.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of NR, (b) Razzakova and Anikeyev caused NR to seek No-Fault reimbursement from Allstate (even though NR was not lawfully entitled to such reimbursement), and (c) NR used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Razzakova and Anikeyev committed mail fraud.

1184.   At all relevant times Razzakova and Anikeyev knew that NR (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) NR.

1185.   Allstate estimates that the unlawful operation of the NR enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of

this scheme is annexed at Exhibit 41 and incorporated herein by reference as if set forth in its entirety.

**P.     Silver Lotus Enterprise**

1186.   Tsukanov and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from Silver Lotus to be mailed to Allstate (and/or counsel for Silver Lotus's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1187.   Tsukanov and Anikeyev caused Silver Lotus to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Silver Lotus was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1188.   Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of Silver Lotus, combined with Anikeyev's unlawful receipt of Silver Lotus's professional acupuncture fees and profits, rendered Silver Lotus completely ineligible for No-Fault reimbursement under New York law.

1189.   Because Silver Lotus was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), Silver Lotus was not lawfully eligible for No-Fault reimbursement, and Tsukanov and Anikeyev purposely caused Silver Lotus to make a misrepresentation each and every time that Silver Lotus mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1190.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of Silver Lotus, (b) Tsukanov and Anikeyev caused

165

Silver Lotus to seek No-Fault reimbursement from Allstate (even though Silver Lotus was not lawfully entitled to such reimbursement), and (c) Silver Lotus used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Tsukanov and Anikeyev committed mail fraud.

1191.  At all relevant times, Tsukanov and Anikeyev knew that Silver Lotus (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) Silver Lotus.

1192.  Allstate estimates that the unlawful operation of the Silver Lotus enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 42 and incorporated herein by reference as if set forth in its entirety.

Q. **New Century Enterprise**

1193.  Kondranina and Anikeyev either personally used the U.S. Mail to further this fraudulent scheme by causing health care bills and records from New Century to be mailed to Allstate (and/or counsel for New Century's patients), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1194.  Kondranina and Anikeyev caused New Century to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that New Century was caused to mail a demand for payment (i.e., invoice or bill) to Allstate.

1195.  Along with the billing for unnecessary/worthless acupuncture services provided to Allstate claimants, Anikeyev's unlawful control of New Century, combined with Anikeyev's

166

unlawful receipt of New Century's professional acupuncture fees and profits, rendered New Century completely ineligible for No-Fault reimbursement under New York law.

1196.   Because New Century was, in fact, unlawfully controlled by Anikeyev (an individual not licensed to practice acupuncture, and not authorized to maintain any controlling interest in a professional service corporation organized to provide professional acupuncture services), New Century was not lawfully eligible for No-Fault reimbursement, and Kondranina and Anikeyev purposely caused New Century to make a misrepresentation each and every time that New Century mailed a document to Allstate claiming eligibility for No-Fault reimbursement on behalf of its patients.

1197.   Moreover, because (a) Anikeyev, as a non-acupuncturist, was not permitted to participate in the operation and management of New Century, (b) Kondranina and Anikeyev caused New Century to seek No-Fault reimbursement from Allstate (even though New Century was not lawfully entitled to such reimbursement), and (c) New Century used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Kondranina and Anikeyev committed mail fraud.

1198.   At all relevant times, Kondranina and Anikeyev knew that New Century (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other health care provider, or Allstate would use the U.S. Mail in connection with each of the claims involved in this scheme, including issuing payments based upon the documentation mailed by (or on behalf of) New Century.

1199.   Allstate estimates that the unlawful operation of the New Century enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in

furtherance of this scheme is annexed at Exhibit 43 and incorporated herein by reference as if set forth in its entirety.

XII.   **SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE**

A.   FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE BAY NEEDLE ENTERPRISE

1200.   Anikeyev induced Matskina to register herself with the State of New York as Bay Needle's sole officer, director, and shareholder.

1201.   The documents created and filed with the State of New York related to Bay Needle omitted any reference to Anikeyev's involvement with or control over Matskina or Bay Needle.

1202.   The documents created and filed with the State of New York related to Bay Needle gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Bay Needle.

1203.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Bay Needle, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Matskina and Bay Needle.

1204.   Moreover, Matskina's and Bay Needle's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Bay Needle.

1205.   Anikeyev's and Matskina's purposeful concealment of Anikeyev's controlling interest in Bay Needle allowed Anikeyev to unlawfully control Bay Needle undetected.

1206.  At all relevant times during the operation of the Bay Needle enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Bay Needle, Anikeyev and Matskina caused Bay Needle to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1207.  Anikeyev directly participated in the operation and management of Bay Needle, and thus caused Bay Needle to falsely claim eligibility for No-Fault reimbursement.

1208.  Matskina participated in the conduct of Bay Needle's affairs when she, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Bay Needle were performed by employees of Bay Needle, when in fact they were performed by independent contractors.

1209.  Matskina also participated in the conduct of Bay Needle's affairs when she attested (or caused or permitted the attestation on her behalf) to the medical necessity of the services that she purportedly performed or purportedly directed the performance of in connection with Bay Needle patients, as well as to the validity of the charges for such services.

1210.  At all relevant times, Matskina, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Bay Needle, and (b) the corresponding billing submitted to Allstate on behalf of Bay Needle.

1211.  At all relevant times, Anikeyev and Matskina actively concealed from Allstate facts regarding Anikeyev's control over Bay Needle to prevent Allstate from discovering that Bay Needle was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1212.   In fact, Anikeyev purposely caused the PC Defendants—including Bay Needle— to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1213.   The facts and circumstances related to Bay Needle's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1214.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1215.   Thus, every time that Anikeyev and Matskina (along with those individuals working under their control) caused Bay Needle to submit No-Fault reimbursement demands to Allstate, Anikeyev and Matskina (and those individuals working under their control) necessarily certified that Bay Needle was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1216.   The full extent of Anikeyev's and Matskina's fraudulent and unlawful acts relative to their control over and unlawful operation of the Bay Needle enterprise—including (a) Anikeyev's control of Bay Needle, and (b) the unlawful channeling of Bay Needle's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

**B.** **FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE KARINA K. ENTERPRISE**

1217.   Anikeyev induced Kolomiytseva to register herself with the State of New York as Karina K.'s sole officer, director, and shareholder.

1218.   The documents created and filed with the State of New York related to Karina K. omitted any reference to Anikeyev's involvement with or control over Kolomiytseva or Karina K.

1219.   The documents created and filed with the State of New York related to Karina K. gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Karina K.

1220.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Karina K., Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Kolomiytseva and Karina K.

1221.   Moreover, Kolomiytseva's and Karina K.'s willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Karina K.

1222.   Anikeyev's and Kolomiytseva's purposeful concealment of Anikeyev's controlling interest in Karina K. allowed Anikeyev to unlawfully control Karina K. undetected.

1223.   At all relevant times during the operation of the Karina K. enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Karina K., Anikeyev and Kolomiytseva caused Karina K. to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1224.   Anikeyev directly participated in the operation and management of Karina K., and thus caused Karina K. to falsely claim eligibility for No-Fault reimbursement.

1225.   Kolomiytseva participated in the conduct of Karina K.'s affairs when she, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Karina K. were performed by employees of Karina K., when in fact they were performed by independent contractors.

1226.   Kolomiytseva also participated in the conduct of Karina K's affairs when she attested (or caused or permitted the attestation on her behalf) to the medical necessity of the services that she purportedly performed or purportedly directed the performance of in connection with Karina K. patients, as well as to the validity of the charges for such services.

1227.   At all relevant times, Kolomiytseva, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Karina K., and (b) the corresponding billing submitted to Allstate on behalf of Karina K.

1228.   At all relevant times, Anikeyev and Kolomiytseva actively concealed from Allstate facts regarding Anikeyev's control over Karina K. to prevent Allstate from discovering that Karina K. was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1229.   In fact, Anikeyev purposely caused the PC Defendants—including Karina K.—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1230.   The facts and circumstances related to Karina K.'s operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by

172

these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1231.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1232.   Thus, every time that Anikeyev and Kolomiytseva (along with those individuals working under their control) caused Karina K. to submit No-Fault reimbursement demands to Allstate, Anikeyev and Kolomiytseva (and those individuals working under their control) necessarily certified that Karina K. was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1233.   The full extent of Anikeyev's and Kolomiytseva's fraudulent and unlawful acts relative to their control over and unlawful operation of the Karina K. enterprise—including (a) Anikeyev's control of Karina K., and (b) the unlawful channeling of Karina K.'s professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

### C.   FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE HEALTHY WAY ENTERPRISE

1234.   In 2006, Anikeyev induced Matskina to register herself with the State of New York as Healthy Way's sole officer, director, and shareholder.

1235.   Subsequently, on or about October 31, 2013, Anikeyev induced Lendel to register herself as an officer, director, and shareholder of Healthy Way.

1236.  The documents created and filed with the State of New York related to Healthy Way omitted any reference to Anikeyev's involvement with or control over Matskina, Lendel, or Healthy Way.

1237.  The documents created and filed with the State of New York related to Healthy Way gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Healthy Way.

1238.  Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Healthy Way, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Matskina, Lendel, and Healthy Way.

1239.  Moreover, Matskina's, Lendel's, and Healthy Way's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Healthy Way.

1240.  Anikeyev's, Matskina's, and Lendel's purposeful concealment of Anikeyev's controlling interest in Healthy Way allowed Anikeyev to unlawfully control Healthy Way undetected.

1241.  At all relevant times during the operation of the Healthy Way enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Healthy Way, Anikeyev and Matskina caused Healthy Way to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1242.  Also, beginning on or about October 31, 2013 and continuing throughout the duration of the Healthy Way enterprise, Lendel joined Anikeyev and Matskina in causing Healthy Way to falsely certify that it was eligible to be reimbursed under New York's No-Fault

laws in order to induce Allstate to pay promptly charges for health care services purportedly provided to Healthy Way's patients.

1243.   Anikeyev directly participated in the operation and management of Healthy Way, and thus caused Healthy Way to falsely claim eligibility for No-Fault reimbursement.

1244.   Matskina and Lendel participated in the conduct of Healthy Way's affairs when they, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Healthy Way were performed by employees of Healthy Way, when in fact they were performed by independent contractors.

1245.   Matskina and Lendel also participated in the conduct of Healthy Way's affairs when they attested (or caused or permitted the attestation on their behalf) to the medical necessity of the services that they purportedly performed or purportedly directed the performance of in connection with Healthy Way patients, as well as to the validity of the charges for such services.

1246.   At all relevant times, Matskina and Lendel, as licensed acupuncturists, were legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Healthy Way, and (b) the corresponding billing submitted to Allstate on behalf of Healthy Way.

1247.   At all relevant times, Anikeyev and Matskina actively concealed from Allstate facts regarding Anikeyev's control over Healthy Way to prevent Allstate from discovering that Healthy Way was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1248.   Also, beginning on or about October 31, 2013 and continuing throughout the duration of the Healthy Way enterprise, Lendel joined Anikeyev and Matskina in actively

concealing from Allstate facts regarding Healthy Way's true ownership and control by the Management Defendants to prevent Allstate from discovering that Healthy Way was controlled by a non-acupuncturist, and thus ineligible to receive No-Fault reimbursement.

1249.   In fact, Anikeyev purposely caused the PC Defendants—including Healthy Way—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1250.   The facts and circumstances related to Healthy Way's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1251.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1252.   Thus, every time that Anikeyev and Matskina (along with those individuals working under their control) caused Healthy Way to submit No-Fault reimbursement demands to Allstate, Anikeyev and Matskina (and those individuals working under their control) necessarily certified that Healthy Way was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1253.   Likewise, every time that Anikeyev, Matskina, and Lendel (along with those individuals working under their control) caused Healthy Way to submit No-Fault reimbursement demands to Allstate, Anikeyev, Matskina, and Lendel (and those individuals working under their

control) necessarily certified that Healthy Way was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1254.  The full extent of Anikeyev's, Matskina's, and Lendel's fraudulent and unlawful acts relative to their control over and unlawful operation of the Healthy Way enterprise—including (a) Anikeyev's control of Healthy Way, and (b) the unlawful channeling of Healthy Way's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

### D.   FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE ALPHA ENTERPRISE

1255.  Anikeyev induced Kolomiytseva to register herself with the State of New York as Alpha's sole officer, director, and shareholder.

1256.  The documents created and filed with the State of New York related to Alpha omitted any reference to Anikeyev's involvement with or control over Kolomiytseva or Alpha.

1257.  The documents created and filed with the State of New York related to Alpha gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Alpha.

1258.  Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Alpha, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Kolomiytseva and Alpha.

1259.  Moreover, Kolomiytseva's and Alpha's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Alpha.

1260.   Anikeyev's and Kolomiytseva's purposeful concealment of Anikeyev's controlling interest in Alpha allowed Anikeyev to unlawfully control Alpha undetected.

1261.   At all relevant times during the operation of the Alpha enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Alpha, Anikeyev and Kolomiytseva caused Alpha to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1262.   Anikeyev directly participated in the operation and management of Alpha, and thus caused Alpha to falsely claim eligibility for No-Fault reimbursement.

1263.   Kolomiytseva participated in the conduct of Alpha's affairs when she, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Alpha were performed by employees of Alpha, when in fact they were performed by independent contractors.

1264.   Kolomiytseva also participated in the conduct of Alpha's affairs when she attested (or caused or permitted the attestation on her behalf) to the medical necessity of the services that she purportedly performed or purportedly directed the performance of in connection with Alpha patients, as well as to the validity of the charges for such services.

1265.   At all relevant times, Kolomiytseva, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Alpha, and (b) the corresponding billing submitted to Allstate on behalf of Alpha.

1266.   At all relevant times, Anikeyev and Kolomiytseva actively concealed from Allstate facts regarding Anikeyev's control over Alpha to prevent Allstate from discovering that

Alpha was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1267.  In fact, Anikeyev purposely caused the PC Defendants—including Alpha—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1268.  The facts and circumstances related to Alpha's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1269.  Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1270.  Thus, every time that Anikeyev and Kolomiytseva (along with those individuals working under their control) caused Alpha to submit No-Fault reimbursement demands to Allstate, Anikeyev and Kolomiytseva (and those individuals working under their control) necessarily certified that Alpha was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1271.  The full extent of Anikeyev's and Kolomiytseva's fraudulent and unlawful acts relative to their control over and unlawful operation of the Alpha enterprise—including (a) Anikeyev's control of Alpha, and (b) the unlawful channeling of Alpha's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

**E.     FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE LOTUS ENTERPRISE**

1272.   In 2007, Anikeyev induced Kornilova to register herself with the State of New York as Lotus's sole officer, director, and shareholder.

1273.   Subsequently, on or about October 31, 2013, Anikeyev induced Lendel to register herself as an officer, director, and shareholder of Lotus.

1274.   The documents created and filed with the State of New York related to Lotus omitted any reference to Anikeyev's involvement with or control over Kornilova, Lendel, or Lotus.

1275.   The documents created and filed with the State of New York related to Lotus gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Lotus.

1276.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Lotus, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Kornilova, Lendel, and Lotus.

1277.   Moreover, Kornilova's, Lendel's, and Lotus's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Lotus.

1278.   Anikeyev's, Kornilova's, and Lendel's purposeful concealment of Anikeyev's controlling interest in Lotus allowed Anikeyev to unlawfully control Lotus undetected.

1279.   At all relevant times during the operation of the Lotus enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who

treated at Lotus, Anikeyev and Kornilova caused Lotus to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1280.   Also, beginning on or about October 31, 2013 and continuing throughout the duration of the Lotus enterprise, Lendel joined Anikeyev and Kornilova in causing Lotus to falsely certify that it was eligible to be reimbursed under New York's No-Fault laws in order to induce Allstate to pay promptly charges for health care services purportedly provided to Lotus's patients.

1281.   Anikeyev directly participated in the operation and management of Lotus, and thus caused Lotus to falsely claim eligibility for No-Fault reimbursement.

1282.   Kornilova and Lendel participated in the conduct of Lotus's affairs when they, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Lotus were performed by employees of Lotus, when in fact they were performed by independent contractors.

1283.   Kornilova and Lendel also participated in the conduct of Lotus's affairs when they attested (or caused or permitted the attestation on their behalf) to the medical necessity of the services that they purportedly performed or purportedly directed the performance of in connection with Lotus patients, as well as to the validity of the charges for such services.

1284.   At all relevant times, Kornilova and Lendel, as licensed acupuncturists, were legally and ethically obligated to act with honesty and in connection with (a) the purported acupuncture treatment rendered through Lotus, and (b) the corresponding billing submitted to Allstate on behalf of Lotus.

1285.   At all relevant times, Anikeyev and Kornilova actively concealed from Allstate facts regarding Anikeyev's control over Lotus to prevent Allstate from discovering that Lotus

was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1286.   Also, beginning on or about October 31, 2013 and continuing throughout the duration of the Lotus enterprise, Lendel joined Anikeyev and Kornilova in actively concealing from Allstate facts regarding Lotus's true ownership and control by the Management Defendants to prevent Allstate from discovering that Lotus was controlled by a non-acupuncturist, and thus ineligible to receive No-Fault reimbursement.

1287.   In fact, Anikeyev purposely caused the PC Defendants—including Lotus—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1288.   The facts and circumstances related to Lotus's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1289.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1290.   Thus, every time that Anikeyev and Kornilova (along with those individuals working under their control) caused Lotus to submit No-Fault reimbursement demands to Allstate, Anikeyev and Kornilova (and those individuals working under their control) necessarily certified that Lotus was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1291.   Likewise, every time that Anikeyev, Kornilova, and Lendel (along with those individuals working under their control) caused Lotus to submit No-Fault reimbursement demands to Allstate, Anikeyev, Kornilova, and Lendel (and those individuals working under their control) necessarily certified that Lotus was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1292.   The full extent of Anikeyev's, Kornilova's, and Lendel's fraudulent and unlawful acts relative to their control over and unlawful operation of the Lotus enterprise—including (a) Anikeyev's control of Lotus, and (b) the unlawful channeling of Lotus's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

### F.    FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE SUNRISE ENTERPRISE

1293.   Anikeyev induced Tsukanov to register himself with the State of New York as Sunrise's sole officer, director, and shareholder.

1294.   The documents created and filed with the State of New York related to Sunrise omitted any reference to Anikeyev's involvement with or control over Tsukanov or Sunrise.

1295.   The documents created and filed with the State of New York related to Sunrise gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Sunrise.

1296.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Sunrise, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Tsukanov and Sunrise.

1297.   Moreover, Tsukanov's and Sunrise's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Sunrise.

1298.   Anikeyev's and Tsukanov's purposeful concealment of Anikeyev's controlling interest in Sunrise allowed Anikeyev to unlawfully control Sunrise undetected.

1299.   At all relevant times during the operation of the Sunrise enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Sunrise, Anikeyev and Tsukanov caused Sunrise to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1300.   Anikeyev directly participated in the operation and management of Sunrise, and thus caused Sunrise to falsely claim eligibility for No-Fault reimbursement.

1301.   Tsukanov participated in the conduct of Sunrise's affairs when he, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Sunrise were performed by employees of Sunrise, when in fact they were performed by independent contractors.

1302.   Tsukanov also participated in the conduct of Sunrise's affairs when he attested (or caused or permitted the attestation on his behalf) to the medical necessity of the services that he purportedly performed or purportedly directed the performance of in connection with Sunrise patients, as well as to the validity of the charges for such services.

1303.   At all relevant times, Tsukanov, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Sunrise, and (b) the corresponding billing submitted to Allstate on behalf of Sunrise.

1304.   At all relevant times, Anikeyev and Tsukanov actively concealed from Allstate facts regarding Anikeyev's control over Sunrise to prevent Allstate from discovering that Sunrise was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1305.   In fact, Anikeyev purposely caused the PC Defendants—including Sunrise—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1306.   The facts and circumstances related to Sunrise's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1307.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1308.   Thus, every time that Anikeyev and Tsukanov (along with those individuals working under their control) caused Sunrise to submit No-Fault reimbursement demands to Allstate, Anikeyev and Tsukanov (and those individuals working under their control) necessarily certified that Sunrise was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1309.   The full extent of Anikeyev's and Tsukanov's fraudulent and unlawful acts relative to their control over and unlawful operation of the Sunrise enterprise—including (a) Anikeyev's control of Sunrise, and (b) the unlawful channeling of Sunrise's professional

proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

## G. FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE EASY CARE ENTERPRISE

1310.   In 2008, Anikeyev induced Kulagina to register herself with the State of New York as Easy Care's sole officer, director, and shareholder.

1311.   Subsequently, on or about June 1, 2013, Anikeyev induced Anikeyeva to register herself as an officer, director, and shareholder of Easy Care.

1312.   The documents created and filed with the State of New York related to Easy Care omitted any reference to Anikeyev's involvement with or control over Kulagina, Anikeyeva, or Easy Care.

1313.   The documents created and filed with the State of New York related to Easy Care gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Easy Care.

1314.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Easy Care, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Kulagina, Anikeyeva, and Easy Care.

1315.   Moreover, Kulagina's, Anikeyeva's, and Easy Care's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Easy Care.

1316.   Anikeyev's, Kulagina's and Anikeyeva's purposeful concealment of Anikeyev's controlling interest in Easy Care allowed Anikeyev to unlawfully control Easy Care undetected.

1317.   At all relevant times during the operation of the Easy Care enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Easy Care, Anikeyev and Kulagina caused Easy Care to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1318.   Also, beginning on or about June 1, 2013 and continuing throughout the duration of the Easy Care enterprise, Anikeyeva joined Anikeyev and Kulagina in causing Easy Care to falsely certify that it was eligible to be reimbursed under New York's No-Fault laws in order to induce Allstate to pay promptly charges for health care services purportedly provided to Easy Care's patients.

1319.   Anikeyev directly participated in the operation and management of Easy Care, and thus caused Easy Care to falsely claim eligibility for No-Fault reimbursement.

1320.   Kulagina and Anikeyeva participated in the conduct of Easy Care's affairs when they, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Easy Care were performed by employees of Easy Care, when in fact they were performed by independent contractors.

1321.   Kulagina and Anikeyeva also participated in the conduct of Easy Care's affairs when they attested (or caused or permitted the attestation on their behalf) to the medical necessity of the services that they purportedly performed or purportedly directed the performance of in connection with Easy Care patients, as well as to the validity of the charges for such services.

1322.   At all relevant times, Kulagina and Anikeyeva, as licensed acupuncturists, were legally and ethically obligated to act with honesty and integrity in connection with (a) the

188

purported acupuncture treatment rendered through Easy Care, and (b) the corresponding billing submitted to Allstate on behalf of Easy Care.

1323.  At all relevant times, Anikeyev and Kulagina actively concealed from Allstate facts regarding Anikeyev's control over Easy Care to prevent Allstate from discovering that Easy Care was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1324.  Also, beginning on or about June 1, 2013 and continuing throughout the duration of the Easy Care enterprise, Anikeyeva joined Anikeyev and Kulagina in actively concealing from Allstate facts regarding Easy Care's true ownership and control by the Management Defendants to prevent Allstate from discovering that Easy Care was controlled by a non-acupuncturist, and thus ineligible to receive No-Fault reimbursement.

1325.  In fact, Anikeyev purposely caused the PC Defendants—including Easy Care—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1326.  The facts and circumstances related to Easy Care's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1327.  Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

189

1328.  Thus, every time that Anikeyev and Kulagina (along with those individuals working under their control) caused Easy Care to submit No-Fault reimbursement demands to Allstate, Anikeyev and Kulagina (and those individuals working under their control) necessarily certified that Easy Care was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1329.  Likewise, every time that Anikeyev, Kulagina, and Anikeyeva (along with those individuals working under their control) caused Easy Care to submit No-Fault reimbursement demands to Allstate, Anikeyev, Kulagina, and Anikeyeva (and those individuals working under their control) necessarily certified that Easy Care was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1330.  The full extent of Anikeyev's, Kulagina's, and Anikeyeva's fraudulent and unlawful acts relative to their control over and unlawful operation of the Easy Care enterprise—including (a) Anikeyev's control of Easy Care, and (b) the unlawful channeling of Easy Care's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

## H.  FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE SHIROM ENTERPRISE

1331.  Anikeyev induced Shimunov to register himself with the State of New York as Shirom's sole officer, director, and shareholder.

1332.  The documents created and filed with the State of New York related to Shirom omitted any reference to Anikeyev's involvement with or control over Shimunov or Shirom.

1333.   The documents created and filed with the State of New York related to Shirom gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Shirom.

1334.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Shirom, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Shimunov and Shirom.

1335.   Moreover, Shimunov's and Shirom's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Shirom.

1336.   Anikeyev's and Shimunov's purposeful concealment of Anikeyev's controlling interest in Shirom allowed Anikeyev to unlawfully control Shirom undetected.

1337.   At all relevant times during the operation of the Shirom enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Shirom, Anikeyev and Shimunov caused Shirom to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1338.   Anikeyev directly participated in the operation and management of Shirom, and thus caused Shirom to falsely claim eligibility for No-Fault reimbursement.

1339.   Shimunov participated in the conduct of Shirom's affairs when he, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Shirom were performed by employees of Shirom, when in fact they were performed by independent contractors.

1340.   Shimunov also participated in the conduct of Shirom's affairs when he attested (or caused or permitted the attestation on his behalf) to the medical necessity of the services that he purportedly performed or purportedly directed the performance of in connection with Shirom patients, as well as to the validity of the charges for such services.

1341.   At all relevant times, Shimunov, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Shirom, and (b) the corresponding billing submitted to Allstate on behalf of Shirom.

1342.   At all relevant times, Anikeyev and Shimunov actively concealed from Allstate facts regarding Anikeyev's control over Shirom to prevent Allstate from discovering that Shirom was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1343.   In fact, Anikeyev purposely caused the PC Defendants—including Shirom—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1344.   The facts and circumstances related to Shirom's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1345.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1346. Thus, every time that Anikeyev and Shimunov (along with those individuals working under their control) caused Shirom to submit No-Fault reimbursement demands to Allstate, Anikeyev and Shimunov (and those individuals working under their control) necessarily certified that Shirom was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1347. The full extent of Anikeyev's and Shimunov's fraudulent and unlawful acts relative to their control over and unlawful operation of the Shirom enterprise—including (a) Anikeyev's control of Shirom, and (b) the unlawful channeling of Shirom's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

## I. FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE URBAN WELL ENTERPRISE

1348. Anikeyev induced Abitbol to register herself with the State of New York as Urban Well's sole officer, director, and shareholder.

1349. The documents created and filed with the State of New York related to Urban Well omitted any reference to Anikeyev's involvement with or control over Abitbol or Urban Well.

1350. The documents created and filed with the State of New York related to Urban Well gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Urban Well.

1351. Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Urban Well, Allstate—even acting with reasonable

diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Abitbol and Urban Well.

1352.   Moreover, Abitbol's and Urban Well's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Urban Well.

1353.   Anikeyev's and Abitbol's purposeful concealment of Anikeyev's controlling interest in Urban Well allowed Anikeyev to unlawfully control Urban Well undetected.

1354.   At all relevant times during the operation of the Urban Well enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Urban Well, Anikeyev and Abitbol caused Urban Well to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1355.   Anikeyev directly participated in the operation and management of Urban Well, and thus caused Urban Well to falsely claim eligibility for No-Fault reimbursement.

1356.   Abitbol participated in the conduct of Urban Well's affairs when she, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Urban Well were performed by employees of Urban Well, when in fact they were performed by independent contractors.

1357.   Abitbol also participated in the conduct of Urban Well's affairs when she attested (or caused or permitted the attestation on her behalf) to the medical necessity of the services that she purportedly performed or purportedly directed the performance of in connection with Urban Well patients, as well as to the validity of the charges for such services.

1358.   At all relevant times, Abitbol, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported

194

acupuncture treatment rendered through Urban Well, and (b) the corresponding billing submitted to Allstate on behalf of Urban Well.

1359.   At all relevant times, Anikeyev and Abitbol actively concealed from Allstate facts regarding Anikeyev's control over Urban Well to prevent Allstate from discovering that Urban Well was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1360.   In fact, Anikeyev purposely caused the PC Defendants—including Urban Well—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1361.   The facts and circumstances related to Urban Well's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1362.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1363.   Thus, every time that Anikeyev and Abitbol (along with those individuals working under their control) caused Urban Well to submit No-Fault reimbursement demands to Allstate, Anikeyev and Abitbol (and those individuals working under their control) necessarily certified that Urban Well was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1364.   The full extent of Anikeyev's and Abitbol's fraudulent and unlawful acts relative to their control over and unlawful operation of the Urban Well enterprise—including (a) Anikeyev's control of Urban Well, and (b) the unlawful channeling of Urban Well's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

**J.      FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE APPROACH ENTERPRISE**

1365.   In 2008, Anikeyev induced Zapolsky to register himself with the State of New York as Approach's sole officer, director, and shareholder.

1366.   Subsequently, on or about May 21, 2013, Anikeyev induced Anikeyeva to register herself as an officer, director, and shareholder of Approach.

1367.   The documents created and filed with the State of New York related to Approach omitted any reference to Anikeyev's involvement with or control over Zapolsky, Anikeyeva, or Approach.

1368.   The documents created and filed with the State of New York related to Approach gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Approach.

1369.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Approach, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Zapolsky, Anikeyeva, and Approach.

1370.   Moreover, Zapolsky's, Anikeyeva's, and Approach's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Approach.

1371.   Anikeyev's, Zapolsky's, and Anikeyeva's purposeful concealment of Anikeyev's controlling interest in Approach allowed Anikeyev to unlawfully control Approach undetected.

1372.   At all relevant times during the operation of the Approach enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Approach, Anikeyev and Zapolsky caused Approach to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1373.   Also, beginning on or about May 21, 2013 and continuing throughout the duration of the Approach enterprise, Anikeyeva joined Anikeyev and Zapolsky in causing Approach to falsely certify that it was eligible to be reimbursed under New York's No-Fault laws in order to induce Allstate to pay promptly charges for health care services purportedly provided to Approach's patients.

1374.   Anikeyev directly participated in the operation and management of Approach, and thus caused Approach to falsely claim eligibility for No-Fault reimbursement.

1375.   Zapolsky and Anikeyeva participated in the conduct of Approach's affairs when they, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Approach were performed by employees of Approach, when in fact they were performed by independent contractors.

1376.   Zapolsky and Anikeyeva also participated in the conduct of Approach's affairs when they attested (or caused or permitted the attestation on their behalf) to the medical necessity of the services that they purportedly performed or purportedly directed the performance

197

of in connection with Approach patients, as well as to the validity of the charges for such services.

1377.   At all relevant times, Zapolsky and Anikeyeva, as licensed acupuncturists, were legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Approach, and (b) the corresponding billing submitted to Allstate on behalf of Approach.

1378.   At all relevant times, Anikeyev and Zapolsky actively concealed from Allstate facts regarding Anikeyev's control over Approach to prevent Allstate from discovering that Approach was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1379.   Also, beginning on or about May 21, 2013 and continuing throughout the duration of the Approach enterprise, Anikeyeva joined Anikeyev and Zapolsky in actively concealing from Allstate facts regarding Approach's true ownership and control by the Management Defendants to prevent Allstate from discovering that Approach was controlled by a non-acupuncturist, and thus ineligible to receive No-Fault reimbursement.

1380.   In fact, Anikeyev purposely caused the PC Defendants—including Approach—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1381.   The facts and circumstances related to Approach's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

198

1382.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1383.   Thus, every time that Anikeyev and Zapolsky (along with those individuals working under their control) caused Approach to submit No-Fault reimbursement demands to Allstate, Anikeyev and Zapolsky (and those individuals working under their control) necessarily certified that Approach was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1384.   Likewise, every time that Anikeyev, Zapolsky, and Anikeyeva (along with those individuals working under their control) caused Approach to submit No-Fault reimbursement demands to Allstate, Anikeyev, Zapolsky, and Anikeyeva (and those individuals working under their control) necessarily certified that Approach was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1385.   The full extent of Anikeyev's, Zapolsky's, and Anikeyeva's fraudulent and unlawful acts relative to their control over and unlawful operation of the Approach enterprise— including (a) Anikeyev's control of Approach, and (b) the unlawful channeling of Approach's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

### K.   FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE SML ENTERPRISE

1386.   Anikeyev induced Kulagina to register herself with the State of New York as SML's sole officer, director, and shareholder.

1387.   Subsequently, on or about June 1, 2013, Anikeyev induced Anikeyeva to register herself as an officer, director, and shareholder of SML.

1388.   The documents created and filed with the State of New York related to SML omitted any reference to Anikeyev's involvement with or control over Kulagina, Anikeyeva, or SML.

1389.   The documents created and filed with the State of New York related to SML gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in SML.

1390.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of SML, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Kulagina, Anikeyeva, and SML.

1391.   Moreover, Kulagina's, Anikeyeva's, and SML's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of SML.

1392.   Anikeyev's, Kulagina's, and Anikeyeva's purposeful concealment of Anikeyev's controlling interest in SML allowed Anikeyev to unlawfully control SML undetected.

1393.   At all relevant times during the operation of the SML enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at SML, Anikeyev and Kulagina caused SML to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1394.   Also, beginning on or about June 1, 2013 and continuing throughout the duration of the SML enterprise, Anikeyeva joined Anikeyev and Kulagina in causing SML to falsely

certify that it was eligible to be reimbursed under New York's No-Fault laws in order to induce Allstate to pay promptly charges for health care services purportedly provided to SML's patients.

1395.   Anikeyev directly participated in the operation and management of SML, and thus caused SML to falsely claim eligibility for No-Fault reimbursement.

1396.   Kulagina and Anikeyeva participated in the conduct of SML's affairs when they, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through SML were performed by employees of SML, when in fact they were performed by independent contractors.

1397.   Kulagina and Anikeyeva also participated in the conduct of SML's affairs when they attested (or caused or permitted the attestation on their behalf) to the medical necessity of the services that they purportedly performed or purportedly directed the performance of in connection with SML patients, as well as to the validity of the charges for such services.

1398.   At all relevant times, Kulagina and Anikeyeva, as licensed acupuncturists, were legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through SML, and (b) the corresponding billing submitted to Allstate on behalf of SML.

1399.   At all relevant times, Anikeyev and Kulagina actively concealed from Allstate facts regarding Anikeyev's control over SML to prevent Allstate from discovering that SML was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1400.   Also, beginning on or about June 1, 2013 and continuing throughout the duration of the SML enterprise, Anikeyeva joined Anikeyev and Kulagina in actively concealing from Allstate facts regarding SML's true ownership and control by the Management Defendants to

201

prevent Allstate from discovering that SML was controlled by a non-acupuncturist, and thus ineligible to receive No-Fault reimbursement.

1401.  In fact, Anikeyev purposely caused the PC Defendants—including SML—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1402.  The facts and circumstances related to SML's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1403.  Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1404.  Thus, every time that Anikeyev and Kulagina (along with those individuals working under their control) caused SML to submit No-Fault reimbursement demands to Allstate, Anikeyev and Kulagina (and those individuals working under their control) necessarily certified that SML was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1405.  Likewise, every time that Anikeyev, Kulagina, and Anikeyeva (along with those individuals working under their control) caused SML to submit No-Fault reimbursement demands to Allstate, Anikeyev, Kulagina, and Anikeyeva (and those individuals working under their control) necessarily certified that SML was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1406.   The full extent of Anikeyev's, Kulagina's, and Anikeyeva's fraudulent and unlawful acts relative to their control over and unlawful operation of the SML enterprise—including (a) Anikeyev's control of SML, and (b) the unlawful channeling of SML's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

## L.   FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE BRONX THERAPY ENTERPRISE

1407.   Anikeyev induced Shimunov to register himself with the State of New York as Bronx Therapy's sole officer, director, and shareholder.

1408.   The documents created and filed with the State of New York related to Bronx Therapy omitted any reference to Anikeyev's involvement with or control over Shimunov or Bronx Therapy.

1409.   The documents created and filed with the State of New York related to Bronx Therapy gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Bronx Therapy.

1410.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Bronx Therapy, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Shimunov and Bronx Therapy.

1411.   Moreover, Shimunov's and Bronx Therapy's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Bronx Therapy.

1412.   Anikeyev's and Shimunov's purposeful concealment of Anikeyev's controlling interest in Bronx Therapy allowed Anikeyev to unlawfully control Bronx Therapy undetected.

1413.   At all relevant times during the operation of the Bronx Therapy enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Bronx Therapy, Anikeyev and Shimunov caused Bronx Therapy to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1414.   Anikeyev directly participated in the operation and management of Bronx Therapy, and thus caused Bronx Therapy to falsely claim eligibility for No-Fault reimbursement.

1415.   Shimunov participated in the conduct of Bronx Therapy's affairs when he, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Bronx Therapy were performed by employees of Bronx Therapy, when in fact they were performed by independent contractors.

1416.   Shimunov also participated in the conduct of Bronx Therapy's affairs when he attested (or caused or permitted the attestation on his behalf) to the medical necessity of the services that he purportedly performed or purportedly directed the performance of in connection with Bronx Therapy patients, as well as to the validity of the charges for such services.

1417.   At all relevant times, Shimunov, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Bronx Therapy, and (b) the corresponding billing submitted to Allstate on behalf of Bronx Therapy.

1418.   At all relevant times, Anikeyev and Shimunov actively concealed from Allstate facts regarding Anikeyev's control over Bronx Therapy to prevent Allstate from discovering that

Bronx Therapy was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1419.  In fact, Anikeyev purposely caused the PC Defendants—including Bronx Therapy—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1420.  The facts and circumstances related to Bronx Therapy's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1421.  Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1422.  Thus, every time that Anikeyev and Shimunov (along with those individuals working under their control) caused Bronx Therapy to submit No-Fault reimbursement demands to Allstate, Anikeyev and Shimunov (and those individuals working under their control) necessarily certified that Bronx Therapy was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1423.  The full extent of Anikeyev's and Shimunov's fraudulent and unlawful acts relative to their control over and unlawful operation of the Bronx Therapy enterprise—including (a) Anikeyev's control of Bronx Therapy, and (b) the unlawful channeling of Bronx Therapy's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

## M.   FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE TC ENTERPRISE

1424.   Anikeyev induced Shkapenyuk to register himself with the State of New York as TC's sole officer, director, and shareholder.

1425.   The documents created and filed with the State of New York related to TC omitted any reference to Anikeyev's involvement with or control over Shkapenyuk or TC.

1426.   The documents created and filed with the State of New York related to TC gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in TC.

1427.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of TC, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Shkapenyuk and TC.

1428.   Moreover, Shkapenyuk's and TC's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of TC.

1429.   Anikeyev's and Shkapenyuk's purposeful concealment of Anikeyev's controlling interest in TC allowed Anikeyev to unlawfully control TC undetected.

1430.   At all relevant times during the operation of the TC enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at TC, Anikeyev and Shkapenyuk caused TC to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1431.   Anikeyev directly participated in the operation and management of TC, and thus caused TC to falsely claim eligibility for No-Fault reimbursement.

1432.   Shkapenyuk participated in the conduct of TC's affairs when he, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through TC were performed by employees of TC, when in fact they were performed by independent contractors.

1433.   Shkapenyuk also participated in the conduct of TC's affairs when he attested (or caused or permitted the attestation on his behalf) to the medical necessity of the services that he purportedly performed or purportedly directed the performance of in connection with TC patients, as well as to the validity of the charges for such services.

1434.   At all relevant times, Shkapenyuk, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through TC, and (b) the corresponding billing submitted to Allstate on behalf of TC.

1435.   At all relevant times, Anikeyev and Shkapenyuk actively concealed from Allstate facts regarding Anikeyev's control over TC to prevent Allstate from discovering that TC was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1436.   In fact, Anikeyev purposely caused the PC Defendants—including TC—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1437.   The facts and circumstances related to TC's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these

defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1438.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1439.   Thus, every time that Anikeyev and Shkapenyuk (along with those individuals working under their control) caused TC to submit No-Fault reimbursement demands to Allstate, Anikeyev and Shkapenyuk (and those individuals working under their control) necessarily certified that TC was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1440.   The full extent of Anikeyev's and Shkapenyuk's fraudulent and unlawful acts relative to their control over and unlawful operation of the TC enterprise—including (a) Anikeyev's control of TC, and (b) the unlawful channeling of TC's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

## N.    FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE ACUHEALTH ENTERPRISE

1441.   Anikeyev induced Kornilova to register herself with the State of New York as Acuhealth's sole officer, director, and shareholder.

1442.   The documents created and filed with the State of New York related to Acuhealth omitted any reference to Anikeyev's involvement with or control over Kornilova or Acuhealth.

1443.   The documents created and filed with the State of New York related to Acuhealth gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Acuhealth.

1444.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Acuhealth, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Kornilova and Acuhealth.

1445.   Moreover, Kornilova's and Acuhealth's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Acuhealth.

1446.   Anikeyev's and Kornilova's purposeful concealment of Anikeyev's controlling interest in Acuhealth allowed Anikeyev to unlawfully control Acuhealth undetected.

1447.   At all relevant times during the operation of the Acuhealth enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Acuhealth, Anikeyev and Kornilova caused Acuhealth to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1448.   Anikeyev directly participated in the operation and management of Acuhealth, and thus caused Acuhealth to falsely claim eligibility for No-Fault reimbursement.

1449.   Kornilova participated in the conduct of Acuhealth's affairs when she, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Acuhealth were performed by employees of Acuhealth, when in fact they were performed by independent contractors.

1450.   Kornilova also participated in the conduct of Acuhealth's affairs when she attested (or caused or permitted the attestation on her behalf) to the medical necessity of the services that she purportedly performed or purportedly directed the performance of in connection with Acuhealth patients, as well as to the validity of the charges for such services.

209

1451.  At all relevant times, Kornilova, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Acuhealth, (b) the corresponding billing submitted to Allstate on behalf of Acuhealth.

1452.  At all relevant times, Anikeyev and Kornilova actively concealed from Allstate facts regarding Anikeyev's control over Acuhealth to prevent Allstate from discovering that Acuhealth was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1453.  In fact, Anikeyev purposely caused the PC Defendants—including Acuhealth—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1454.  The facts and circumstances related to Acuhealth's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1455.  Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1456.  Thus, every time that Anikeyev and Kornilova (along with those individuals working under their control) caused Acuhealth to submit No-Fault reimbursement demands to Allstate, Anikeyev and Kornilova (and those individuals working under their control) necessarily

certified that Acuhealth was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1457.   The full extent of Anikeyev's and Kornilova's fraudulent and unlawful acts relative to their control over and unlawful operation of the Acuhealth enterprise—including (a) Anikeyev's control of Acuhealth, and (b) the unlawful channeling of Acuhealth's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

### O.   FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE NR ENTERPRISE

1458.   Anikeyev induced Razzakova to register herself with the State of New York as NR's sole officer, director, and shareholder.

1459.   The documents created and filed with the State of New York related to NR omitted any reference to Anikeyev's involvement with or control over Razzakova or NR.

1460.   The documents created and filed with the State of New York related to NR gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in NR.

1461.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of NR, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Razzakova and NR.

1462.   Moreover, Razzakova's and NR's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of NR.

1463.  Anikeyev's and Razzakova's purposeful concealment of Anikeyev's controlling interest in NR allowed Anikeyev to unlawfully control NR undetected.

1464.  At all relevant times during the operation of the NR enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at NR, Anikeyev and Razzakova caused NR to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1465.  Anikeyev directly participated in the operation and management of NR, and thus caused NR to falsely claim eligibility for No-Fault reimbursement.

1466.  Razzakova participated in the conduct of NR's affairs when she, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through NR were performed by employees of NR, when in fact they were performed by independent contractors.

1467.  Razzakova also participated in the conduct of NR's affairs when she attested (or caused or permitted the attestation on her behalf) to the medical necessity of the services that she purportedly performed or purportedly directed the performance of in connection with NR patients, as well as to the validity of the charges for such services.

1468.  At all relevant times, Razzakova, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through NR, and (b) the corresponding billing submitted to Allstate on behalf of NR.

1469.  At all relevant times, Anikeyev and Razzakova actively concealed from Allstate facts regarding Anikeyev's control over NR to prevent Allstate from discovering that NR was

212

controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1470. In fact, Anikeyev purposely caused the PC Defendants—including NR—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1471. The facts and circumstances related to NR's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1472. Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1473. Thus, every time that Anikeyev and Razzakova (along with those individuals working under their control) caused NR to submit No-Fault reimbursement demands to Allstate, Anikeyev and Razzakova (and those individuals working under their control) necessarily certified that NR was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1474. The full extent of Anikeyev's and Razzakova's fraudulent and unlawful acts relative to their control over and unlawful operation of the NR enterprise—including (a) Anikeyev's control of NR, and (b) the unlawful channeling of NR's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

P.   **FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE SILVER LOTUS ENTERPRISE**

1475.   Anikeyev induced Tsukanov to register himself with the State of New York as Silver Lotus's sole officer, director, and shareholder.

1476.   The documents created and filed with the State of New York related to Silver Lotus omitted any reference to Anikeyev's involvement with or control over Tsukanov or Silver Lotus.

1477.   The documents created and filed with the State of New York related to Silver Lotus gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in Silver Lotus.

1478.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Silver Lotus, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Tsukanov and Silver Lotus.

1479.   Moreover, Tsukanov's and Silver Lotus's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of Silver Lotus.

1480.   Anikeyev's and Tsukanov's purposeful concealment of Anikeyev's controlling interest in Silver Lotus allowed Anikeyev to unlawfully control Silver Lotus undetected.

1481.   At all relevant times during the operation of the Silver Lotus enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Silver Lotus, Anikeyev and Tsukanov caused Silver Lotus to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1482.   Anikeyev directly participated in the operation and management of Silver Lotus, and thus caused Silver Lotus to falsely claim eligibility for No-Fault reimbursement.

1483.   Tsukanov participated in the conduct of Silver Lotus's affairs when he, among other things, represented in the bills submitted to Allstate that the acupuncture services purportedly performed through Silver Lotus were performed by employees of Silver Lotus, when in fact they were performed by independent contractors.

1484.   Tsukanov also participated in the conduct of Silver Lotus's affairs when he attested (or caused or permitted the attestation on his behalf) to the medical necessity of the services that he purportedly performed or purportedly directed the performance of in connection with Silver Lotus patients, as well as to the validity of the charges for such services.

1485.   At all relevant times, Tsukanov, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through Silver Lotus, and (b) the corresponding billing submitted to Allstate on behalf of Silver Lotus.

1486.   At all relevant times, Anikeyev and Tsukanov actively concealed from Allstate facts regarding Anikeyev's control over Silver Lotus to prevent Allstate from discovering that Silver Lotus was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1487.   In fact, Anikeyev purposely caused the PC Defendants—including Silver Lotus— to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

215

1488.   The facts and circumstances related to Silver Lotus's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

1489.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1490.  Thus, every time that Anikeyev and Tsukanov (along with those individuals working under their control) caused Silver Lotus to submit No-Fault reimbursement demands to Allstate, Anikeyev and Tsukanov (and those individuals working under their control) necessarily certified that Silver Lotus was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1491.  The full extent of Anikeyev's and Tsukanov's fraudulent and unlawful acts relative to their control over and unlawful operation of the Silver Lotus enterprise—including (a) Anikeyev's control of Silver Lotus, and (b) the unlawful channeling of Silver Lotus's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

## Q.   FRAUDULENT CONCEALMENT OF ANIKEYEV'S UNLAWFUL CONTROL OF THE NEW CENTURY ENTERPRISE

1492.  Anikeyev induced Kondranina to register herself with the State of New York as New Century's sole officer, director, and shareholder.

1493.   The documents created and filed with the State of New York related to New Century omitted any reference to Anikeyev's involvement with or control over Kondranina or New Century.

1494.   The documents created and filed with the State of New York related to New Century gave no indication to Allstate or the general public that Anikeyev in any way maintained a controlling interest in New Century.

1495.   Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of New Century, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Anikeyev's domination of and control over Kondranina and New Century.

1496.   Moreover, Kondranina's and New Century's willful failure to comply with Allstate's EUO requests (as described above) further prevented Allstate from discovering information about the operation, management, and control of New Century.

1497.   Anikeyev's and Kondranina's purposeful concealment of Anikeyev's controlling interest in New Century allowed Anikeyev to unlawfully control NR undetected.

1498.   At all relevant times during the operation of the New Century enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at New Century, Anikeyev and Kondranina caused New Century to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1499.   Anikeyev directly participated in the operation and management of New Century, and thus caused New Century to falsely claim eligibility for No-Fault reimbursement.

1500.   Kondranina participated in the conduct of New Century's affairs when she, among other things, represented in the bills submitted to Allstate that the acupuncture services

217

purportedly performed through New Century were performed by employees of New Century, when in fact they were performed by independent contractors.

1501. Kondranina also participated in the conduct of New Century's affairs when she attested (or caused or permitted the attestation on her behalf) to the medical necessity of the services that she purportedly performed or purportedly directed the performance of in connection with New Century patients, as well as to the validity of the charges for such services.

1502. At all relevant times, Kondranina, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through New Century, and (b) the corresponding billing submitted to Allstate on behalf of NR.

1503. At all relevant times, Anikeyev and Kondranina actively concealed from Allstate facts regarding Anikeyev's control over New Century to prevent Allstate from discovering that New Century was controlled by a non-acupuncturist, and therefore, ineligible to bill for or collect No-Fault benefits.

1504. In fact, Anikeyev purposely caused the PC Defendants—including New Century—to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, wide-spread insurance fraud scheme masterminded by Anikeyev.

1505. The facts and circumstances related to New Century's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

218

1506.   Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

1507.   Thus, every time that Anikeyev and Kondranina (along with those individuals working under their control) caused New Century to submit No-Fault reimbursement demands to Allstate, Anikeyev and Kondranina (and those individuals working under their control) necessarily certified that New Century was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1508.   The full extent of Anikeyev's and Kondranina's fraudulent and unlawful acts relative to their control over and unlawful operation of the New Century enterprise—including (a) Anikeyev's control of New Century, and (b) the unlawful channeling of New Century's professional proceeds to Anikeyev and/or Sylvan—was not, and could not have been, known to Allstate until it commenced this action.

## XIII.   ALLSTATE'S JUSTIFIABLE RELIANCE

1509.   Each claim submitted to Allstate by (or on behalf of) Bay Needle, Karina K., Healthy Way, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, and New Century was verified pursuant to Insurance Law § 403.

1510.   At all relevant times, Matskina, Kolomiytseva, Kornilova, Lendel, Tsukanov, Kulagina, Anikeyeva, Shimunov, Abitbol, Zapolsky, Shkapenyuk, Razzakova, Kondranina, as licensed acupuncturists, were legally and ethically obligated to act with honesty and integrity in connection with their provision of, and billing for, acupuncture treatments and services.

219

1511.   To induce Allstate to promptly pay Bay Needle's, Karina K.'s, Healthy Way's, Alpha's, Lotus's, Sunrise's, Easy Care's, Shirom's, Urban Well's, Approach's, SML's, Bronx Therapy's, TC's, Acuhealth's, NR's, Silver Lotus's, and New Century's patient invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or HICF forms certifying that Bay Needle, Karina K., Healthy Way, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, and New Century were eligible to be reimbursed under New York's No-Fault laws.

1512.   Further, to induce Allstate to pay promptly the fraudulent charges for the acupuncture treatments and services purportedly provided, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise non-compensable charges from Allstate.  These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Bay Needle's, Karina K.'s, Healthy Way's, Alpha's, Lotus's, Sunrise's, Easy Care's, Shirom's, Urban Well's, Approach's, SML's, Bronx Therapy's, TC's, Acuhealth's, NR's, Silver Lotus's, and New Century's charges are not promptly paid in full.

1513.   Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

1514.   At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Bay Needle's, Karina K.'s, Healthy Way's, Alpha's, Lotus's, Sunrise's, Easy Care's, Shirom's, Urban Well's, Approach's, SML's, Bronx Therapy's, TC's, Acuhealth's, NR's, Silver Lotus's, and New Century's reimbursement eligibility under New York law.

220

1515.   In reasonable reliance on these misrepresentations, Allstate paid money to Bay Needle, Karina K., Healthy Way, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, and New Century to its detriment.

1516.   Allstate would not have made any of these payments to these entities had the defendants provided true and accurate information about Bay Needle's, Karina K.'s, Healthy Way's, Alpha's, Lotus', Sunrise's, Easy Care's, Shirom's, Urban Well's, Approach's, SML's, Bronx Therapy's, TC's, Acuhealth's, NR's, Silver Lotus', and New Century's reimbursement eligibility under New York law, including the control of the entities and the fact and necessity of the services provided.

1517.   As a result of the defendants' conduct, Allstate has paid in excess of $5,669,000.00 in reasonable reliance on the defendants' false health care documentation and false representations regarding the defendants' eligibility for reimbursement under New York's No-Fault laws.

1518.   Because the defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the defendants' fraudulent conduct until shortly before it filed this Complaint.

## XIV.  DAMAGES

1519.   The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for:

(a)     Payments made to Bay Needle Care, Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $224,700.00, the exact amount to be determined at trial. The chart annexed at Exhibit 44, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Bay Needle Care, Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(b)     Payments made to Karina K. Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $537,100.00, the exact amount to be determined at trial. The chart annexed at Exhibit 45, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Karina K. Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(c)     Payments made to Healthy Way Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $613,100.00, the exact amount to be determined at trial. The chart annexed at Exhibit 46, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Healthy Way Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(d)     Payments made to Alpha Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $250,300.00, the exact amount to be determined at trial. The chart annexed at Exhibit 47, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Alpha Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(e)     Payments made to Lotus Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $788,300.00, the exact amount to be determined at trial. The chart annexed at Exhibit 48, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Lotus Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(f)     Payments made to Sunrise Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $672,500.00, the exact amount to be determined at trial. The chart annexed at Exhibit 49, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Sunrise Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(g)     Payments made to Easy Care Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $547,800.00, the exact amount to be determined at trial. The chart annexed at Exhibit 50, and incorporated herein as if set forth in

its entirety, identifies Allstate's payments to Easy Care Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(h)     Payments made to Shirom Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $404,000.00, the exact amount to be determined at trial. The chart annexed at Exhibit 51, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Shirom Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(i)     Payments made to Urban Well Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $328,900.00, the exact amount to be determined at trial. The chart annexed at Exhibit 52, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Urban Well Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(j)     Payments made to Acupuncture Approach, P.C. in connection with first-party ("No-Fault") claims in excess of $457,400.00, the exact amount to be determined at trial. The chart annexed at Exhibit 53, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Acupuncture Approach, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(k)     Payments made to SML Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $147,000.00, the exact amount to be determined at trial. The chart annexed at Exhibit 54, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to SML Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(l)     Payments made to Bronx Acupuncture Therapy P.C. in connection with first-party ("No-Fault") claims in excess of $229,600.00, the exact amount to be determined at trial. The chart annexed at Exhibit 55, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Bronx Acupuncture Therapy P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(m)     Payments made to TC Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $207,600.00, the exact amount to be determined at trial. The chart annexed at Exhibit 56, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to TC Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

223

(n)     Payments made to Acuhealth Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $136,900.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 57, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Acuhealth Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(o)     Payments made to NR Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $48,900.00, the exact amount to be determined at trial. The chart annexed at Exhibit 58, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to NR Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(p)     Payments made to Silver Lotus Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $30,600.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 59, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Silver Lotus Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(q)     Payments made to New Century Acupuncture P.C. in connection with first-party ("No-Fault") claims in excess of $43,800.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 60, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to New Century Acupuncture P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(r)     Expenses incurred to review, adjust, investigate, litigate, and pay the false and fraudulent claims created by the defendants which supported the defendants' operation of the enterprises through a pattern of illegal activity.

XV.     **CAUSES OF ACTION**

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BAY NEEDLE CARE, ACUPUNCTURE P.C. ENTERPRISE**
**(Ellina Matskina, L.Ac. and Andrey Anikeyev)**

1520.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

224

1521.  Bay Needle Care, Acupuncture P.C. ("Bay Needle") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1522.  In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Bay Needle, Defendants Ellina Matskina, L.Ac. and Andrey Anikeyev (collectively, the "Count I Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Bay Needle's business, or should have reasonably foreseen that the mailing of such false health care documentation by Bay Needle would occur, in furtherance of the Count I Defendants' scheme to defraud.

1523.  The Count I Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 27.

1524.  Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1525.  Policies of insurance were delivered to insureds through the U.S Mail.

1526.  Payments made by Allstate to Bay Needle Care, Acupuncture P.C. were delivered through the U.S. Mail.

1527.  As described above, the Count I Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients

225

of Bay Needle Care, Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1528.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Bay Needle Care, Acupuncture P.C., for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

1529.   The Count I Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1530.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1531.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1532.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Bay Needle for the benefit of the Count I Defendants.

1533.   The Count I Defendants associated with the Bay Needle enterprise, and participated—both directly and indirectly—in the conduct of the Bay Needle enterprise through a pattern of racketeering activities.

1534.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

1535.   The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1536.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1537.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1538.   By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BAY NEEDLE CARE, ACUPUNCTURE P.C. ENTERPRISE
### (Ellina Matskina, L.Ac. and Andrey Anikeyev)

1539.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1540.   Defendants Ellina Matskina, L.Ac. and Andrey Anikeyev (collectively, the "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Bay Needle Care, Acupuncture P.C. ("Bay Needle").

1541.   The Count II Defendants each agreed to further, facilitate, support, and/or operate the Bay Needle Enterprise through a pattern of racketeering activity.

227

1542.   As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

1543.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Bay Needle, even though Bay Needle, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1544.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Bay Needle in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1545.   The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1546.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1547.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT III</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**KARINA K. ACUPUNCTURE P.C. ENTERPRISE**
**(Karina Kolomiytseva, L.Ac. and Andrey Anikeyev)**

1548.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1549.  Karina K. Acupuncture P.C. ("Karina K.") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1550.  In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Karina K., Defendants Karina Kolomiytseva, L.Ac. and Andrey Anikeyev (collectively, the "Count III Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Karina K.'s business, or should have reasonably foreseen that the mailing of such false health care documentation by Karina K. would occur, in furtherance of the Count III Defendants' scheme to defraud.

1551.  The Count III Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 28.

1552.  Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1553.  Policies of insurance were delivered to insureds through the U.S Mail.

229

1554.  Payments made by Allstate to Karina K. Acupuncture P.C. were delivered through the U.S. Mail.

1555.  As described above, the Count III Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Karina K. Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1556.  As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Karina K. Acupuncture P.C., for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

1557.  The Count III Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1558.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1559.  By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1560.  The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Karina K. for the benefit of the Count III Defendants.

230

1561. The Count III Defendants associated with the Karina K. enterprise, and participated—both directly and indirectly—in the conduct of the Karina K. enterprise through a pattern of racketeering activities.

1562. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

1563. The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1564. Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1565. Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1566. By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### KARINA K. ACUPUNCTURE P.C. ENTERPRISE
### (Karina Kolomiytseva, L.Ac. and Andrey Anikeyev)

1567. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1568.  Defendants Karina Kolomiytseva, L.Ac. and Andrey Anikeyev (collectively, the "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Karina K. Acupuncture P.C. ("Karina K.").

1569.  The Count IV Defendants each agreed to further, facilitate, support, and/or operate the Karina K. Enterprise through a pattern of racketeering activity.

1570.  As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

1571.  The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Karina K., even though Karina K., as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1572.  The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Karina K. in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1573.  The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1574.  Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1575.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the

defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**HEALTHY WAY ACUPUNCTURE P.C. ENTERPRISE**
**(Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev)**

1576.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1577.  Healthy Way Acupuncture P.C. ("Healthy Way") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1578.  In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Healthy Way, Defendants Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev (collectively, the "Count V Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Healthy Way's business, or should have reasonably foreseen that the mailing of such false health care documentation by Healthy Way would occur, in furtherance of the Count V Defendants' scheme to defraud.

1579.  The Count V Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 29.

1580.  Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1581.  Policies of insurance were delivered to insureds through the U.S Mail.

1582.  Payments made by Allstate to Healthy Way Acupuncture P.C. were delivered through the U.S. Mail.

1583.  As described above, the Count V Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Healthy Way Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1584.  As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Healthy Way Acupuncture P.C., for the benefit of one or more of the Count V Defendants, that would not otherwise have been paid.

1585.  The Count V Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1586.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1587.  By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing

scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1588.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Healthy Way for the benefit of the Count V Defendants.

1589.   The Count V Defendants associated with the Healthy Way enterprise, and participated—both directly and indirectly—in the conduct of the Healthy Way enterprise through a pattern of racketeering activities.

1590.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

1591.   The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1592.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1593.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1594.   By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**HEALTHY WAY ACUPUNCTURE P.C. ENTERPRISE**
**(Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev)**

1595.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1596.   Defendants Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev (collectively, the "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Healthy Way Acupuncture P.C. ("Healthy Way").

1597.   The Count VI Defendants each agreed to further, facilitate, support, and/or operate the Healthy Way Enterprise through a pattern of racketeering activity.

1598.   As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

1599.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Healthy Way, even though Healthy Way, as a result of the Count VI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1600.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Healthy Way in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1601.   The Count VI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

236

1602.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1603.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ALPHA ACUPUNCTURE P.C. ENTERPRISE**
**(Karina Kolomiytseva, L.Ac. and Andrey Anikeyev)**

1604.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1605.   Alpha Acupuncture P.C. ("Alpha") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1606.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Alpha, Defendants Karina Kolomiytseva, L.Ac. and Andrey Anikeyev (collectively, the "Count VII Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Alpha's business, or should have reasonably foreseen that the mailing of such false health care documentation by Alpha would occur, in furtherance of the Count VII Defendants' scheme to defraud.

237

1607.   The Count VII Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 30.

1608.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1609.   Policies of insurance were delivered to insureds through the U.S Mail.

1610.   Payments made by Allstate to Alpha Acupuncture P.C. were delivered through the U.S. Mail.

1611.   As described above, the Count VII Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Alpha Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1612.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Alpha Acupuncture P.C., for the benefit of one or more of the Count VII Defendants, that would not otherwise have been paid.

1613.   The Count VII Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1614.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1615.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1616.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Alpha for the benefit of the Count VII Defendants.

1617.   The Count VII Defendants associated with the Alpha enterprise, and participated—both directly and indirectly—in the conduct of the Alpha enterprise through a pattern of racketeering activities.

1618.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

1619.   The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1620.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1621.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1622.   By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

239

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ALPHA ACUPUNCTURE P.C. ENTERPRISE**
**(Karina Kolomiytseva, L.Ac. and Andrey Anikeyev)**

1623.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1624.   Defendants Karina Kolomiytseva, L.Ac. and Andrey Anikeyev (collectively, the "Count VIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Alpha Acupuncture P.C. ("Alpha").

1625.   The Count VIII Defendants each agreed to further, facilitate, support, and/or operate the Alpha Enterprise through a pattern of racketeering activity.

1626.   As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1627.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Alpha, even though Alpha, as a result of the Count VIII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1628.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Alpha in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1629.   The Count VIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

240

1630.  Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1631.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**LOTUS ACUPUNCTURE P.C. ENTERPRISE**
**(Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev)**

1632.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1633.  Lotus Acupuncture P.C. ("Lotus") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1634.  In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Lotus, Defendants Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev (collectively, the "Count IX Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Lotus's business, or should have reasonably foreseen that the mailing of such false health care documentation by Lotus would occur, in furtherance of the Count IX Defendants' scheme to defraud.

1635.   The Count IX Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 31.

1636.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1637.   Policies of insurance were delivered to insureds through the U.S Mail.

1638.   Payments made by Allstate to Lotus Acupuncture P.C. were delivered through the U.S. Mail.

1639.   As described above, the Count IX Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Lotus Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1640.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Lotus Acupuncture P.C., for the benefit of one or more of the Count IX Defendants, that would not otherwise have been paid.

1641.   The Count IX Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1642.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1643.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1644.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Lotus for the benefit of the Count IX Defendants.

1645.   The Count IX Defendants associated with the Lotus enterprise, and participated—both directly and indirectly—in the conduct of the Lotus enterprise through a pattern of racketeering activities.

1646.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

1647.   The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1648.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1649.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1650.   By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**LOTUS ACUPUNCTURE P.C. ENTERPRISE**
**(Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev)**

1651.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1652.   Defendants Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev (collectively, the "Count X Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Lotus Acupuncture P.C. ("Lotus").

1653.   The Count X Defendants each agreed to further, facilitate, support, and/or operate the Lotus Enterprise through a pattern of racketeering activity.

1654.   As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

1655.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Lotus, even though Lotus, as a result of the Count X Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1656.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Lotus in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1657.   The Count X Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

244

1658.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1659.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SUNRISE ACUPUNCTURE P.C. ENTERPRISE**
**(Yury Tsukanov, L.Ac. and Andrey Anikeyev)**

1660.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1661.   Sunrise Acupuncture P.C. ("Sunrise") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1662.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Sunrise, Defendants Yury Tsukanov, L.Ac. and Andrey Anikeyev (collectively, the "Count XI Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Sunrise's business, or should have reasonably foreseen that the mailing of such false health care documentation by Sunrise would occur, in furtherance of the Count XI Defendants' scheme to defraud.

1663.   The Count XI Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 32.

1664.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1665.   Policies of insurance were delivered to insureds through the U.S Mail.

1666.   Payments made by Allstate to Sunrise Acupuncture P.C. were delivered through the U.S. Mail.

1667.   As described above, the Count XI Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Sunrise Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1668.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Sunrise Acupuncture P.C., for the benefit of one or more of the Count XI Defendants, that would not otherwise have been paid.

1669.   The Count XI Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1670.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1671.  By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1672.  The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Sunrise for the benefit of the Count XI Defendants.

1673.  The Count XI Defendants associated with the Sunrise enterprise, and participated—both directly and indirectly—in the conduct of the Sunrise enterprise through a pattern of racketeering activities.

1674.  Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

1675.  The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1676.  Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1677.  Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1678.  By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SUNRISE ACUPUNCTURE P.C. ENTERPRISE**
**(Yury Tsukanov, L.Ac. and Andrey Anikeyev)**

1679.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1680.   Defendants Yury Tsukanov, L.Ac. and Andrey Anikeyev (collectively, the "Count XII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Sunrise Acupuncture P.C. ("Sunrise").

1681.   The Count XII Defendants each agreed to further, facilitate, support, and/or operate the Sunrise Enterprise through a pattern of racketeering activity.

1682.   As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

1683.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Sunrise, even though Sunrise, as a result of the Count XII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1684.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Sunrise in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1685.   The Count XII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

248

1686.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1687.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XIII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### EASY CARE ACUPUNCTURE P.C. ENTERPRISE
### (Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)

1688.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1689.   Easy Care Acupuncture P.C. ("Easy Care") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1690.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Easy Care, Defendants Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev (collectively, the "Count XIII Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Easy Care's business, or should have reasonably foreseen that the mailing of such false health care documentation by Easy Care would occur, in furtherance of the Count XIII Defendants' scheme to defraud.

249

1691.   The Count XIII Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 33.

1692.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1693.   Policies of insurance were delivered to insureds through the U.S Mail.

1694.   Payments made by Allstate to Easy Care Acupuncture P.C. were delivered through the U.S. Mail.

1695.   As described above, the Count XIII Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Easy Care Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1696.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Easy Care Acupuncture P.C., for the benefit of one or more of the Count XIII Defendants, that would not otherwise have been paid.

1697.   The Count XIII Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1698.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1699.  By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1700.  The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Easy Care for the benefit of the Count XIII Defendants.

1701.  The Count XIII Defendants associated with the Easy Care enterprise, and participated—both directly and indirectly—in the conduct of the Easy Care enterprise through a pattern of racketeering activities.

1702.  Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII Defendants' conduct.

1703.  The Count XIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1704.  Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1705.  Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1706.  By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the

claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XIV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### EASY CARE ACUPUNCTURE P.C. ENTERPRISE
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

1707.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1708.   Defendants Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev (collectively, the "Count XIV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Easy Care Acupuncture P.C. ("Easy Care").

1709.   The Count XIV Defendants each agreed to further, facilitate, support, and/or operate the Easy Care Enterprise through a pattern of racketeering activity.

1710.   As such, the Count XIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1711.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Easy Care, even though Easy Care, as a result of the Count XIV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1712.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Easy Care in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1713.   The Count XIV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1714.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1715.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SHIROM ACUPUNCTURE P.C. ENTERPRISE**
**(Roman Shimunov, L.Ac. and Andrey Anikeyev)**

1716.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1717.   Shirom Acupuncture P.C. ("Shirom") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1718.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Shirom, Defendants Roman Shimunov, L.Ac. and Andrey Anikeyev (collectively, the "Count XV Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the

ordinary course of Shirom's business, or should have reasonably foreseen that the mailing of such false health care documentation by Shirom would occur, in furtherance of the Count XV's Defendants' scheme to defraud.

1719.   The Count XV Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 34.

1720.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1721.   Policies of insurance were delivered to insureds through the U.S Mail.

1722.   Payments made by Allstate to Shirom Acupuncture P.C. were delivered through the U.S. Mail.

1723.   As described above, the Count XV Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Shirom Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1724.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Shirom Acupuncture P.C., for the benefit of one or more of the Count XV Defendants, that would not otherwise have been paid.

1725.   The Count XV Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate

from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1726.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1727.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1728.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Shirom for the benefit of the Count XV Defendants.

1729.   The Count XV Defendants associated with the Shirom enterprise, and participated—both directly and indirectly—in the conduct of the Shirom enterprise through a pattern of racketeering activities.

1730.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV Defendants' conduct.

1731.   The Count XV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1732.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1733.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1734.  By virtue of the Count XV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SHIROM ACUPUNCTURE P.C. ENTERPRISE**
**(Roman Shimunov, L.Ac. and Andrey Anikeyev)**

1735.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1736.  Defendants Roman Shimunov, L.Ac. and Andrey Anikeyev (collectively, the "Count XVI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Shirom Acupuncture P.C. ("Shirom").

1737.  The Count XVI Defendants each agreed to further, facilitate, support, and/or operate the Shirom Enterprise through a pattern of racketeering activity.

1738.  As such, the Count XVI Defendants conspired to violate 18 U.S.C. § 1962(c).

1739.  The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Shirom, even though Shirom, as a result of the Count XVI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1740.  The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Shirom in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1741.   The Count XVI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1742.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1743.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XVII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### URBAN WELL ACUPUNCTURE P.C. ENTERPRISE
### (Ilona Shoshana Abitbol, L.Ac. and Andrey Anikeyev)

1744.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1745.   Urban Well Acupuncture P.C. ("Urban Well") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1746.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Urban Well, Defendants Ilona Shoshana Abitbol, L.Ac. and Andrey Anikeyev ( collectively, the "Count XVII Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with

257

Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Urban Well's business, or should have reasonably foreseen that the mailing of such false health care documentation by Urban Well would occur, in furtherance of the Count XVII's Defendants' scheme to defraud.

1747.   The Count XVII Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 35.

1748.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1749.   Policies of insurance were delivered to insureds through the U.S Mail.

1750.   Payments made by Allstate to Urban Well Acupuncture P.C. were delivered through the U.S. Mail.

1751.   As described above, the Count XVII Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Urban Well Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1752.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Urban Well Acupuncture P.C., for the benefit of one or more of the Count XVII Defendants, that would not otherwise have been paid.

258

1753.   The Count XVII Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1754.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1755.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XVII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1756.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Urban Well for the benefit of the Count XVII Defendants.

1757.   The Count XVII Defendants associated with the Urban Well enterprise, and participated—both directly and indirectly—in the conduct of the Urban Well enterprise through a pattern of racketeering activities.

1758.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XVII Defendants' conduct.

1759.   The Count XVII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1760.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1761.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1762.   By virtue of the Count XVII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**URBAN WELL ACUPUNCTURE P.C. ENTERPRISE**
**(Ilona Shoshana Abitbol, L.Ac. and Andrey Anikeyev)**

1763.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1764.   Defendants Ilona Shoshana Abitbol, L.Ac. and Andrey Anikeyev (collectively, the "Count XVIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Urban Well Acupuncture P.C. ("Urban Well").

1765.   The Count XVIII Defendants each agreed to further, facilitate, support, and/or operate the Urban Well Enterprise through a pattern of racketeering activity.

1766.   As such, the Count XVIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1767.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Urban Well, even though Urban Well, as a result of the Count XVIII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1768.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Urban Well in connection with acupuncture services that were falsely

260

reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1769.   The Count XVIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1770.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1771.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ACUPUNCTURE APPROACH, P.C. ENTERPRISE**
**(Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

1772.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1773.   Acupuncture Approach, P.C. ("Approach") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1774.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Approach, Defendants Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev (collectively, the "Count XIX Defendants"),

intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Approach's business, or should have reasonably foreseen that the mailing of such false health care documentation by Approach would occur, in furtherance of the Count XIX's Defendants' scheme to defraud.

1775.   The Count XIX Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 36.

1776.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1777.   Policies of insurance were delivered to insureds through the U.S Mail.

1778.   Payments made by Allstate to Acupuncture Approach, P.C. were delivered through the U.S. Mail.

1779.   As described above, the Count XIX Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Acupuncture Approach, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1780.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Acupuncture Approach, P.C., for the benefit of one or more of the Count XIX Defendants, that would not otherwise have been paid.

1781.   The Count XIX Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1782.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1783.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XIX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1784.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Approach for the benefit of the Count XIX Defendants.

1785.   The Count XIX Defendants associated with the Approach enterprise, and participated—both directly and indirectly—in the conduct of the Approach enterprise through a pattern of racketeering activities.

1786.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIX Defendants' conduct.

1787.   The Count XIX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1788.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1789.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1790.   By virtue of the Count XIX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XX**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ACUPUNCTURE APPROACH, P.C. ENTERPRISE**
**(Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

1791.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1792.   Defendants Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev (collectively, the "Count XX Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Acupuncture Approach, P.C. ("Approach").

1793.   The Count XX Defendants each agreed to further, facilitate, support, and/or operate the Approach Enterprise through a pattern of racketeering activity.

1794.   As such, the Count XX Defendants conspired to violate 18 U.S.C. § 1962(c).

1795.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Approach, even though Approach, as a result of the Count XX Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

264

1796.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Approach in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1797.   The Count XX Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1798.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1799.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XX Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XXI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SML ACUPUNCTURE P.C. ENTERPRISE
### (Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)

1800.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1801.   SML Acupuncture P.C. ("SML") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1802.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of SML, Defendants Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev (collectively, the "Count XXI Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of SML's business, or should have reasonably foreseen that the mailing of such false health care documentation by SML would occur, in furtherance of the Count XXI Defendants' scheme to defraud.

1803.   The Count XXI Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 37.

1804.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1805.   Policies of insurance were delivered to insureds through the U.S Mail.

1806.   Payments made by Allstate to SML Acupuncture P.C. were delivered through the U.S. Mail.

1807.   As described above, the Count XXI Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of SML Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1808.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to SML Acupuncture P.C., for the benefit of one or more of the Count XXI Defendants, that would not otherwise have been paid.

1809.   The Count XXI Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1810.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1811.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XXI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1812.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to SML for the benefit of the Count XXI Defendants.

1813. The Count XXI Defendants associated with the SML enterprise, and participated—both directly and indirectly—in the conduct of the SML enterprise through a pattern of racketeering activities.

1814.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXI Defendants' conduct.

1815.   The Count XXI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

267

1816.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1817.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1818.   By virtue of the Count XXI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SML ACUPUNCTURE P.C. ENTERPRISE**
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

1819.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1820.   Defendants Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev (collectively, the "Count XXII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of SML Acupuncture P.C. ("SML").

1821.   The Count XXII Defendants each agreed to further, facilitate, support, and/or operate the SML Enterprise through a pattern of racketeering activity.

1822.   As such, the Count XXII Defendants conspired to violate 18 U.S.C. § 1962(c).

1823.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through SML, even though SML, as a result of the Count XXII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1824.  The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through SML in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1825.  The Count XXII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1826.  Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1827.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXIII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### BRONX ACUPUNCTURE THERAPY P.C. ENTERPRISE
### (Roman Shimunov, L.Ac. and Andrey Anikeyev)

1828.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1527 as if set forth fully herein.

1829.  Bronx Acupuncture Therapy P.C. ("Bronx Therapy") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1830.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Bronx Therapy, Defendants Roman Shimunov, L.Ac. and Andrey Anikeyev (collectively, the "Count XXIII Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Bronx Therapy's business, or should have reasonably foreseen that the mailing of such false health care documentation by Bronx Therapy would occur, in furtherance of the Count XXIII Defendants' scheme to defraud.

1831.   The Count XXIII Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 38.

1832.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1833.   Policies of insurance were delivered to insureds through the U.S Mail.

1834.   Payments made by Allstate to Bronx Acupuncture Therapy P.C. were delivered through the U.S. Mail.

1835.   As described above, the Count XXIII Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Bronx Acupuncture Therapy P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1836.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Bronx Acupuncture Therapy P.C., for the benefit of one or more of the Count XXIII Defendants, that would not otherwise have been paid.

1837.   The Count XXIII Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1838.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1839.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XXIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1840.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Bronx Therapy for the benefit of the Count XXIII Defendants.

1841.   The Count XXIII Defendants associated with the Bronx Therapy enterprise, and participated—both directly and indirectly—in the conduct of the Bronx Therapy enterprise through a pattern of racketeering activities.

1842.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXIII Defendants' conduct.

1843.   The Count XXIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

271

1844.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1845.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1846.   By virtue of the Count XXIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXIV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BRONX ACUPUNCTURE THERAPY P.C. ENTERPRISE
### (Roman Shimunov, L.Ac. and Andrey Anikeyev)

1847.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1848.   Defendants Roman Shimunov, L.Ac. and Andrey Anikeyev (collectively, the "Count XXIV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Bronx Acupuncture Therapy P.C. ("Bronx Therapy").

1849.   The Count XXIV Defendants each agreed to further, facilitate, support, and/or operate the Bronx Therapy Enterprise through a pattern of racketeering activity.

1850.   As such, the Count XXIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1851.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Bronx Therapy, even though Bronx Therapy, as a result of the Count XXIV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

272

1852.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Bronx Therapy in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1853.   The Count XXIV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1854.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1855.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXIV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XXV
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### TC ACUPUNCTURE P.C. ENTERPRISE
### (Igor Shkapenyuk, L.Ac. and Andrey Anikeyev)

1856.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1857.   TC Acupuncture P.C. ("TC") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1858.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of TC, Defendants Igor Shkapenyuk, L.Ac. and Andrey Anikeyev (collectively, the "Count XXV Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of TC's business, or should have reasonably foreseen that the mailing of such false health care documentation by TC would occur, in furtherance of the Count XXV Defendants' scheme to defraud.

1859.   The Count XXV Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 39.

1860.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1861.   Policies of insurance were delivered to insureds through the U.S Mail.

1862.   Payments made by Allstate to TC Acupuncture P.C. were delivered through the U.S. Mail.

1863.   As described above, the Count XXV Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of TC Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1864.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to TC Acupuncture P.C., for the benefit of one or more of the Count XXV Defendants, that would not otherwise have been paid.

1865.   The Count XXV Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1866.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1867.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XXV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1868.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to TC for the benefit of the Count XXV Defendants.

1869.   The Count XXV Defendants associated with the TC enterprise, and participated— both directly and indirectly—in the conduct of the TC enterprise through a pattern of racketeering activities.

1870.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXV Defendants' conduct.

1871.   The Count XXV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1872.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1873.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1874.   By virtue of the Count XXV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXVI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**TC ACUPUNCTURE P.C. ENTERPRISE**
**(Igor Shkapenyuk, L.Ac. and Andrey Anikeyev)**

1875.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1876.   Defendants Igor Shkapenyuk, L.Ac. and Andrey Anikeyev (collectively, the "Count XXVI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of TC Acupuncture P.C. ("TC").

1877.   The Count XXVI Defendants each agreed to further, facilitate, support, and/or operate the TC Enterprise through a pattern of racketeering activity.

1878.   As such, the Count XXVI Defendants conspired to violate 18 U.S.C. § 1962(c).

1879.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through TC, even though TC, as a result of the Count XXVI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1880.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through TC in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1881.   The Count XXVI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1882.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1883.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXVI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XXVII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ACUHEALTH ACUPUNCTURE P.C. ENTERPRISE
### (Natalya Kornilova, L.Ac. and Andrey Anikeyev)

1884.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1885.   Acuhealth Acupuncture P.C. ("Acuhealth") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1886.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Acuhealth, Defendants Natalya Kornilova, L.Ac. and Andrey

Anikeyev (collectively, the "Count XXVII Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Acuhealth's business, or should have reasonably foreseen that the mailing of such false health care documentation by Acuhealth would occur, in furtherance of the Count XXVII Defendants' scheme to defraud.

1887.   The Count XXVII Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 40.

1888.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1889.   Policies of insurance were delivered to insureds through the U.S Mail.

1890.   Payments made by Allstate to Acuhealth Acupuncture P.C. were delivered through the U.S. Mail.

1891.   As described above, the Count XXVII Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Acuhealth Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1892.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Acuhealth

Acupuncture P.C., for the benefit of one or more of the Count XXVII Defendants, that would not otherwise have been paid.

1893.  The Count XXVII Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1894.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1895.  By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XXVII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1896.  The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Acuhealth for the benefit of the Count XXVII Defendants.

1897.  The Count XXVII Defendants associated with the Acuhealth enterprise, and participated—both directly and indirectly—in the conduct of the Acuhealth enterprise through a pattern of racketeering activities.

1898.  Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXVII Defendants' conduct.

1899.  The Count XXVII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1900.  Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1901.  Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1902.  By virtue of the Count XXVII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XXVIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ACUHEALTH ACUPUNCTURE P.C. ENTERPRISE
### (Natalya Kornilova, L.Ac. and Andrey Anikeyev)

1903.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1904.  Defendants Natalya Kornilova, L.Ac. and Andrey Anikeyev (collectively, the "Count XXVIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Acuhealth Acupuncture P.C. ("Acuhealth").

1905.  The Count XXVIII Defendants each agreed to further, facilitate, support, and/or operate the Acuhealth Enterprise through a pattern of racketeering activity.

1906.  As such, the Count XXVIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1907.  The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Acuhealth, even though Acuhealth, as a result of the Count XXVIII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1908.  The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Acuhealth in connection with acupuncture services that were falsely

reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1909. The Count XXVIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1910. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1911. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXVIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXIX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NR ACUPUNCTURE P.C. ENTERPRISE
### (Nellya Razzakova, L.Ac. and Andrey Anikeyev)

1912. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1913. NR Acupuncture P.C. ("NR") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1914. In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of NR, Defendants Nellya Razzakova, L.Ac. and Andrey Anikeyev (collectively, the "Count XXIX Defendants"), intentionally prepared and mailed (or caused to be

prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of NR's business, or should have reasonably foreseen that the mailing of such false health care documentation by NR would occur, in furtherance of the Count XXIX Defendants' scheme to defraud.

1915.  The Count XXIX Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 41.

1916.  Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1917.  Policies of insurance were delivered to insureds through the U.S Mail.

1918.  Payments made by Allstate to NR Acupuncture P.C. were delivered through the U.S. Mail.

1919.  As described above, the Count XXIX Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of NR Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1920.  As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to NR Acupuncture P.C., for the benefit of one or more of the Count XXIX Defendants, which would not otherwise have been paid.

1921.   The Count XXIX Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1922.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1923.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XXIX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1924.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to NR for the benefit of the Count XXIX Defendants.

1925.   The Count XXIX Defendants associated with the NR enterprise, and participated—both directly and indirectly—in the conduct of the NR enterprise through a pattern of racketeering activities.

1926.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXIX Defendants' conduct.

1927.   The Count XXIX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1928.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1929.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1930.   By virtue of the Count XXIX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXX
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## NR ACUPUNCTURE P.C. ENTERPRISE
### (Nellya Razzakova, L.Ac. and Andrey Anikeyev)

1931.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1932.   Defendants Nellya Razzakova, L.Ac. and Andrey Anikeyev (collectively, the "Count XXX Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of NR Acupuncture P.C. ("NR").

1933.   The Count XXX Defendants each agreed to further, facilitate, support, and/or operate the NR Enterprise through a pattern of racketeering activity.

1934.   As such, the Count XXX Defendants conspired to violate 18 U.S.C. § 1962(c).

1935.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through NR, even though NR, as a result of the Count XXX Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1936.   The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through NR in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1937.   The Count XXX Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1938.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1939.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXX Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XXXI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SILVER LOTUS ACUPUNCTURE P.C. ENTERPRISE
### (Yury Tsukanov, L.Ac. and Andrey Anikeyev)

1940.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1941.   Silver Lotus Acupuncture P.C. ("Silver Lotus") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1942.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Silver Lotus, Defendants Yury Tsukanov, L.Ac. and Andrey Anikeyev (collectively, the "Count XXXI Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of Silver Lotus's business, or should have reasonably foreseen that the mailing of such false health care documentation by Silver Lotus would occur, in furtherance of the Count XXXI Defendants' scheme to defraud.

1943.   The Count XXXI Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 42.

1944.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1945.   Policies of insurance were delivered to insureds through the U.S Mail.

1946.   Payments made by Allstate to Silver Lotus Acupuncture P.C. were delivered through the U.S. Mail.

1947.   As described above, the Count XXXI Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of Silver Lotus Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

286

1948.   As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Silver Lotus Acupuncture P.C., for the benefit of one or more of the Count XXXI Defendants, that would not otherwise have been paid.

1949.   The Count XXXI Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1950.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1951.   By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XXXI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1952.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Silver Lotus for the benefit of the Count XXXI Defendants.

1953.   The Count XXXI Defendants associated with the Silver Lotus enterprise, and participated—both directly and indirectly—in the conduct of the Silver Lotus enterprise through a pattern of racketeering activities.

1954.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXXI Defendants' conduct.

1955.   The Count XXXI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1956.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1957.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1958.   By virtue of the Count XXXI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SILVER LOTUS ACUPUNCTURE P.C. ENTERPRISE**
**(Yury Tsukanov, L.Ac. and Andrey Anikeyev)**

1959.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1960.   Defendants Yury Tsukanov, L.Ac. and Andrey Anikeyev (collectively, the "Count XXXII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Silver Lotus Acupuncture P.C. ("Silver Lotus").

1961.   The Count XXXII Defendants each agreed to further, facilitate, support, and/or operate the Silver Lotus Enterprise through a pattern of racketeering activity.

1962.   As such, the Count XXXII Defendants conspired to violate 18 U.S.C. § 1962(c).

1963.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through Silver Lotus, even though Silver Lotus, as a result of the Count XXXII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1964.  The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through Silver Lotus in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1965.  The Count XXXII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1966.  Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1967.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXXII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXXIII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NEW CENTURY ACUPUNCTURE P.C. ENTERPRISE
#### (Lyubov Kondranina, L.Ac. and Andrey Anikeyev)

1968.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1969.  New Century Acupuncture P.C. ("New Century") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1970.   In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of New Century, Defendants Lyubov Kondranina, L.Ac. and Andrey Anikeyev (collectively, the "Count XXXIII Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false health care documentation in connection with Allstate insurance claims, or knew that such false health care documentation would be mailed in the ordinary course of New Century's business, or should have reasonably foreseen that the mailing of such false health care documentation by New Century would occur, in furtherance of the Count XXXIII Defendants' scheme to defraud.

1971.   The Count XXXIII Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 43.

1972.   Among other things, NF-3 forms, acupuncture billing invoices, acupuncture reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1973.   Policies of insurance were delivered to insureds through the U.S Mail.

1974.   Payments made by Allstate to New Century Acupuncture P.C. were delivered through the U.S. Mail.

1975.   As described above, the Count XXXIII Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other health care documentation to Allstate related to acupuncture services purportedly provided to patients of New Century Acupuncture P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1976.  As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to New Century Acupuncture P.C., for the benefit of one or more of the Count XXXIII Defendants, that would not otherwise have been paid.

1977.  The Count XXXIII Defendants' pattern of submitting (or causing or knowing of the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

1978.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1979.  By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count XXXIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1980.  The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to New Century for the benefit of the Count XXXIII Defendants.

1981.  The Count XXXIII Defendants associated with the New Century enterprise, and participated—both directly and indirectly—in the conduct of the New Century enterprise through a pattern of racketeering activities.

1982.  Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXXIII Defendants' conduct.

1983.  The Count XXXIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1984.   Allstate is in the business of providing automobile insurance coverage and adjusting claims for such coverage.

1985.   Insurance fraud schemes such as the one detailed herein have a deleterious impact on Allstate's financial well-being, and also have an adverse effect on prevailing insurance rate premiums.

1986.   By virtue of the Count XXXIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XXXIV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### NEW CENTURY ACUPUNCTURE P.C. ENTERPRISE
### (Lyubov Kondranina, L.Ac. and Andrey Anikeyev)

1987.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1519 as if set forth fully herein.

1988.   Defendants Lyubov Kondranina, L.Ac. and Andrey Anikeyev (collectively, the "Count XXXIV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of New Century Acupuncture P.C. ("New Century").

1989.   The Count XXXIV Defendants each agreed to further, facilitate, support, and/or operate the New Century Enterprise through a pattern of racketeering activity.

1990.   As such, the Count XXXIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1991.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate by and through New Century, even though New Century, as a result of the Count XXXIV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1992.  The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate by and through New Century in connection with acupuncture services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1993.  The Count XXXIV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1994.  Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of defendants' unlawful conduct described herein.

1995.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXXIV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXXV**
**COMMON-LAW FRAUD**
**(Ellina Matskina, L.Ac., Andrey Anikeyev, and Bay Needle Care, Acupuncture P.C.)**

1996.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

1997.  Defendants Ellina Matskina, L.Ac., Andrey Anikeyev, and Bay Needle Care, Acupuncture P.C. (collectively, the "Count XXXV Defendants") conspired to defraud Allstate through their unlawful operation and control of Bay Needle Care, Acupuncture P.C. ("Bay Needle").

293

1998.   The Count XXXV Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Bay Needle was entitled to receive No-Fault reimbursement under New York law.

1999.   The misrepresentations of fact by the Count XXXV Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Bay Needle.

2000.   The Count XXXV Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2001.   The misrepresentations were intentionally made by the Count XXXV Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Bay Needle—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2002.   The Count XXXV Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2003.   Allstate reasonably relied, to its detriment, upon the Count XXXV Defendants' material misrepresentations concerning Bay Needle's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Bay Needle's patients, each of whom had assigned to Bay Needle the right for Bay Needle to avail itself of its patients' available No-Fault insurance coverage to pay Bay Needle's charges.

2004.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Bay Needle—in excess of $224,700.00—for health care expenses relating to

services rendered to Allstate claimants, even though Bay Needle was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XXXVI**
**COMMON-LAW FRAUD**
**(Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Karina K. Acupuncture P.C.)**

2005.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2006.   Defendants Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Karina K. Acupuncture P.C. (collectively, the "Count XXXVI Defendants") conspired to defraud Allstate through their unlawful operation and control of Karina K. Acupuncture P.C. ("Karina K.").

2007.   The Count XXXVI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Karina K. was entitled to receive No-Fault reimbursement under New York law.

2008.   The misrepresentations of fact by the Count XXXVI Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Karina K.

2009.   The Count XXXVI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2010.   The misrepresentations were intentionally made by the Count XXXVI Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Karina K.—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2011.  The Count XXXVI Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2012.  Allstate reasonably relied, to its detriment, upon the Count XXXVI Defendants' material misrepresentations concerning Karina K.'s eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Karina K.'s patients, each of whom had assigned to Karina K. the right for Karina K. to avail itself of its patients' available No-Fault insurance coverage to pay Karina K.'s charges.

2013.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Karina K.—in excess of $537,100.00—for health care expenses relating to services rendered to Allstate claimants, even though Karina K. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XXXVII**
**COMMON-LAW FRAUD**
**(Ellina Matskina, L.Ac., Andrey Anikeyev, and Healthy Way Acupuncture P.C.)**

2014.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2015.  Defendants Ellina Matskina, L.Ac., Andrey Anikeyev, and Healthy Way Acupuncture P.C. (collectively, the "Count XXXVII Defendants") conspired to defraud Allstate through their unlawful operation and control of Healthy Way Acupuncture P.C. ("Healthy Way").

2016.  The Count XXXVII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Healthy Way was entitled to receive No-Fault reimbursement under New York law.

2017.  The misrepresentations of fact by the Count XXXVII Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of **Healthy Way**.

2018.  The Count **XXXVII** Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2019.  The misrepresentations were intentionally made by the Count **XXXVII** Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of **Healthy Way**—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2020.  The Count **XXXVII** Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2021.  Allstate reasonably relied, to its detriment, upon the Count **XXXVII** Defendants' material misrepresentations concerning **Healthy Way's** eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to **Healthy Way's** patients, each of whom had assigned to **Healthy Way** the right for **Healthy Way** to avail itself of its patients' available No-Fault insurance coverage to pay **Healthy Way's** charges.

2022.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to **Healthy Way**—in excess of $613,100.00—for health care expenses relating to services rendered to Allstate claimants, even though **Healthy Way** was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XXXVIII
## COMMON-LAW FRAUD
**(Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Alpha Acupuncture P.C.)**

2023.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2024. Defendants Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Alpha Acupuncture P.C. (collectively, the "Count XXXVIII Defendants") conspired to defraud Allstate through their unlawful operation and control of Alpha Acupuncture P.C. ("Alpha").

2025.  The Count XXXVIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Alpha was entitled to receive No-Fault reimbursement under New York law.

2026.  The misrepresentations of fact by the Count XXXVIII Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Alpha.

2027.  The Count XXXVIII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2028.  The misrepresentations were intentionally made by the Count XXXVIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Alpha—an unlawfully operated and controlled professional service corporation— for payment of No-Fault insurance benefits.

2029.  The Count XXXVIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

298

2030.  Allstate reasonably relied, to its detriment, upon the Count **XXXVIII** Defendants'
material misrepresentations concerning **Alpha**'s eligibility to receive No-Fault reimbursement in
paying numerous bills relating to health care services purportedly provided to **Alpha**'s patients,
each of whom had assigned to **Alpha** the right for **Alpha** to avail itself of its patients' available
No-Fault insurance coverage to pay **Alpha**'s charges.

2031.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit
payments made to **Alpha**—in excess of $250,300.00—for health care expenses relating to
services rendered to Allstate claimants, even though **Alpha** was, at all relevant times, ineligible
to receive No-Fault reimbursement under New York law.

### COUNT XXXIX
### COMMON-LAW FRAUD
### (Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev, and Lotus Acupuncture P.C.)

2032.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set
forth above in paragraphs 1 through 1519 as if set forth fully herein.

2033.  Defendants Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev,
and Lotus Acupuncture P.C. (collectively, the "Count XXXIX Defendants") conspired to defraud
Allstate through their unlawful operation and control of Lotus Acupuncture P.C. ("Lotus").

2034.  The Count XXXIX Defendants' scheme to defraud Allstate was dependent upon a
succession of material misrepresentations of fact that Lotus was entitled to receive No-Fault
reimbursement under New York law.

2035.  The misrepresentations of fact by the Count **XXXIX** Defendants included, but
were not limited to, the material misrepresentations of fact made in reports, invoices, and
collection documentation mailed to Allstate by, through, or on behalf of **Lotus**.

2036.   The Count XXXIX Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2037.   The misrepresentations were intentionally made by the Count XXXIX Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Lotus—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2038.   The Count XXXIX Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2039.   Allstate reasonably relied, to its detriment, upon the Count XXXIX Defendants' material misrepresentations concerning Lotus's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Lotus's patients, each of whom had assigned to Lotus the right for Lotus to avail itself of its patients' available No-Fault insurance coverage to pay Lotus's charges.

2040.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Lotus—in excess of $788,300.00—for health care expenses relating to services rendered to Allstate claimants, even though Lotus was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XL
## COMMON-LAW FRAUD
### (Yury Tsukanov, L.Ac., Andrey Anikeyev, and Sunrise Acupuncture P.C.)

2041.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

300

2042.   Defendants Yury Tsukanov, L.Ac., Andrey Anikeyev, and Sunrise Acupuncture P.C. (collectively, the "Count XL Defendants") conspired to defraud Allstate through their unlawful operation and control of Sunrise Acupuncture P.C. ("Sunrise").

2043.   The Count XL Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Sunrise was entitled to receive No-Fault reimbursement under New York law.

2044.   The misrepresentations of fact by the Count XL Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Sunrise.

2045.   The Count XL Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2046.   The misrepresentations were intentionally made by the Count XL Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Sunrise—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2047.   The Count XL Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2048.   Allstate reasonably relied, to its detriment, upon the Count XL Defendants' material misrepresentations concerning Sunrise's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Sunrise's patients, each of whom had assigned to Sunrise the right for Sunrise to avail itself of its patients' available No-Fault insurance coverage to pay Sunrise's charges.

2049.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Sunrise—in excess of $672,500.00—for health care expenses relating to services rendered to Allstate claimants, even though Sunrise was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLI**
**COMMON-LAW FRAUD**
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Easy Care Acupuncture P.C.)**

2050.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2051.  Defendants Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Easy Care Acupuncture P.C. (collectively, the "Count XLI Defendants") conspired to defraud Allstate through their unlawful operation and control of Easy Care Acupuncture P.C. ("Easy Care").

2052.  The Count XLI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Easy Care was entitled to receive No-Fault reimbursement under New York law.

2053.  The misrepresentations of fact by the Count XLI Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Easy Care.

2054.  The Count XLI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2055.  The misrepresentations were intentionally made by the Count XLI Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of

Easy Care—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2056.  The Count XLI Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2057.  Allstate reasonably relied, to its detriment, upon the Count XLI Defendants' material misrepresentations concerning Easy Care's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Easy Care's patients, each of whom had assigned to Easy Care the right for Easy Care to avail itself of its patients' available No-Fault insurance coverage to pay Easy Care's charges.

2058.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Easy Care—in excess of $547,800.00—for health care expenses relating to services rendered to Allstate claimants, even though Easy Care was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLII**
**COMMON-LAW FRAUD**
**(Roman Shimunov, L.Ac., Andrey Anikeyev, and Shirom Acupuncture P.C.)**

2059.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2060.  Defendants Roman Shimunov, L.Ac., Andrey Anikeyev, and Shirom Acupuncture P.C. (collectively, the "Count XLII Defendants") conspired to defraud Allstate through their unlawful operation and control of Shirom Acupuncture P.C. ("Shirom").

2061.  The Count XLII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Shirom was entitled to receive No-Fault reimbursement under New York law.

2062.   The misrepresentations of fact by the Count XLII Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Shirom.

2063.   The Count XLII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2064.   The misrepresentations were intentionally made by the Count XLII Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Shirom—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2065.   The Count XLII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2066.   Allstate reasonably relied, to its detriment, upon the Count XLII Defendants' material misrepresentations concerning Shirom's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Shirom's patients, each of whom had assigned to Shirom the right for Shirom to avail itself of its patients' available No-Fault insurance coverage to pay Shirom's charges.

2067.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Shirom—in excess of $404,000.00—for health care expenses relating to services rendered to Allstate claimants, even though Shirom was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLIII**
**COMMON-LAW FRAUD**
**(Ilona Shoshana Abitbol, L.Ac., Andrey Anikeyev, and Urban Well Acupuncture P.C.)**

2068.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2069.  Defendants Ilona Shoshana Abitbol, L.Ac., Andrey Anikeyev, and Urban Well Acupuncture P.C. (collectively, the "Count XLIII Defendants") conspired to defraud Allstate through their unlawful operation and control of Urban Well Acupuncture P.C. ("Urban Well").

2070.  The Count XLIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Urban Well was entitled to receive No-Fault reimbursement under New York law.

2071.  The misrepresentations of fact by the Count XLIII Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Urban Well.

2072.  The Count XLIII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2073.  The misrepresentations were intentionally made by the Count XLIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Urban Well—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2074.  The Count XLIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

305

2075.  Allstate reasonably relied, to its detriment, upon the Count XLIII Defendants' material misrepresentations concerning Urban Well's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Urban Well's patients, each of whom had assigned to Urban Well the right for Urban Well to avail itself of its patients' available No-Fault insurance coverage to pay Urban Well's charges.

2076.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Urban Well—in excess of $328,900.00—for health care expenses relating to services rendered to Allstate claimants, even though Urban Well was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLIV**
**COMMON-LAW FRAUD**
**(Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and**
**Acupuncture Approach, P.C.)**

2077.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2078.  Defendants Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Acupuncture Approach, P.C. (collectively, the "Count XLIV Defendants") conspired to defraud Allstate through their unlawful operation and control of Acupuncture Approach, P.C. ("Approach").

2079.  The Count XLIV Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Approach was entitled to receive No-Fault reimbursement under New York law.

306

2080.   The misrepresentations of fact by the Count XLIV Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Approach.

2081.   The Count XLIV Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2082.   The misrepresentations were intentionally made by the Count XLIV Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Approach—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2083.   The Count XLIV Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2084.   Allstate reasonably relied, to its detriment, upon the Count XLIV Defendants' material misrepresentations concerning Approach's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Approach's patients, each of whom had assigned to Approach the right for Approach to avail itself of its patients' available No-Fault insurance coverage to pay Approach's charges.

2085.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Approach—in excess of $457,400.00—for health care expenses relating to services rendered to Allstate claimants, even though Approach was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLV**
**COMMON-LAW FRAUD**
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and SML Acupuncture P.C.)**

2086.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2087.   Defendants Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and SML Acupuncture P.C. (collectively, the "Count XLV Defendants") conspired to defraud Allstate through their unlawful operation and control of SML Acupuncture P.C. ("SML").

2088.   The Count XLV Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that SML was entitled to receive No-Fault reimbursement under New York law.

2089.   The misrepresentations of fact by the Count XLV Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of SML.

2090.   The Count XLV Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2091.   The misrepresentations were intentionally made by the Count XLV Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of SML—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2092.   The Count XLV Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2093.  Allstate reasonably relied, to its detriment, upon the Count XLV Defendants' material misrepresentations concerning SML's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to SML's patients, each of whom had assigned to SML the right for SML to avail itself of its patients' available No-Fault insurance coverage to pay SML's charges.

2094.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to SML—in excess of $147,000.00—for health care expenses relating to services rendered to Allstate claimants, even though SML was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XLVI
## COMMON-LAW FRAUD
### (Roman Shimunov, L.Ac., Andrey Anikeyev, and Bronx Acupuncture Therapy P.C.)

2095.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2096.  Defendants Roman Shimunov, L.Ac., Andrey Anikeyev, and Bronx Acupuncture Therapy P.C. (collectively, the "Count XLVI Defendants") conspired to defraud Allstate through their unlawful operation and control of Bronx Acupuncture Therapy P.C. ("Bronx Therapy").

2097.  The Count XLVI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Bronx Therapy was entitled to receive No-Fault reimbursement under New York law.

2098.  The misrepresentations of fact by the Count XLVI Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Bronx Therapy.

2099.  The Count XLVI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2100.  The misrepresentations were intentionally made by the Count XLVI Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Bronx Therapy—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2101.  The Count XLVI Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2102.  Allstate reasonably relied, to its detriment, upon the Count XLVI Defendants' material misrepresentations concerning Bronx Therapy's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Bronx Therapy's patients, each of whom had assigned to Bronx Therapy the right for Bronx Therapy to avail itself of its patients' available No-Fault insurance coverage to pay Bronx Therapy's charges.

2103.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Bronx Therapy—in excess of $229,600.00—for health care expenses relating to services rendered to Allstate claimants, even though Bronx Therapy was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

### COUNT XLVII
### COMMON-LAW FRAUD
**(Igor Shkapenyuk, L.Ac., Andrey Anikeyev, and TC Acupuncture P.C.)**

2104.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

310

2105.   Defendants Igor Shkapenyuk, L.Ac., Andrey Anikeyev, and TC Acupuncture P.C. (collectively, the "Count XLVII Defendants") conspired to defraud Allstate through their unlawful operation and control of TC Acupuncture P.C. ("TC").

2106.   The Count XLVII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that TC was entitled to receive No-Fault reimbursement under New York law.

2107.   The misrepresentations of fact by the Count XLVII Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of TC.

2108.   The Count XLVII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2109.   The misrepresentations were intentionally made by the Count XLVII Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of TC—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2110.   The Count XLVII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2111.   Allstate reasonably relied, to its detriment, upon the Count XLVII Defendants' material misrepresentations concerning TC's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to TC's patients, each of whom had assigned to TC the right for TC to avail itself of its patients' available No-Fault insurance coverage to pay TC's charges.

311

2112.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to TC—in excess of $207,600.00—for health care expenses relating to services rendered to Allstate claimants, even though TC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XLVIII**
**COMMON-LAW FRAUD**
**(Natalya Kornilova, L.Ac., Andrey Anikeyev, and Acuhealth Acupuncture P.C.)**

2113.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2114.  Defendants Natalya Kornilova, L.Ac., Andrey Anikeyev, and Acuhealth Acupuncture P.C. (collectively, the "Count XLVIII Defendants") conspired to defraud Allstate through their unlawful operation and control of Acuhealth Acupuncture P.C. ("Acuhealth").

2115.  The Count XLVIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Acuhealth was entitled to receive No-Fault reimbursement under New York law.

2116.  The misrepresentations of fact by the Count XLVIII Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Acuhealth.

2117.  The Count XLVIII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2118.  The misrepresentations were intentionally made by the Count XLVIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Acuhealth—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

312

2119.  The Count XLVIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2120.  Allstate reasonably relied, to its detriment, upon the Count XLVIII Defendants' material misrepresentations concerning Acuhealth's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to Acuhealth's patients, each of whom had assigned to Acuhealth the right for Acuhealth to avail itself of its patients' available No-Fault insurance coverage to pay Acuhealth's charges.

2121.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Acuhealth—in excess of $136,900.00—for health care expenses relating to services rendered to Allstate claimants, even though Acuhealth was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XLIX
## COMMON-LAW FRAUD
### (Nellya Razzakova, L.Ac., Andrey Anikeyev, and NR Acupuncture P.C.)

2122.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2123.  Defendants Nellya Razzakova, L.Ac., Andrey Anikeyev, and NR Acupuncture P.C. (collectively, the "Count XLIX Defendants") conspired to defraud Allstate through their unlawful operation and control of NR Acupuncture P.C. ("NR").

2124.  The Count XLIX Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that NR was entitled to receive No-Fault reimbursement under New York law.

313

2125.   The misrepresentations of fact by the Count XLIX Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of NR.

2126.   The Count XLIX Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2127.   The misrepresentations were intentionally made by the Count XLIX Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of NR—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2128.   The Count XLIX Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2129.   Allstate reasonably relied, to its detriment, upon the Count XLIX Defendants' material misrepresentations concerning NR's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to NR's patients, each of whom had assigned to NR the right for NR to avail itself of its patients' available No-Fault insurance coverage to pay NR's charges.

2130.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to NR—in excess of $48,900.00—for health care expenses relating to services rendered to Allstate claimants, even though NR was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT L
## COMMON-LAW FRAUD
### (Yury Tsukanov, L.Ac., Andrey Anikeyev, and Silver Lotus Acupuncture P.C.)

2131.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2132.  Defendants Yury Tsukanov, L.Ac., Andrey Anikeyev, and Silver Lotus Acupuncture P.C. (collectively, the "Count L Defendants") conspired to defraud Allstate through their unlawful operation and control of Silver Lotus Acupuncture P.C. ("Silver Lotus").

2133.  The Count L Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Silver Lotus was entitled to receive No-Fault reimbursement under New York law.

2134.  The misrepresentations of fact by the Count L Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of Silver Lotus.

2135.  The Count L Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

2136.  The misrepresentations were intentionally made by the Count L Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of Silver Lotus—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2137.  The Count L Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2138.  Allstate reasonably relied, to its detriment, upon the Count L Defendants' material misrepresentations concerning Silver Lotus's eligibility to receive No-Fault reimbursement in

315

paying numerous bills relating to health care services purportedly provided to Silver Lotus's patients, each of whom had assigned to Silver Lotus the right for Silver Lotus to avail itself of its patients' available No-Fault insurance coverage to pay Silver Lotus's charges.

2139.  Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to Silver Lotus—in excess of $30,600.00—for health care expenses relating to services rendered to Allstate claimants, even though Silver Lotus was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT LI**
**COMMON-LAW FRAUD**
**(Lyubov Kondranina, L.Ac., Andrey Anikeyev, and New Century Acupuncture P.C.)**

2140.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2141.  Defendants Lyubov Kondranina, L.Ac., Andrey Anikeyev, and New Century Acupuncture P.C. (collectively, the "Count LI Defendants") conspired to defraud Allstate through their unlawful operation and control of New Century Acupuncture P.C. ("New Century").

2142.  The Count LI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that New Century was entitled to receive No-Fault reimbursement under New York law.

2143.  The misrepresentations of fact by the Count LI Defendants included, but were not limited to, the material misrepresentations of fact made in reports, invoices, and collection documentation mailed to Allstate by, through, or on behalf of New Century.

2144.  The Count LI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

316

2145.   The misrepresentations were intentionally made by the Count LI Defendants in furtherance of their scheme to defraud Allstate by submitting claims by, through, or on behalf of New Century—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

2146.   The Count LI Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

2147.   Allstate reasonably relied, to its detriment, upon the Count LI Defendants' material misrepresentations concerning New Century's eligibility to receive No-Fault reimbursement in paying numerous bills relating to health care services purportedly provided to New Century's patients, each of whom had assigned to New Century the right for New Century to avail itself of its patients' available No-Fault insurance coverage to pay New Century's charges.

2148.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made to New Century—in excess of $43,800.00—for health care expenses relating to services rendered to Allstate claimants, even though New Century was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT LII
## UNJUST ENRICHMENT
### (Ellina Matskina, L.Ac., Andrey Anikeyev, and Bay Needle Care, Acupuncture P.C.)

2149.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2150.   As alleged herein, Defendants Ellina Matskina, L.Ac., Andrey Anikeyev, and Bay Needle Care, Acupuncture P.C. (collectively, the "Count LII Defendants"), conspired to induce

Allstate to make numerous and substantial payments to Bay Needle Care, Acupuncture P.C. ("Bay Needle") pursuant to New York's No-Fault laws.

2151.   As alleged herein, Bay Needle was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Bay Needle was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2152.   When Allstate paid Bay Needle, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LII Defendants, or persons working under their control, made concerning Bay Needle's reimbursement eligibility under New York's No-Fault laws.

2153.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Bay Needle during the course of the scheme constitutes a benefit that the Count LII Defendants aggressively caused Bay Needle to seek and voluntarily accept.

2154.   Throughout the course of their scheme, the Count LII Defendants caused Bay Needle to wrongfully obtain a multitude of payments from Allstate—in excess of $224,700.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2155.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Bay Needle, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Bay Needle.

2156.   As a direct and proximate result of Anikeyev's unlawful control over Bay Needle, at no point was Bay Needle ever eligible for reimbursement under New York's No-Fault laws.

318

2157. Throughout the duration of this scheme, the Count LII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Bay Needle.

2158. Retention of those benefits by the Count LII Defendants would violate fundamental principles of justice, equity and good conscience.

### COUNT LIII
### UNJUST ENRICHMENT
**(Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Karina K. Acupuncture P.C.)**

2159. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2160. As alleged herein, Defendants Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Karina K. Acupuncture P.C. (collectively, the "Count LIII Defendants"), conspired to induce Allstate to make numerous and substantial payments to Karina K. Acupuncture P.C. ("Karina K.") pursuant to New York's No-Fault laws.

2161. As alleged herein, Karina K. was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Karina K. was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2162. When Allstate paid Karina K., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LIII Defendants, or persons working under their control, made concerning Karina K.'s reimbursement eligibility under New York's No-Fault laws.

2163.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Karina K. during the course of the scheme constitutes a benefit that the Count LIII Defendants aggressively caused Karina K. to seek and voluntarily accept.

2164.   Throughout the course of their scheme, the Count LIII Defendants caused Karina K. to wrongfully obtain a multitude of payments from Allstate—in excess of $537,100.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2165.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Karina K., including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Karina K.

2166.   As a direct and proximate result of Anikeyev's unlawful control over Karina K., at no point was Karina K. ever eligible for reimbursement under New York's No-Fault laws.

2167.   Throughout the duration of this scheme, the Count LIII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Karina K.

2168.   Retention of those benefits by the Count LIII Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT LIV**
**UNJUST ENRICHMENT**
**(Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev, and Healthy Way**
**Acupuncture P.C.)**

2169.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2170.   As alleged herein, Defendants Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev, and Healthy Way Acupuncture P.C. (collectively, the "Count LIV Defendants"), conspired to induce Allstate to make numerous and substantial payments to Healthy Way Acupuncture P.C. ("Healthy Way") pursuant to New York's No-Fault laws.

2171.   As alleged herein, Healthy Way was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Healthy Way was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2172.   When Allstate paid Healthy Way, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LIV Defendants, or persons working under their control, made concerning Healthy Way's reimbursement eligibility under New York's No-Fault laws.

2173.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Healthy Way during the course of the scheme constitutes a benefit that the Count LIV Defendants aggressively caused Healthy Way to seek and voluntarily accept.

2174.   Throughout the course of their scheme, the Count LIV Defendants Healthy Way to wrongfully obtain a multitude of payments from Allstate—in excess of $613,100.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2175.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Healthy Way, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Healthy Way.

2176.   As a direct and proximate result of Anikeyev's unlawful control over Healthy Way, at no point was Healthy Way ever eligible for reimbursement under New York's No-Fault laws.

2177.   Throughout the duration of this scheme, the Count LIV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Healthy Way.

2178.   Retention of those benefits by the Count LIV Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT LV
## UNJUST ENRICHMENT
### (Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Alpha Acupuncture P.C.)

2179.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2180.   As alleged herein, Defendants Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Alpha Acupuncture P.C. (collectively, the "Count LV Defendants"), conspired to induce Allstate to make numerous and substantial payments to Alpha Acupuncture P.C. ("Alpha") pursuant to New York's No-Fault laws.

2181.   As alleged herein, Alpha was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Alpha was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2182.   When Allstate paid Alpha, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LV Defendants, or persons working under their control, made concerning Alpha's reimbursement eligibility under New York's No-Fault laws.

2183.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Alpha during the course of the scheme constitutes a benefit that the Count LV Defendants aggressively caused Alpha to seek and voluntarily accept.

2184.   Throughout the course of their scheme, the Count LV Defendants caused Alpha to wrongfully obtain a multitude of payments from Allstate—in excess of $250,300.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2185.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Alpha, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Alpha.

2186.   As a direct and proximate result of Anikeyev's unlawful control over Alpha, at no point was Alpha ever eligible for reimbursement under New York's No-Fault laws.

2187.   Throughout the duration of this scheme, the Count LV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived,

323

in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Alpha.

2188.   Retention of those benefits by the Count LV Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT LVI
## UNJUST ENRICHMENT
### (Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev, and Lotus Acupuncture P.C.)

2189.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2190.   As alleged herein, Defendants Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev, and Lotus Acupuncture P.C. (collectively, the "Count LVI Defendants"), conspired to induce Allstate to make numerous and substantial payments to Lotus Acupuncture P.C. ("Lotus") pursuant to New York's No-Fault laws.

2191.   As alleged herein, Lotus was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Lotus was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2192.   When Allstate paid Lotus, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LVI Defendants, or persons working under their control, made concerning Lotus's reimbursement eligibility under New York's No-Fault laws.

2193.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Lotus during the course of the scheme constitutes a benefit that the Count LVI Defendants aggressively caused Lotus to seek and voluntarily accept.

2194.   Throughout the course of their scheme, the Count LVI Defendants caused Lotus to wrongfully obtain a multitude of payments from Allstate—in excess of $788,300.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2195.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Lotus, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Lotus.

2196.   As a direct and proximate result of Anikeyev's unlawful control over Lotus, at no point was Lotus ever eligible for reimbursement under New York's No-Fault laws.

2197.   Throughout the duration of this scheme, the Count LVI Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Lotus.

2198.   Retention of those benefits by the Count LVI Defendants would violate fundamental principles of justice, equity and good conscience.

### COUNT LVII
### UNJUST ENRICHMENT
### (Yury Tsukanov, L.Ac., Andrey Anikeyev, and Sunrise Acupuncture P.C.)

2199.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2200.   As alleged herein, Defendants Yury Tsukanov, L.Ac., Andrey Anikeyev, and Sunrise Acupuncture P.C. (collectively, the "Count LVII Defendants"), conspired to induce

Allstate to make numerous and substantial payments to Sunrise Acupuncture P.C. ("Sunrise") pursuant to New York's No-Fault laws.

2201.  As alleged herein, Sunrise was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Sunrise was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2202.  When Allstate paid Sunrise, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LVII Defendants, or persons working under their control, made concerning Sunrise's reimbursement eligibility under New York's No-Fault laws.

2203.  Each and every No-Fault reimbursement payment that Allstate was caused to make to Sunrise during the course of the scheme constitutes a benefit that the Count LVII Defendants aggressively caused Sunrise to seek and voluntarily accept.

2204.  Throughout the course of their scheme, the Count LVII Defendants caused Sunrise to wrongfully obtain a multitude of payments from Allstate—in excess of $672,500.00— as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2205.  Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Sunrise, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Sunrise.

2206.  As a direct and proximate result of Anikeyev's unlawful control over Sunrise, at no point was Sunrise ever eligible for reimbursement under New York's No-Fault laws.

2207. Throughout the duration of this scheme, the Count LVII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Sunrise.

2208. Retention of those benefits by the Count LVII Defendants would violate fundamental principles of justice, equity and good conscience.

### COUNT LVIII
### UNJUST ENRICHMENT
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Easy Care Acupuncture P.C.)**

2209. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2210. As alleged herein, Defendants Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Easy Care Acupuncture P.C. (collectively, the "Count LVIII Defendants"), conspired to induce Allstate to make numerous and substantial payments to Easy Care Acupuncture P.C. ("Easy Care") pursuant to New York's No-Fault laws.

2211. As alleged herein, Easy Care was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Easy Care was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2212. When Allstate paid Easy Care, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LVIII Defendants, or persons working under their control, made concerning Easy Care's reimbursement eligibility under New York's No-Fault laws.

2213.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Easy Care during the course of the scheme constitutes a benefit that the Count LVIII Defendants aggressively caused Easy Care to seek and voluntarily accept.

2214.   Throughout the course of their scheme, the Count LVIII Defendants caused Easy Care to wrongfully obtain a multitude of payments from Allstate—in excess of $547,800.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2215.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Easy Care, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Easy Care.

2216.   As a direct and proximate result of Anikeyev's unlawful control over Easy Care, at no point was Easy Care ever eligible for reimbursement under New York's No-Fault laws.

2217.   Throughout the duration of this scheme, the Count LVIII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Easy Care.

2218.   Retention of those benefits by the Count LVIII Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT LIX**
**UNJUST ENRICHMENT**
**(Roman Shimunov, L.Ac., Andrey Anikeyev, and Shirom Acupuncture P.C.)**

2219.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2220.  As alleged herein, Defendants Roman Shimunov, L.Ac., Andrey Anikeyev, and Shirom Acupuncture P.C. (collectively, the "Count LIX Defendants"), conspired to induce Allstate to make numerous and substantial payments to Shirom Acupuncture P.C. ("Shirom") pursuant to New York's No-Fault laws.

2221.  As alleged herein, Shirom was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Shirom was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2222.  When Allstate paid Shirom, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LIX Defendants, or persons working under their control, made concerning Shirom's reimbursement eligibility under New York's No-Fault laws.

2223.  Each and every No-Fault reimbursement payment that Allstate was caused to make to Shirom during the course of the scheme constitutes a benefit that the Count LIX Defendants aggressively caused Shirom to seek and voluntarily accept.

2224.  Throughout the course of their scheme, the Count LIX Defendants caused Shirom to wrongfully obtain a multitude of payments from Allstate—in excess of $404,000.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2225.  Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture

services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Shirom, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Shirom.

2226.  As a direct and proximate result of Anikeyev's unlawful control over Shirom, at no point was Shirom ever eligible for reimbursement under New York's No-Fault laws.

2227.  Throughout the duration of this scheme, the Count LIX Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Shirom.

2228.  Retention of those benefits by the Count LIX Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT LX
## UNJUST ENRICHMENT
### (Ilona Shoshana Abitbol, L.Ac., Andrey Anikeyev, and Urban Well Acupuncture P.C.)

2229.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2230.  As alleged herein, Defendants Ilona Shoshana Abitbol, L.Ac., Andrey Anikeyev, and Urban Well Acupuncture P.C. (collectively, the "Count LX Defendants"), conspired to induce Allstate to make numerous and substantial payments to Urban Well Acupuncture P.C. ("Urban Well") pursuant to New York's No-Fault laws.

2231.   As alleged herein, Urban Well was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Urban Well was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2232.   When Allstate paid Urban Well, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LX Defendants, or persons working under their control, made concerning Urban Well's reimbursement eligibility under New York's No-Fault laws.

2233.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Urban Well during the course of the scheme constitutes a benefit that the Count LX Defendants aggressively caused Urban Well to seek and voluntarily accept.

2234.   Throughout the course of their scheme, the Count LX Defendants caused Urban Well to wrongfully obtain a multitude of payments from Allstate—in excess of $328,900.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2235.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Urban Well, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Urban Well.

2236.   As a direct and proximate result of Anikeyev's unlawful control over Urban Well, at no point was Urban Well ever eligible for reimbursement under New York's No-Fault laws.

2237.   Throughout the duration of this scheme, the Count LX Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived,

331

in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Urban Well.

2238.   Retention of those benefits by the Count LX Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT LXI**
**UNJUST ENRICHMENT**
**(Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Acupuncture Approach, P.C.)**

2239.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2240.   As alleged herein, Defendants Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Acupuncture Approach, P.C. (collectively, the "Count LXI Defendants"), conspired to induce Allstate to make numerous and substantial payments to Acupuncture Approach, P.C. ("Approach") pursuant to New York's No-Fault laws.

2241.   As alleged herein, Approach was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Approach was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2242.   When Allstate paid Approach, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXI Defendants, or persons working under their control, made concerning Approach's reimbursement eligibility under New York's No-Fault laws.

2243.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Approach during the course of the scheme constitutes a benefit that the Count LXI Defendants aggressively caused Approach to seek and voluntarily accept.

332

2244. Throughout the course of their scheme, the Count LXI Defendants caused Approach to wrongfully obtain a multitude of payments from Allstate—in excess of $457,400.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2245. Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Approach, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Approach.

2246. As a direct and proximate result of Anikeyev's unlawful control over Approach, at no point was Approach ever eligible for reimbursement under New York's No-Fault laws.

2247. Throughout the duration of this scheme, the Count LXI Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Approach.

2248. Retention of those benefits by the Count LXI Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT LXII
## UNJUST ENRICHMENT
### (Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and SML Acupuncture P.C.)

2249. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2250.  As alleged herein, Defendants Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and SML Acupuncture P.C. (collectively, the "Count LXII Defendants"), conspired to induce Allstate to make numerous and substantial payments to SML Acupuncture P.C. ("SML") pursuant to New York's No-Fault laws.

2251.  As alleged herein, SML was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, SML was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2252.  When Allstate paid SML, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXII Defendants, or persons working under their control, made concerning SML's reimbursement eligibility under New York's No-Fault laws.

2253.  Each and every No-Fault reimbursement payment that Allstate was caused to make to SML during the course of the scheme constitutes a benefit that the Count LXII Defendants aggressively caused SML to seek and voluntarily accept.

2254.  Throughout the course of their scheme, the Count LXII Defendants caused SML to wrongfully obtain a multitude of payments from Allstate—in excess of $147,000.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2255.  Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control SML, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by SML.

334

2256.   As a direct and proximate result of Anikeyev's unlawful control over SML, at no point was SML ever eligible for reimbursement under New York's No-Fault laws.

2257.   Throughout the duration of this scheme, the Count LXII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to SML.

2258.   Retention of those benefits by the Count LXII Defendants would violate fundamental principles of justice, equity and good conscience.

<u>**COUNT LXIII**</u>
**UNJUST ENRICHMENT**
**(Roman Shimunov, L.Ac., Andrey Anikeyev, and Bronx Acupuncture Therapy P.C.)**

2259.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2260.   As alleged herein, Defendants Roman Shimunov, L.Ac., Andrey Anikeyev, and Bronx Acupuncture Therapy P.C. (collectively, the "Count LXIII Defendants"), conspired to induce Allstate to make numerous and substantial payments to Bronx Acupuncture Therapy P.C. ("Bronx Therapy") pursuant to New York's No-Fault laws.

2261.   As alleged herein, Bronx Therapy was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Bronx Therapy was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2262.   When Allstate paid Bronx Therapy, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that

the Count LXIII Defendants, or persons working under their control, made concerning Bronx Therapy's reimbursement eligibility under New York's No-Fault laws.

2263.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Bronx Therapy during the course of the scheme constitutes a benefit that the Count LXIII Defendants aggressively caused Bronx Therapy to seek and voluntarily accept.

2264.   Throughout the course of their scheme, the Count LXIII Defendants caused Bronx Therapy to wrongfully obtain a multitude of payments from Allstate—in excess of $229,600.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2265.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Bronx Therapy, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Bronx Therapy.

2266.   As a direct and proximate result of Anikeyev's unlawful control over Bronx Therapy, at no point was Bronx Therapy ever eligible for reimbursement under New York's No-Fault laws.

2267.   Throughout the duration of this scheme, the Count LXIII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Bronx Therapy.

336

2268.   Retention of those benefits by the Count LXIII Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT LXIV**
**UNJUST ENRICHMENT**
**(Igor Shkapenyuk, L.Ac., Andrey Anikeyev, and TC Acupuncture P.C.)**

2269.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2270.   As alleged herein, Defendants Igor Shkapenyuk, L.Ac., Andrey Anikeyev, and TC Acupuncture P.C. (collectively, the "Count LXIV Defendants"), conspired to induce Allstate to make numerous and substantial payments to TC Acupuncture P.C. ("TC") pursuant to New York's No-Fault laws.

2271.   As alleged herein, TC was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, TC was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2272.   When Allstate paid TC, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXIV Defendants, or persons working under their control, made concerning TC's reimbursement eligibility under New York's No-Fault laws.

2273.   Each and every No-Fault reimbursement payment that Allstate was caused to make to TC during the course of the scheme constitutes a benefit that the Count LXIV Defendants aggressively caused TC to seek and voluntarily accept.

2274.   Throughout the course of their scheme, the Count LXIV Defendants caused TC to wrongfully obtain a multitude of payments from Allstate—in excess of $207,600.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

337

2275.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control TC, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by TC.

2276.   As a direct and proximate result of Anikeyev's unlawful control over TC, at no point was TC ever eligible for reimbursement under New York's No-Fault laws.

2277.   Throughout the duration of this scheme, the Count LXIV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to TC.

2278.   Retention of those benefits by the Count LXIV Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT LXV**
**UNJUST ENRICHMENT**
**(Natalya Kornilova, L.Ac., Andrey Anikeyev, and Acuhealth Acupuncture P.C.)**

2279.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2280.   As alleged herein, Defendants Natalya Kornilova, L.Ac., Andrey Anikeyev, and Acuhealth Acupuncture P.C. (collectively, the "Count LXV Defendants"), conspired to induce Allstate to make numerous and substantial payments to Acuhealth Acupuncture P.C. ("Acuhealth") pursuant to New York's No-Fault laws.

2281.  As alleged herein, Acuhealth was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Acuhealth was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2282.  When Allstate paid Acuhealth, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXV Defendants, or persons working under their control, made concerning Acuhealth's reimbursement eligibility under New York's No-Fault laws.

2283.  Each and every No-Fault reimbursement payment that Allstate was caused to make to Acuhealth during the course of the scheme constitutes a benefit that the Count LXV Defendants aggressively caused Acuhealth to seek and voluntarily accept.

2284.  Throughout the course of their scheme, the Count LXV Defendants caused Acuhealth to wrongfully obtain a multitude of payments from Allstate—in excess of $136,900.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2285.  Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Acuhealth, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Acuhealth.

2286.  As a direct and proximate result of Anikeyev's unlawful control over Acuhealth, at no point was Acuhealth ever eligible for reimbursement under New York's No-Fault laws.

2287.  Throughout the duration of this scheme, the Count LXV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Acuhealth.

2288.  Retention of those benefits by the Count LXV Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT LXVI**
**UNJUST ENRICHMENT**
**(Nellya Razzakova, L.Ac., Andrey Anikeyev, and NR Acupuncture P.C.)**

2289.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2290.  As alleged herein, Defendants Nellya Razzakova, L.Ac., Andrey Anikeyev, and NR Acupuncture P.C. (collectively, the "Count LXVI Defendants"), conspired to induce Allstate to make numerous and substantial payments to NR Acupuncture P.C. ("NR") pursuant to New York's No-Fault laws.

2291.  As alleged herein, NR was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, NR was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2292.  When Allstate paid NR, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXVI Defendants, or persons working under their control, made concerning NR's reimbursement eligibility under New York's No-Fault laws.

340

2293.   Each and every No-Fault reimbursement payment that Allstate was caused to make to NR during the course of the scheme constitutes a benefit that the Count LXVI Defendants aggressively caused NR to seek and voluntarily accept.

2294.   Throughout the course of their scheme, the Count LXVI Defendants caused NR to wrongfully obtain a multitude of payments from Allstate—in excess of $48,900.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2295.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control NR, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by NR.

2296.   As a direct and proximate result of Anikeyev's unlawful control over NR, at no point was NR ever eligible for reimbursement under New York's No-Fault laws.

2297.   Throughout the duration of this scheme, the Count LXVI Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to NR.

2298.   Retention of those benefits by the Count LXVI Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT LXVII
## UNJUST ENRICHMENT
### (Yury Tsukanov, L.Ac., Andrey Anikeyev, and Silver Lotus Acupuncture P.C.)

2299.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2300.  As alleged herein, Defendants Yury Tsukanov, L.Ac., Andrey Anikeyev, and Silver Lotus Acupuncture P.C. (collectively, the "Count LXVII Defendants"), conspired to induce Allstate to make numerous and substantial payments to Silver Lotus Acupuncture P.C. ("Silver Lotus") pursuant to New York's No-Fault laws.

2301.  As alleged herein, Silver Lotus was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, Silver Lotus was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2302.  When Allstate paid Silver Lotus, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXVII Defendants, or persons working under their control, made concerning Silver Lotus's reimbursement eligibility under New York's No-Fault laws.

2303.  Each and every No-Fault reimbursement payment that Allstate was caused to make to Silver Lotus during the course of the scheme constitutes a benefit that the Count LXVII Defendants aggressively caused Silver Lotus to seek and voluntarily accept.

2304.  Throughout the course of their scheme, the Count LXVII Defendants caused Silver Lotus to wrongfully obtain a multitude of payments from Allstate—in excess of $788,300.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2305.   Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control Silver Lotus, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by Silver Lotus.

2306.   As a direct and proximate result of Anikeyev's unlawful control over Silver Lotus, at no point was Silver Lotus ever eligible for reimbursement under New York's No-Fault laws.

2307.   Throughout the duration of this scheme, the Count LXVII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Silver Lotus.

2308.   Retention of those benefits by the Count LXVII Defendants would violate fundamental principles of justice, equity and good conscience.

### COUNT LXVIII
### UNJUST ENRICHMENT
#### (Lyubov Kondranina, L.Ac., Andrey Anikeyev, and New Century Acupuncture P.C.)

2309.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2310.   As alleged herein, Defendants Lyubov Kondranina, L.Ac., Andrey Anikeyev, and New Century Acupuncture P.C. (collectively, the "Count LXVIII Defendants"), conspired to

induce Allstate to make numerous and substantial payments to New Century Acupuncture P.C. ("New Century") pursuant to New York's No-Fault laws.

2311. As alleged herein, New Century was never eligible for reimbursement under New York's No-Fault laws because, at all relevant times, New Century was unlawfully operated and controlled by Anikeyev, a non-acupuncturist.

2312. When Allstate paid New Century, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count LXVIII Defendants, or persons working under their control, made concerning New Century's reimbursement eligibility under New York's No-Fault laws.

2313. Each and every No-Fault reimbursement payment that Allstate was caused to make to New Century during the course of the scheme constitutes a benefit that the Count LXVIII Defendants aggressively caused New Century to seek and voluntarily accept.

2314. Throughout the course of their scheme, the Count LXVIII Defendants caused New Century to wrongfully obtain a multitude of payments from Allstate—in excess of $43,800.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

2315. Under New York law, Anikeyev—as a person lacking legal authorization to (a) provide professional acupuncture services, (b) control the provision of professional acupuncture services, and (c) receive any fees or profits derived from the provision of professional acupuncture services—never had any legal right to control New Century, including its account receivables and/or the receipt and disbursement of any professional acupuncture fees and profits obtained by New Century.

344

2316.   As a direct and proximate result of Anikeyev's unlawful control over New Century, at no point was New Century ever eligible for reimbursement under New York's No-Fault laws.

2317.   Throughout the duration of this scheme, the Count LXVIII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to New Century.

2318.   Retention of those benefits by the Count LXVIII Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT LXIX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Failure to Appear for an Examination Under Oath)**
**(Against Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C.)**

2319.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2320.   As described above, PC Defendants Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C. each breached conditions precedent to coverage under the No-Fault laws by failing to appear for EUOs.

2321.   The PC Defendants' conduct of failing to appear for numerous EUOs without any justification is demonstrative of a pattern of willful noncooperation.

345

2322.   These material breaches of the No-Fault laws relieve Allstate of any obligations to reimburse the PC Defendants for the claims submitted to Allstate for which an EUO was noticed.

2323.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants have no rights under the No-Fault laws regarding the claims submitted to Allstate for which an EUO was noticed, and that Allstate is under no duty to pay any claim for which Allstate sought an EUO and for which the PC Defendants failed to appear.

## COUNT LXX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
(Bay Needle Care, Acupuncture P.C.)

2324.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2325.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2326.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Bay Needle Care, Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

346

2327.   Bay Needle Care, Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2328.   Bay Needle Care, Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2329.   Bay Needle Care, Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2330.   A justifiable controversy exists between Allstate and Bay Needle Care, Acupuncture P.C. because Bay Needle Care, Acupuncture P.C. rejects Allstate's ability to deny such claims.

2331.   Allstate has no adequate remedy at law.

2332.   Bay Needle Care, Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Bay Needle Care, Acupuncture P.C.

2333.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Bay Needle Care, Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT LXXI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Karina K. Acupuncture P.C.)

2334.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2335.  To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2336.  In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Karina K. Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2337.  Karina K. Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2338.  Karina K. Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2339.  Karina K. Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2340.  A justifiable controversy exists between Allstate and Karina K. Acupuncture P.C. because Karina K. Acupuncture P.C. rejects Allstate's ability to deny such claims.

2341.  Allstate has no adequate remedy at law.

2342.   Karina K. Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Karina K. Acupuncture P.C.

2343.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Karina K. Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT LXXII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Healthy Way Acupuncture P.C.)**

2344.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2345.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2346.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Healthy Way Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York

Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2347.   Healthy Way Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2348.   Healthy Way Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2349.   Healthy Way Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2350.   A justifiable controversy exists between Allstate and Healthy Way Acupuncture P.C. because Healthy Way Acupuncture P.C. rejects Allstate's ability to deny such claims.

2351.   Allstate has no adequate remedy at law.

2352.   Healthy Way Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Healthy Way Acupuncture P.C.

2353.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Healthy Way Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT LXXIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Alpha Acupuncture P.C.)

2354.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2355.  To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2356.  In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Alpha Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2357.  Alpha Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2358.  Alpha Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2359.  Alpha Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2360.  A justifiable controversy exists between Allstate and Alpha Acupuncture P.C. because Alpha Acupuncture P.C. rejects Allstate's ability to deny such claims.

2361.  Allstate has no adequate remedy at law.

2362.  Alpha Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Alpha Acupuncture P.C.

2363.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Alpha Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

### COUNT LXXIV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Lotus Acupuncture P.C.)

2364.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2365.  To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2366.  In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Lotus Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance

Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2367.  Lotus Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2368.  Lotus Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2369.  Lotus Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2370.  A justifiable controversy exists between Allstate and Lotus Acupuncture P.C. because Lotus Acupuncture P.C. rejects Allstate's ability to deny such claims.

2371.  Allstate has no adequate remedy at law.

2372.  Lotus Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Lotus Acupuncture P.C.

2373.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Lotus Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT LXXV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Sunrise Acupuncture P.C.)

2374.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2375.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2376.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Sunrise Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2377. Sunrise Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2378. Sunrise Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2379. Sunrise Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2380. A justifiable controversy exists between Allstate and Sunrise Acupuncture P.C. because Sunrise Acupuncture P.C. rejects Allstate's ability to deny such claims.

2381.   Allstate has no adequate remedy at law.

354

2382.   Sunrise Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Sunrise Acupuncture P.C.

2383.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Sunrise Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT LXXVI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Easy Care Acupuncture P.C.)

2384.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2385.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2386.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Easy Care Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance

Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2387.   Easy Care Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2388.   Easy Care Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2389.   Easy Care Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2390.   A justifiable controversy exists between Allstate and Easy Care Acupuncture P.C. because Easy Care Acupuncture P.C. rejects Allstate's ability to deny such claims.

2391.   Allstate has no adequate remedy at law.

2392.   Easy Care Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Easy Care Acupuncture P.C.

2393.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Easy Care Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT LXXVII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Shirom Acupuncture P.C.)**

2394.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2395.  To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2396.  In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Shirom Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2397.  Shirom Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2398.  Shirom Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2399.  Shirom Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2400.  A justifiable controversy exists between Allstate and Shirom Acupuncture P.C. because Shirom Acupuncture P.C. rejects Allstate's ability to deny such claims.

2401.  Allstate has no adequate remedy at law.

357

2402.  Shirom Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Shirom Acupuncture P.C.

2403.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Shirom Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT LXXVIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Urban Well Acupuncture P.C.)**

2404.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2405.  To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2406.  In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Urban Well Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance

Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2407.   Urban Well Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2408.   Urban Well Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2409.   Urban Well Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2410.   A justifiable controversy exists between Allstate and Urban Well Acupuncture P.C. because Urban Well Acupuncture P.C. rejects Allstate's ability to deny such claims.

2411.   Allstate has no adequate remedy at law.

2412.   Urban Well Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Urban Well Acupuncture P.C.

2413.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Urban Well Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT LXXIX
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Acupuncture Approach, P.C.)

2414.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2415.  To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2416.  In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Acupuncture Approach, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2417.  Acupuncture Approach, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2418.  Acupuncture Approach, P.C. continues to challenge Allstate's prior claim denials.

2419.  Acupuncture Approach, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2420.  A justifiable controversy exists between Allstate and Acupuncture Approach, P.C. because Acupuncture Approach, P.C. rejects Allstate's ability to deny such claims.

2421.  Allstate has no adequate remedy at law.

2422.  Acupuncture Approach, P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Acupuncture Approach, P.C.

2423.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Acupuncture Approach, P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT LXXX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(SML Acupuncture P.C.)**

2424.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2425.  To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2426.  In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), SML Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance

361

Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2427.   SML Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2428.   SML Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2429.   SML Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2430.   A justifiable controversy exists between Allstate and SML Acupuncture P.C. because SML Acupuncture P.C. rejects Allstate's ability to deny such claims.

2431.   Allstate has no adequate remedy at law.

2432.   SML Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by SML Acupuncture P.C.

2433.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that SML Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT LXXXI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Bronx Acupuncture Therapy P.C.)

2434.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2435.  To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2436.  In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Bronx Acupuncture Therapy P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2437.  Bronx Acupuncture Therapy P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2438.  Bronx Acupuncture Therapy P.C. continues to challenge Allstate's prior claim denials.

2439.  Bronx Acupuncture Therapy P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2440.  A justifiable controversy exists between Allstate and Bronx Acupuncture Therapy P.C. because Bronx Acupuncture Therapy P.C. rejects Allstate's ability to deny such claims.

2441.  Allstate has no adequate remedy at law.

2442.   Bronx Acupuncture Therapy P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Bronx Acupuncture Therapy P.C.

2443.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Bronx Acupuncture Therapy P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT LXXXII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (TC Acupuncture P.C.)

2444.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2445.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2446.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), TC Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance

Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2447.   TC Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2448.   TC Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2449.   TC Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2450.   A justifiable controversy exists between Allstate and TC Acupuncture P.C. because TC Acupuncture P.C. rejects Allstate's ability to deny such claims.

2451.   Allstate has no adequate remedy at law.

2452.   TC Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by TC Acupuncture P.C.

2453.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that TC Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT LXXXIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Acuhealth Acupuncture P.C.)**

2454.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2455.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2456.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Acuhealth Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2457.   Acuhealth Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2458.   Acuhealth Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2459.   Acuhealth Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2460.   A justifiable controversy exists between Allstate and Acuhealth Acupuncture P.C. because Acuhealth Acupuncture P.C. rejects Allstate's ability to deny such claims.

2461.   Allstate has no adequate remedy at law.

2462.   Acuhealth Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Acuhealth Acupuncture P.C.

2463.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Acuhealth Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT LXXXIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (NR Acupuncture P.C.)

2464.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2465.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2466.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), NR Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance

367

Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2467.   NR Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2468.   NR Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2469.   NR Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2470.   A justifiable controversy exists between Allstate and NR Acupuncture P.C. because NR Acupuncture P.C. rejects Allstate's ability to deny such claims.

2471.   Allstate has no adequate remedy at law.

2472.   NR Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by NR Acupuncture P.C.

2473.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that NR Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT LXXXV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Silver Lotus Acupuncture P.C.)**

2474.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2475.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2476.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), Silver Lotus Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2477.   Silver Lotus Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2478.   Silver Lotus Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2479.   Silver Lotus Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2480.   A justifiable controversy exists between Allstate and Silver Lotus Acupuncture P.C. because Silver Lotus Acupuncture P.C. rejects Allstate's ability to deny such claims.

2481.   Allstate has no adequate remedy at law.

369

2482.   Silver Lotus Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Silver Lotus Acupuncture P.C.

2483.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Silver Lotus Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

### COUNT LXXXVI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (New Century Acupuncture P.C.)

2484.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in paragraphs 1 through 1519 as if set forth fully herein.

2485.   To be eligible to receive assigned No-Fault benefits, an assignee provider of professional acupuncture services must adhere to all applicable New York statutes that grant the authority to provide acupuncture services in New York.

2486.   In view of its (a) unlawful corporate structure, (b) unlawful control by a non-acupuncturist (i.e., Anikeyev), and (c) unlawful sharing of professional acupuncture fees with a non-acupuncturist (i.e., Anikeyev), New Century Acupuncture P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional acupuncture services (including, but not limited to, New York

370

Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

2487.   New Century Acupuncture P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

2488.   New Century Acupuncture P.C. continues to challenge Allstate's prior claim denials.

2489.   New Century Acupuncture P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

2490.   A justifiable controversy exists between Allstate and New Century Acupuncture P.C. because New Century Acupuncture P.C. rejects Allstate's ability to deny such claims.

2491.   Allstate has no adequate remedy at law.

2492.   New Century Acupuncture P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by New Century Acupuncture P.C.

2493.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring New Century Acupuncture P.C. at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by a non-acupuncturist, and (c) engaged in the unlawful sharing of fees derived from the provision of professional acupuncture services, and thus has no standing to submit or receive assigned No-Fault benefits.

## XVI.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property & Casualty Insurance Company, Encompass Home & Auto Insurance Company, Encompass Insurance Company of Massachusetts, Encompass Indemnity Company, and Northbrook Indemnity Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BAY NEEDLE CARE, ACUPUNCTURE P.C. ENTERPRISE**
**(Ellina Matskina, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**BAY NEEDLE CARE, ACUPUNCTURE P.C. ENTERPRISE**
**(Ellina Matskina, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

372

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**KARINA K. ACUPUNCTURE P.C. ENTERPRISE**
**(Karina Kolomiytseva, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**KARINA K. ACUPUNCTURE P.C. ENTERPRISE**
**(Karina Kolomiytseva, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### HEALTHY WAY ACUPUNCTURE P.C. ENTERPRISE
### (Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev)

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### HEALTHY WAY ACUPUNCTURE P.C. ENTERPRISE
### (Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev)

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ALPHA ACUPUNCTURE P.C. ENTERPRISE
### (Karina Kolomiytseva, L.Ac. and Andrey Anikeyev)

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ALPHA ACUPUNCTURE P.C. ENTERPRISE
### (Karina Kolomiytseva, L.Ac. and Andrey Anikeyev)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### LOTUS ACUPUNCTURE P.C. ENTERPRISE
### (Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**LOTUS ACUPUNCTURE P.C. ENTERPRISE**
**(Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SUNRISE ACUPUNCTURE P.C. ENTERPRISE**
**(Yury Tsukanov, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SUNRISE ACUPUNCTURE P.C. ENTERPRISE**
**(Yury Tsukanov, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XIII
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EASY CARE ACUPUNCTURE P.C. ENTERPRISE**
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XIV
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**EASY CARE ACUPUNCTURE P.C. ENTERPRISE**
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SHIROM ACUPUNCTURE P.C. ENTERPRISE
### (Roman Shimunov, L.Ac. and Andrey Anikeyev)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SHIROM ACUPUNCTURE P.C. ENTERPRISE
### (Roman Shimunov, L.Ac. and Andrey Anikeyev)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XVII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### URBAN WELL ACUPUNCTURE P.C. ENTERPRISE
### (Ilona Shoshana Abitbol, L.Ac. and Andrey Anikeyev)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

378

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XVIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### URBAN WELL ACUPUNCTURE P.C. ENTERPRISE
### (Ilona Shoshana Abitbol, L.Ac. and Andrey Anikeyev)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XIX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ACUPUNCTURE APPROACH, P.C. ENTERPRISE
### (Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XX
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## ACUPUNCTURE APPROACH, P.C. ENTERPRISE
**(Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XXI
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## SML ACUPUNCTURE P.C. ENTERPRISE
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XXII
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## SML ACUPUNCTURE P.C. ENTERPRISE
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BRONX ACUPUNCTURE THERAPY P.C. ENTERPRISE**
**(Roman Shimunov, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXIV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**BRONX ACUPUNCTURE THERAPY P.C. ENTERPRISE**
**(Roman Shimunov, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

<u>**COUNT XXV**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**TC ACUPUNCTURE P.C. ENTERPRISE**
**(Igor Shkapenyuk, L.Ac. and Andrey Anikeyev)**

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just.

<u>**COUNT XXVI**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**TC ACUPUNCTURE P.C. ENTERPRISE**
**(Igor Shkapenyuk, L.Ac. and Andrey Anikeyev)**

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just.

<u>**COUNT XXVII**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ACUHEALTH ACUPUNCTURE P.C. ENTERPRISE**
**(Natalya Kornilova, L.Ac. and Andrey Anikeyev)**

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXVIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ACUHEALTH ACUPUNCTURE P.C. ENTERPRISE**
**(Natalya Kornilova, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**NR ACUPUNCTURE P.C. ENTERPRISE**
**(Nellya Razzakova, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXX**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**NR ACUPUNCTURE P.C. ENTERPRISE**
**(Nellya Razzakova, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SILVER LOTUS ACUPUNCTURE P.C. ENTERPRISE**
**(Yury Tsukanov, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SILVER LOTUS ACUPUNCTURE P.C. ENTERPRISE**
**(Yury Tsukanov, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**NEW CENTURY ACUPUNCTURE P.C. ENTERPRISE**
**(Lyubov Kondranina, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXIV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**NEW CENTURY ACUPUNCTURE P.C. ENTERPRISE**
**(Lyubov Kondranina, L.Ac. and Andrey Anikeyev)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XXXV**
**COMMON LAW FRAUD**
**(Ellina Matskina, L.Ac., Andrey Anikeyev, and Bay Needle Care, Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXVI
### COMMON LAW FRAUD
**(Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Karina K. Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXVII
### COMMON LAW FRAUD
**(Ellina Matskina, L.Ac., Andrey Anikeyev, and Healthy Way Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXVIII
## COMMON LAW FRAUD
**(Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Alpha Acupuncture P.C.)**

(a)  AWARD Allstate's actual damages in an amount to be determined at trial;

(b)  AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c)  AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)  GRANT all other relief this Court deems just.

## COUNT XXXIX
## COMMON LAW FRAUD
**(Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev, and Lotus Acupuncture P.C.)**

(a)  AWARD Allstate's actual damages in an amount to be determined at trial;

(b)  AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c)  AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)  GRANT all other relief this Court deems just.

## COUNT XL
## COMMON LAW FRAUD
**(Yury Tsukanov, L.Ac., Andrey Anikeyev, and Sunrise Acupuncture P.C.)**

(a)  AWARD Allstate's actual damages in an amount to be determined at trial;

(b)  AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

### COUNT XLI
### COMMON LAW FRAUD
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Easy Care Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

### COUNT XLII
### COMMON LAW FRAUD
**(Roman Shimunov, L.Ac., Andrey Anikeyev, and Shirom Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

### COUNT XLIII
### COMMON LAW FRAUD
**(Ilona Shoshana Abitbol, L.Ac., Andrey Anikeyev, and Urban Well Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

388

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XLIV
## COMMON LAW FRAUD
**(Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Acupuncture Approach, P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XLV
## COMMON-LAW FRAUD
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and SML Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XLVI**
**COMMON LAW FRAUD**
**(Roman Shimunov, L.Ac., Andrey Anikeyev, and Bronx Acupuncture Therapy P.C.)**

(a)  AWARD Allstate's actual damages in an amount to be determined at trial;

(b)  AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c)  AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)  GRANT all other relief this Court deems just.

**COUNT XLVII**
**COMMON LAW FRAUD**
**(Igor Shkapenyuk, L.Ac., Andrey Anikeyev, and TC Acupuncture P.C.)**

(a)  AWARD Allstate's actual damages in an amount to be determined at trial;

(b)  AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c)  AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)  GRANT all other relief this Court deems just.

**COUNT XLVIII**
**COMMON LAW FRAUD**
**(Natalya Kornilova, L.Ac., Andrey Anikeyev, and Acuhealth Acupuncture P.C.)**

(a)  AWARD Allstate's actual damages in an amount to be determined at trial;

(b)  AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c)  AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

390

(d) GRANT all other relief this Court deems just.

## COUNT XLIX
## COMMON LAW FRAUD
**(Nellya Razzakova, L.Ac., Andrey Anikeyev, and NR Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT L
## COMMON LAW FRAUD
**(Yury Tsukanov, L.Ac., Andrey Anikeyev, and Silver Lotus Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT LI
## COMMON LAW FRAUD
**(Lyubov Kondranina, L.Ac., Andrey Anikeyev, and New Century Acupuncture P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

### COUNT LII
### UNJUST ENRICHMENT
**(Ellina Matskina, L.Ac., Andrey Anikeyev, and Bay Needle Care, Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT LIII
### UNJUST ENRICHMENT
**(Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Karina K. Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT LIV
### UNJUST ENRICHMENT
**(Ellina Matskina, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev, and Healthy Way Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

### COUNT LV
### UNJUST ENRICHMENT
**(Karina Kolomiytseva, L.Ac., Andrey Anikeyev, and Alpha Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT LVI
### UNJUST ENRICHMENT
**(Natalya Kornilova, L.Ac., Oksana Lendel, L.Ac., Andrey Anikeyev, and Lotus Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT LVII
### UNJUST ENRICHMENT
**(Yury Tsukanov, L.Ac., Andrey Anikeyev, and Sunrise Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT LVIII
### UNJUST ENRICHMENT
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Easy Care Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT LIX
### UNJUST ENRICHMENT
**(Roman Shimunov, L.Ac., Andrey Anikeyev, and Shirom Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT LX
## UNJUST ENRICHMENT
**(Ilona Shoshana Abitbol, L.Ac., Andrey Anikeyev, and Urban Well Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.


## COUNT LXI
## UNJUST ENRICHMENT
**(Dimitry Zapolsky, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and Acupuncture Approach, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.


## COUNT LXII
## UNJUST ENRICHMENT
**(Ada Kulagina, L.Ac., Valentina Anikeyeva, L.Ac., Andrey Anikeyev, and SML Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.


## COUNT LXIII
## UNJUST ENRICHMENT
**(Roman Shimunov, L.Ac., Andrey Anikeyev, and Bronx Acupuncture Therapy P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT LXIV
## UNJUST ENRICHMENT
**(Igor Shkapenyuk, L.Ac., Andrey Anikeyev, and TC Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial;

 and

(b) GRANT all other relief this Court deems just.

## COUNT LXV
## UNJUST ENRICHMENT
**(Natalya Kornilova, L.Ac., Andrey Anikeyev, and Acuhealth Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial;

 and

(b) GRANT all other relief this Court deems just.

## COUNT LXVI
## UNJUST ENRICHMENT
**(Nellya Razzakova, L.Ac., Andrey Anikeyev, and NR Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial;

 and

(b) GRANT all other relief this Court deems just.

## COUNT LXVII
## UNJUST ENRICHMENT
**(Yury Tsukanov, L.Ac., Andrey Anikeyev, and Silver Lotus Acupuncture P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial;

 and

(b) GRANT all other relief this Court deems just.

395

## COUNT LXVIII
### UNJUST ENRICHMENT
**(Lyubov Kondranina, L.Ac., Andrey Anikeyev, and New Century Acupuncture P.C.)**

(a)  AWARD Allstate's actual and consequential damages to be determined at trial;

and

(b)  GRANT all other relief this Court deems just.

## COUNT LXIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Failure to Appear for an Examination Under Oath)**
**(Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C.)**

(a)  DECLARE that PC Defendants, Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C., each breached a condition precedent to coverage by failing to appear, on numerous occasions, for duly noticed and reasonably requested EUOs without any reasonable justification, thus constituting a pattern of willful noncooperation;

(b)  DECLARE that the intentional failure of PC Defendants, Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C., to appear for these duly noticed and reasonably requested EUOs caused each entity to lose its No-Fault reimbursement eligibility with respect to certain claims submitted to Allstate on

behalf of their patients, including, but not necessarily limited to, those claims listed in the chart annexed at Exhibit 19;

(c) DECLARE that Allstate has no duty to pay any claim submitted by PC Defendants, Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C., for which Allstate sought an EUO, and for which PC Defendants, Acupuncture Approach P.C., Bronx Acupuncture Therapy P.C., Easy Care Acupuncture P.C., Healthy Way Acupuncture P.C., Karina K. Acupuncture P.C., Lotus Acupuncture P.C., Shirom Acupuncture P.C., and Sunrise Acupuncture P.C., failed to appear, including, but not necessarily limited to, those claims listed in the chart annexed at Exhibit 19; and

(d) GRANT all other relief this Court deems just and appropriate.

### COUNT LXX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Bay Needle Care, Acupuncture P.C.)

(a) DECLARE that Bay Needle Care, Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Bay Needle Care, Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Bay Needle Care, Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Karina K. Acupuncture P.C.)

(a) DECLARE that Karina K. Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Karina K. Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Karina K. Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Healthy Way Acupuncture P.C.)

(a) DECLARE that Healthy Way Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

398

(b) DECLARE that Healthy Way Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Healthy Way Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Alpha Acupuncture P.C.)

(a) DECLARE that Alpha Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Alpha Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Alpha Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Lotus Acupuncture P.C.)

(a) DECLARE that Lotus Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local

399

licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Lotus Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Lotus Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Sunrise Acupuncture P.C.)

(a) DECLARE that Sunrise Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Sunrise Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Sunrise Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXVI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Easy Care Acupuncture P.C.)

(a) DECLARE that Easy Care Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a

400

result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Easy Care Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Easy Care Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXVII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Shirom Acupuncture P.C.)**

(a) DECLARE that Shirom Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Shirom Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Shirom Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXVIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
#### (Urban Well Acupuncture P.C.)

(a) DECLARE that Urban Well Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Urban Well Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Urban Well Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
#### (Acupuncture Approach, P.C.)

(a) DECLARE that Acupuncture Approach, P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Acupuncture Approach, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Acupuncture Approach, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXX
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (SML Acupuncture P.C.)

(a) DECLARE that SML Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that SML Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by SML Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXXI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Bronx Acupuncture Therapy P.C.)

(a) DECLARE that Bronx Acupuncture Therapy P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Bronx Acupuncture Therapy P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Bronx Acupuncture Therapy P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(TC Acupuncture P.C.)**

(a) DECLARE that TC Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that TC Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by TC Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT LXXXIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Acuhealth Acupuncture P.C.)**

(a) DECLARE that Acuhealth Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Acuhealth Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Acuhealth Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

### COUNT LXXXIV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (NR Acupuncture P.C.)

(a) DECLARE that NR Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that NR Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by NR Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

### COUNT LXXXV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Silver Lotus Acupuncture P.C.)

(a) DECLARE that Silver Lotus Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that Silver Lotus Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by Silver Lotus Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT LXXXVI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
#### (New Century Acupuncture P.C.)

(a) DECLARE that New Century Acupuncture P.C. at all relevant times, has been unlawfully organized, controlled, and/or operated by a non-acupuncturist, and as a result, has been caused to operate in violation of at least one New York State and/or local licensing requirement necessary to provide professional acupuncture services in New York;

(b) DECLARE that New Century Acupuncture P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously denied and/or future No-Fault insurance claims submitted by New Century Acupuncture P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Michael W. Whitcher (MW 7455)
mwhitcher@smithbrink.com
Shauna L. Sullivan (SS5624)
ssullivan@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
Ph:  (347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Fire & Casualty Insurance Company, and*
*Northbrook Indemnity Company*

Dated:  October 12, 2016